**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

| | |
|---|---|
| THE STATE OF LOUISIANA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. FOOD AND DRUG ADMINISTRATION, *et al.*, <br><br> *Defendants*. | Civil Action No. 6:25-cv-01491 <br><br> Judge: David C. Joseph <br><br> Mag. Judge: David J. Ayo |

**DECLARATION OF EVAN MASINGILL**

I, Evan Masingill, declare as follows:

1. I am the President and Chief Executive Officer of GenBioPro Inc. I make this declaration in support of GenBioPro's Motion to Intervene and its Opposition to Plaintiffs' Motion for Preliminary Relief under 5 U.S.C. § 705. If called to testify, I would testify competently to all of the statements in this Declaration.

2. GenBioPro is a privately held pharmaceutical company founded in 2011.

3. Between 2011 and 2019, GenBioPro invested several million dollars in working to bring to market a generic version of the drug mifepristone. That investment was necessary to satisfy requirements set by the U.S. Food and Drug Administration (FDA) for approval of an Abbreviated New Drug Application (ANDA) to sell a generic drug.

4. FDA approved GenBioPro's ANDA for generic mifepristone on April 11, 2019, and GenBioPro continues to hold that ANDA.

1

5. GenBioPro sells only generic mifepristone and misoprostol; it sells no other products. Sales of mifepristone account for the majority of GenBioPro's revenue.

6. GenBioPro currently manufactures and distributes mifepristone according to FDA's Risk Evaluation and Mitigation Strategy ("REMS"), which FDA updated in 2023. The 2023 REMS update, among other things, formally removed a requirement in the prior version of the REMS that mifepristone could be dispensed only in-person in certain healthcare settings, specifically clinics, medical offices, and hospitals. That in-person dispensing requirement, while it was in effect, meant that mifepristone could not be dispensed by pharmacies.

7. I understand that Plaintiffs in this case have asked the Court to suspend, vacate, or otherwise enjoin the 2023 REMS in a way that would reimpose the in-person dispensing requirement, including on a preliminary basis before any final rulings in the litigation. Doing so would have immediate and irreparable consequences for GenBioPro's business. Moreover, if the Court were to suspend the 2023 REMS, but that suspension were later lifted, modified, vacated, or or reversed (causing the 2023 REMS to go back into effect), GenBioPro would have no way to recover the revenue that it lost while the suspension was in effect.

8. In reliance on FDA's 2023 REMS, GenBioPro adapted its distribution model to incorporate a new system of pharmacy-based distribution.

9. GenBioPro's efforts toward adapting the pharmacy distribution model required hundreds (if not thousands) of internal staff hours over an 18-month period to redesign GenBioPro's supply chain and compliance operations. Those efforts included, among many other things, negotiating contracts with distributors, onboarding certified pharmacies, overhauling our information-technology and order-tracking systems, re-training the sales team, re-designing the company website and customer interface, and building new distribution and logistics frameworks.

The endeavor was so significant that we at GenBioPro considered the project to be a product "re-launch."

10. Currently, a significant portion of GenBioPro's total sales are to pharmacies. As such, a suspension of the 2023 REMS and reimposition of the in-person dispensing requirement would have an immediate effect of cutting off sales to pharmacies, and therefore cutting off a substantial portion of GenBioPro's total revenue.

11. Suspending the 2023 REMS would interfere with the entire market for mifepristone. For instance, in-person clinics would see a dramatic influx of patients who must travel to those clinics to obtain the medication in person. Given the inherent limitations on the capacity of the existing clinic network to serve patients in person, there is likely a ceiling on the amount of additional clinic sales that GenBioPro could make in response to a suspension of the 2023 REMS. Any additional sales to clinics could not offset lost pharmacy sales.

12. Any court-ordered suspension of the 2023 REMS would cause significant uncertainty about whether GenBioPro would be permitted to continue selling existing mifepristone stock pending FDA's issuance of new REMS and/or applicable guidance. Accordingly, the immediate impacts of a suspension could be disruptive nationwide.

13. A suspension of the 2023 REMS would also harm GenBioPro because the drop in sales may force GenBioPro to scale back procurement and other internal operations. If the suspension is later lifted and the 2023 REMS go back into effect, GenBioPro would need to incur many of the same costs that it previously expended to adapt to the 2023 REMS (as detailed in paragraph 9 above). In addition, GenBioPro would incur significant delays to ramp back up to the level of operations it was at pre-suspension.

14. A suspension of the 2023 REMS would be particularly disruptive and costly for the pharmacy-specific aspects of GenBioPro's operations. For instance, certain of GenBioPro's distribution contracts are specific to pharmacies, meaning they would need to be either cancelled or paused if pharmacy dispensing were suspended.

15. To the extent a suspension of the 2023 REMS requires changes to the REMS-related documents (such as prescriber and patient agreements), GenBioPro would need to expend time and resources updating those documents. And to the extent a suspension of the 2023 REMS requires changes to the product's labeling, GenBioPro will incur significant expense creating new labels for its product and potentially even re-labeling the inventory that it has already produced. All of these costs would be unnecessary and unrecoverable if the suspension of the 2023 REMS were later lifted, modified, vacated, or reversed (causing the 2023 REMS to go back into effect).

16. I understand that issues have been raised in this litigation about the reporting of adverse events to FDA. As an ANDA holder, GenBioPro is required to and does submit annual reports to FDA detailing all adverse event reports that it receives regarding mifepristone. GenBioPro also submits any serious and unexpected adverse drug experiences within 15 days of receipt. The first page of GenBioPro's mifepristone label also informs prescribers and patients how to report any negative side effects to GenBioPro or to FDA directly, consistent with federal law and regulations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: 03-Feb-26



Evan Masingill