# EXHIBIT B



July 3, 2025

***VIA ELECTRONIC SUBMISSION ([WWW.REGULATIONS.GOV](WWW.REGULATIONS.GOV))***

Division of Dockets Management
U.S. Food and Drug Administration
Department of Health and Human Services
5630 Fishers Lane, Rm. 1061
Rockville, MD 20852

**CITIZEN PETITION**

The undersigned submits this petition under Section 505 of the Federal Food, Drug, and Cosmetic Act ("FDCA") and 21 C.F.R. § 10.30 to request the Commissioner of Food and Drugs to: (1) refrain from taking any action that would reduce patient access to the drug mifepristone and/or increase the burdens associated with prescribing or dispensing mifepristone, absent new robust scientific or clinical evidence that meets applicable statutory standards warranting such a change; and (2) confirm that any steps that may be taken to modify, suspend, or withdraw FDA approval for mifepristone, including in response to any court order, will follow all applicable rules and procedures for any withdrawal or suspension required under the Administrative Procedure Act ("APA"), the FDCA, and implementing regulations, and that Petitioner will be permitted to continue to market and sell mifepristone in the United States until all such procedures have been completed.[1]

GenBioPro, Inc. ("Petitioner") markets a generic version of mifepristone, which provides patients with a safe, effective, and non-invasive medication option for terminating a pregnancy. Mifepristone was first approved by the Agency as safe and effective for medically terminating early pregnancies over two decades ago, when FDA approved a New Drug Application ("NDA") for mifepristone tablets marketed under the brand name Mifeprex®.[2] Petitioner has held an FDA-approved Abbreviated New Drug Application ("ANDA") to market generic mifepristone since 2019.[3] In the twenty-five years since the medication's approval, mifepristone's safety and efficacy have been confirmed time and again through FDA's repeated and rigorous review of the underlying scientific data and literature, as well as real-world clinical experience of the millions of American women who have safely terminated their pregnancies with the mifepristone regimen. The robust scientific and clinical record demonstrates that mifepristone is safely used under the mifepristone Risk Evaluation and Mitigation Strategy ("REMS") with Elements to Assure Safe Use ("ETASU") as currently framed. And, as FDA has repeatedly recognized, there is no scientific

---

[1] All articles, references, and sources cited herein are provided in an attached Appendix, in accordance with 21 C.F.R. § 10.20(c).

[2] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., NDA Approval Letter, NDA 020687 (Sept. 28, 2000), [https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.pdf](https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.pdf).

[3] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., ANDA Approval Letter, ANDA 091178 (Apr. 11, 2019), [https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2019/091178Orig1s000ltr.pdf](https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2019/091178Orig1s000ltr.pdf).

1



basis for allegations that administration of mifepristone causes harm to the environment. In light of mifepristone's longstanding safety and effectiveness profile, Petitioner respectfully requests that FDA take no action that would reduce or inhibit patient access to this important medication.[4]

Furthermore, as FDA is well aware, FDA's approvals regarding mifepristone have come under legal challenge, and efforts are underway to seek withdrawal of, or limitations on, Petitioner's ANDA approval. These unfounded attacks on FDA's well-reasoned and appropriate decisions pursuant to its congressional mandate are of grave concern to Petitioner, which has invested considerable effort and resources in reliance on FDA's prior regulatory actions with respect to mifepristone, with the understanding that any possible attempt to withdraw or take other actions with respect to an FDA approval are subject to well-established and legally required FDA processes. Accordingly, Petitioner respectfully requests confirmation that any steps to withdraw or limit FDA's approval of Petitioner's ANDA for mifepristone—whether in effectuation of a court order or otherwise—will follow all applicable procedures afforded by law and regulation to Petitioner as the ANDA holder and that FDA will permit Petitioner to continue marketing and selling mifepristone until those procedures have been completed, as required by law.

Petitioner is aware of recent statements by Department of Health and Human Services ("HHS") Secretary Robert F. Kennedy, Jr. that the Commissioner will undertake a "complete review" of mifepristone and will provide a recommendation to President Trump regarding the mifepristone label and REMS.[5] Petitioner requests that it be provided an opportunity to comment and provide input with respect to any such review, in accordance with Petitioner's rights as the ANDA holder for mifepristone. Additionally, Petitioner requests that, in the course of any such review, FDA ensure that all data reviewed are made public; that the Agency consider the entire body of evidence supporting mifepristone's safety and effectiveness, which reflects over two decades of robust scientific research and the experience of millions of patients; and that FDA consider the content of and attachments to this Petition as part of its review. As the expert agency charged by Congress with evaluating the safety and efficacy of drugs, FDA must adhere to its longstanding scientific and legal standards requiring objective safety data and transparent study methodologies, such that the Agency can continue to engage in scientifically sound, evidence-based decision-making on important matters affecting public health.

---

[4] If anything, the current scientific and medical record may support expanding patient access by revising aspects of the current REMS and ETASU.

[5] *Hearing on Fiscal Year 2026 Department of Health and Human Services Budget: Hearing Before the S. Comm. On Health, Educ., Labor & Pensions*, 119th Cong. (May 4, 2025) (statement of Robert F. Kennedy, Jr., Secretary, Health and Human Services), https://www.help.senate.gov/hearings/hearing-on-fiscal-year-2026-department-of-health-and-human-services-budget (Secretary Kennedy expressing that "at very least the [mifepristone] label should be changed"); *see also* Amna Nawaz, *What the new FDA commissioner says about possible restrictions on abortion medication*, PBS News (Apr 24, 2025), https://www.pbs.org/newshour/show/what-the-new-fda-commissioner-says-about-possible-restrictions-on-abortion-medication (reporting that the Commissioner stated he has "no plans to take action on mifepristone"); Letter from Martin A. Makary, Comm'r of Food & Drugs, U.S. Food & Drug Admin., to Senator Josh Hawley (June 2, 2025) (stating that the Commissioner is "committed to conducting a review of mifepristone").



## TABLE OF CONTENTS

A.    ACTION REQUESTED ........................................................................................... 3

B.    STATEMENT OF GROUNDS ................................................................................. 4

   1.    **As FDA Has Repeatedly Found, The Safety and Efficacy of Mifepristone is Well-Established and Supported by Robust Scientific Data** ................................................ 4

     a.    FDA Has Repeatedly Concluded Mifepristone is Supported by Substantial Evidence of Safety and Efficacy ....................................................................................... 4

     b.    Mifepristone Remains Safe and Effective Under the Current REMS ..................... 12

     c.    Unsubstantiated Claims by Abortion Opponents Do Not Justify Imposing Restrictions on Mifepristone Access ................................................................ 15

     d.    FDA Must Avoid Undue Burdens on Patient Access to Mifepristone ..................... 20

   2.    **There is No Scientific Evidence Suggesting that Mifepristone Causes Harm to the Environment** ................................................................................................... 21

   3.    **Any FDA Withdrawal of Petitioner's ANDA Approval Must Follow All Applicable Procedures Afforded by Law and Regulation** ............................................ 26

     a.    FDA's Approval of Petitioner's ANDA is Facing a Legal Challenge..................... 26

     b.    Statute and Regulations Require FDA to Follow Specific Procedures to Withdraw an ANDA ..................................................................................................... 27

     c.    Suspension of Mifepristone Outside FDA Procedure Would Be Unlawful ............. 29

   4.    **Conclusion** ........................................................................................................ 30

C.    ENVIRONMENTAL IMPACT ............................................................................... 30

D.    ECONOMIC IMPACT ........................................................................................... 30

E.    CERTIFICATION ................................................................................................... 30

### A.    ACTION REQUESTED

Petitioner requests that, absent new peer-reviewed studies or otherwise robust scientific or clinical evidence warranting such action, FDA take no action that would reduce patient access to mifepristone and/or increase the burdens associated with prescribing or dispensing mifepristone, including but not limited to any of the following actions:

(1) revoking or suspending the 2000 approval of Mifeprex (NDA 020687) or the 2019 approval of generic mifepristone (ANDA 091178);

(2) adding new ETASU to the current REMS for mifepristone;

(3) reinstating former ETASU that are not part of the current REMS;

(4) making the existing ETASU more onerous;



(5) modifying the REMS or labeling for mifepristone in a manner that is not supported by robust scientific or clinical evidence;

(6) modifying the REMS or labeling for mifepristone based on any scientific or clinical evidence that has not been provided to Petitioner with sufficient time to comment on its validity, relevance, and application to any REMS or labeling modification; or

(7) otherwise restricting healthcare practitioner or patient access to mifepristone without adherence to statutory processes and standards.

Additionally, Petitioner requests that FDA confirm that:

(1) any withdrawal or other adverse action by FDA on the approval of Petitioner's ANDA for mifepristone—whether in effectuation of a court order or otherwise—will follow all applicable procedures and meet all standards afforded by law and regulation to Petitioner as the ANDA holder; and

(2) FDA will permit Petitioner to continue marketing and shipping mifepristone until such procedures have been completed.

### B.    STATEMENT OF GROUNDS

#### 1.    As FDA Has Repeatedly Found, The Safety and Efficacy of Mifepristone is Well-Established and Supported by Robust Scientific Data

As FDA is aware, mifepristone is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.[6] Under the FDA-approved dosing regimen, mifepristone is administered in a single oral dose, followed by buccal administration of misoprostol 24 to 48 hours after taking mifepristone. The label provides that patients should follow up with their healthcare provider approximately 7 to 14 days after taking mifepristone to confirm that complete termination of pregnancy has occurred. Since the medication's approval nearly twenty-five years ago, mifepristone has continued to exhibit a robust safety and efficacy profile, as demonstrated by its FDA approval history and countless peer-reviewed medical studies.

##### a.    FDA Has Repeatedly Concluded Mifepristone is Supported by Substantial Evidence of Safety and Efficacy

For over two decades, FDA has consistently affirmed mifepristone's safety and effectiveness, grounded in rigorous scientific review and real-world data from millions of uses. As the body of evidence supporting its safety and efficacy has grown over time, FDA has appropriately updated mifepristone's conditions of use to remove unduly burdensome restrictions on patient access and the health care delivery system. At every stage, FDA's decisions have been

---

[6] MIFEPREX Prescribing Information (Mar. 23, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/020687Orig1s026lbl.pdf.



based on a comprehensive review of the entire body of scientific evidence, including peer-reviewed clinical studies and robust scientific data, as further outlined below.

*(i)    NDA Approval and REMS*

Mifepristone was first approved by FDA under the brand name Mifeprex in 2000.[7] This approval was based on an extensive body of scientific data substantiating its safety and effectiveness, including three clinical studies involving approximately 2,500 patients.[8] The approval was granted under FDA regulations at 21 C.F.R Part 314 Subpart H, which allowed FDA to impose conditions it deemed necessary to ensure the product's safe use.

In 2008, at the request of several members of Congress, the U.S. Government Accountability Office ("GAO") reviewed FDA's approval of mifepristone and the Agency's oversight of the drug since approval.[9] GAO found that the mifepristone NDA was supported by a four-year analysis by FDA of three clinical studies involving mifepristone, other substantial scientific and medical data, and additional safety data from the prior extensive use of the drug overseas. GAO concluded that FDA's approval process and postmarket oversight of mifepristone was consistent with its processes and postmarket oversight for other Subpart H drugs.

When Congress adopted the REMS framework in 2007, it deemed each drug with existing Subpart H restrictions to have an approved REMS imposing the same restrictions.[10] Congress directed that ETASU imposed under REMS must "not be unduly burdensome on patient access to the drug," and, "to the extent practicable," must "minimize the burden on the health care delivery system."[11] In 2008, FDA reviewed the distribution restrictions set forth in the first FDA-approved label for mifepristone and concluded they were sufficient to constitute an acceptable REMS for

---

[7] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., NDA Approval Letter, NDA 020687 (Sept. 28, 2000), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.pdf. *See also* U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., Medical Review (Sept. 28, 2000), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_medr_P1.pdf and https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_medr_P2.pdf.

[8] MIFEPREX Prescribing Information (Sept. 28, 2000), https://www.accessdata.fda.gov/drugsatfda_docs/label/2000/20687lbl.pdf (describing three clinical trials underlying MIFEPREX 2000 approval). *See also* Irving M. Spitz et al., *Early Pregnancy Termination with Mifepristone and Misoprostol in the United States*, 338 New England J. Med. 1241 (1998).

[9] U.S. Gov't Accountability Off., GAO-08-751, *Food and Drug Administration: Approval and Oversight of the Drug Mifeprex* 15 (2008), https://www.gao.gov/assets/gao-08-751.pdf.

[10] 21 U.S.C. § 331 note.

[11] 21 U.S.C. § 355-1(f)(2).

5



the drug.[12] In 2011, FDA approved a REMS for mifepristone providing for essentially the same requirements previously imposed under Subpart H.[13]

*(ii)*     *2016 Changes*

Fifteen years after FDA's initial approval of Mifeprex, Danco Laboratories, LLC ("Danco"), the NDA holder, submitted a supplemental NDA ("sNDA") to revise Mifeprex's label and REMS in light of the further development of extensive data from dozens of clinical studies.[14] FDA approved most of the proposed modifications in 2016,[15] including: (1) increasing the gestational age limit in the labeling from 49 days to 70 days;[16] (2) reducing the number of required

---

[12] 73 Fed. Reg. 16313 (Mar. 27, 2008).

[13] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., Supplement Approval Letter, NDA 020687/S-014 (June 8, 2011), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2011/020687s014ltr.pdf.

[14] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., Supplement Approval Letter, NDA 020687/S-020 (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2016/020687Orig1s020ltr.pdf.

[15] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., Medical Review, Application No. 020687Orig1s020 (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf (hereinafter "2016 FDA Medical Review").

[16] *Id.* at 32-38, 53-57 & tbls. 6 & 7 (citing Beverly Winikoff et al., *Two Distinct Oral Routes of Misoprostol in Mifepristone Medical Abortion: A Randomized Controlled Trial*, 112 Obstetrics & Gynecology 1303 (2008), https://pubmed.ncbi.nlm.nih.gov/19037040/; Beverly Winikoff et al., *Extending Outpatient Medical Abortion Services Through 70 Days of Gestational Age*, 120 Obstetrics & Gynecology 1070 (2012), https://pubmed.ncbi.nlm.nih.gov/23090524/; Mary Gatter et al., *Efficacy and Safety of Medical Abortion Using Mifepristone and Buccal Misoprostol Through 63 Days*, 91 Contraception 269 (2015), https://pmc.ncbi.nlm.nih.gov/articles/PMC4373977/; Patricio Sanhueza Smith et al., *Safety, Efficacy and Acceptability of Outpatient Mifepristone-Misoprostol Medical Abortion Through 70 Days Since Last Menstrual Period in Public Sector Facilities in Mexico City*, 22 Reprod. Health Matters 75 (2015), https://pubmed.ncbi.nlm.nih.gov/25702071/; Adriana A. Boersma et al., *Mifepristone Followed by Home Administration of Buccal Misoprostol for Medical Abortion Up to 70 Days of Amenorrhoea in a General Practice in Curacao*, 16 Eur. J. Contraception & Reprod. Health Care 61 (2011), https://pubmed.ncbi.nlm.nih.gov/21303309/; Melanie Peña et al., *Efficacy and Acceptability of a Mifepristone-misoprostol Combined Regimen for Early Induced Abortion Among Women in Mexico City*, 127 Int'l J. Gynecology & Obstetrics 82 (2014), https://pubmed.ncbi.nlm.nih.gov/24957534/; Erica Chong et al., *A Randomized Controlled Trial of Different Buccal Misoprostol Doses in Mifepristone Medical Abortion*, 86 Contraception 251 (2012), https://pubmed.ncbi.nlm.nih.gov/22305917/; Hillary Bracken et al., *A Two-pill Sublingual Misoprostol Outpatient Regimen Following Mifepristone for Medical Abortion Through 70 days' LMP: A Prospective Comparative Open-label Trial*, 89 Contraception 181 (2014), https://pubmed.ncbi.nlm.nih.gov/24332431/; Elaine V. Gouk et al., *Medical Termination of Pregnancy at 63-83 Days Gestation*, 106 Brit. J. Obstetrics & Gynaecology 535 (1999), https://pubmed.ncbi.nlm.nih.gov/10426609/; Daniel Grossman et al., *Effectiveness and Acceptability of Medical Abortion Provided Through Telemedicine*, 118 Obstetrics & Gynecology 296 (2011), https://pubmed.ncbi.nlm.nih.gov/21775845/; Mitchell D. Creinin et al., *Mifepristone and Misoprostol Administered Simultaneously Versus 24 Hours Apart for Abortion: A Randomized Controlled Trial,* 109 Obstetrics & Gynecology 885 (2007), https://pubmed.ncbi.nlm.nih.gov/17400850/; Luu Doan Ireland et



in-person visits in the labeling from 3 to 1 (allowing for home administration of misoprostol and remote follow-up);[17] and (3) allowing mifepristone to be prescribed by non-physicians licensed to

---

al., *Medical Compared with Surgical Abortion for Effective Pregnancy Termination in the First Trimester*, 126 Obstetrics & Gynecology 22 (2015), https://pubmed.ncbi.nlm.nih.gov/26241252/).

[17] 2016 FDA Medical Review at 38-41, 44, 65-66 & tbl. 8, (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf (citing Mary Gatter et al., *Efficacy and Safety of Medical Abortion Using Mifepristone and Buccal Misoprostol Through 63 Days*, 91 Contraception 269 (2015), https://pmc.ncbi.nlm.nih.gov/articles/PMC4373977/; Beverly Winikoff et al., *Two Distinct Oral Routes of Misoprostol in Mifepristone Medical Abortion: A Randomized Controlled Trial*, 112 Obstetrics & Gynecology 1303 (2008), https://pubmed.ncbi.nlm.nih.gov/19037040/; Beverly Winikoff et al., *Extending Outpatient Medical Abortion Services Through 70 Days of Gestational Age*, 120 Obstetrics & Gynecology 1070 (2012), https://pubmed.ncbi.nlm.nih.gov/23090524/; Yael Swica et al., *Acceptability of Home Use of Mifepristone for Medical Abortion*, 88 Contraception 122 (2013), https://pubmed.ncbi.nlm.nih.gov/23177917; Karmen S. Louie et al., *Acceptability and Feasibility of Mifepristone Medical Abortion in the Early First Trimester in Azerbaijan*, 19 Eur. J. Contraception & Reprod. Health Care 457 (2014), https://pubmed.ncbi.nlm.nih.gov/25047120/; Melanie Peña et al., *Efficacy and Acceptability of a Mifepristone-misoprostol Combined Regimen for Early Induced Abortion Among Women in Mexico City*, 127 Int'l J. Gynecology & Obstetrics 82 (2014), https://pubmed.ncbi.nlm.nih.gov/24957534/; Hillary Bracken et al., *A Two-pill Sublingual Misoprostol Outpatient Regimen Following Mifepristone for Medical Abortion Through 70 days' LMP: A Prospective Comparative Open-label Trial*, 89 Contraception 181 (2014), https://pubmed.ncbi.nlm.nih.gov/24332431/; Adriana Boersma et al., *Mifepristone Followed by Home Administration of Buccal Misoprostol for Medical Abortion Up to 70 Days of Amenorrhoea in a General Practice in Curacao*, 16 Eur. J. Contraception & Reprod. Health Care 61 (2011), https://pubmed.ncbi.nlm.nih.gov/21303309/; Erica Chong et al., *A Randomized Controlled Trial of Different Buccal Misoprostol Doses in Mifepristone Medical Abortion*, 86 Contraception 251 (2012), https://pubmed.ncbi.nlm.nih.gov/22305917/; Nguyen Thi Nhu Ngoc et al., *Acceptability and Feasibility of Phone Follow-up After Early Medical Abortion in Vietnam: A Randomized Controlled Trial*, 123 Obstetrics & Gynecology 88 (2014), https://pubmed.ncbi.nlm.nih.gov/24463668/; Phillip Goldstone et al., *Early Medical Abortion Using Low-dose Mifepristone Followed by Buccal Misoprostol: A Large Australian Observational Study*, 197 Med. J Austral. 282 (2012), https://pubmed.ncbi.nlm.nih.gov/22938126/; Patricio Sanhueza Smith et al., *Safety, Efficacy and Acceptability of Outpatient Mifepristone-Misoprostol Medical Abortion Through 70 Days Since Last Menstrual Period in Public Sector Facilities in Mexico City*, 22 Reprod. Health Matters 75 (2015), https://pubmed.ncbi.nlm.nih.gov/25702071/; Elizabeth G. Raymond et al., *First-trimester Medical Abortion with Mifepristone 200 mg and Misoprostol: A Systematic Review*, 87 Contraception 26 (2013), https://pubmed.ncbi.nlm.nih.gov/22898359/; Daniel Grossman & Kate Grindlay, *Alternatives to Ultrasound for Follow-up After Medication Abortion: A Systematic Review*, 83 Contraception 504 (2011), https://pubmed.ncbi.nlm.nih.gov/21570546/; Lisa K. Perriera et al., *Feasibility of Telephone Follow-Up After Medical Abortion*, 81 Contraception 143 (2010), https://www.contraceptionjournal.org/article/S0010-7824(09)00387-4/abstract; Christian Fiala et al., *Verifying the Effectiveness of Medical Abortion; Ultrasound Versus hCG Testing*, 109 Eur. J. Obstetrics & Gynecology & Reprod. Biology 190 (2003), https://pubmed.ncbi.nlm.nih.gov/12860340/; Kelsey Lynd et al., *Simplified Medical Abortion Using a Semi-quantitative Pregnancy Test for Home-Based Follow-up*, 121 Int'l J Gynecology & Obstetrics 144 (2013), https://pubmed.ncbi.nlm.nih.gov/23477704/; S.T. Cameron et al., *Can Women Determine the Success of Early Medical Termination of Pregnancy*



prescribe drugs (e.g., nurse practitioners).[18] Before granting the sNDA and REMS modification, FDA undertook a full review of all elements of the mifepristone REMS, finding that "[t]he safety profile of [mifepristone] is well-characterized over 15 years of experience, with known risks occurring rarely; the safety profile has not changed over the period of surveillance."[19] FDA found that medication abortion "has been increasingly used as its efficacy and safety have become well-established by both research and experience, and serious complications have proven to be extremely rare."[20] FDA also found that the rates of serious adverse events associated with the new regimen, including home administration of misoprostol, are "exceedingly low."[21]

In 2018, responding to another request from members of Congress, GAO reviewed FDA's approval of the 2016 changes. It found that FDA had reviewed numerous peer-reviewed published studies, articles and data that supported the efficacy and safety of the proposed changes and had

---

*Themselves?* 91 Contraception 6 (2015), https://www.sciencedirect.com/science/article/abs/pii/S0010782414006908).

[18] 2016 FDA Medical Review at 43-44, 78-79 (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf (citing R. Renner et al., *Who Can Provide Effective and Safe Termination of Pregnancy Care: A Systematic Review*, 10 BJOG 23 (2013), https://pubmed.ncbi.nlm.nih.gov/22900974/; Claudia Diaz Olavarrieta et al., *Nurse Versus Physician-Provision of Early Medical Abortion in Mexico: A Randomized Controlled Non-Inferiority Trial*, 93 Bull. World Health Org. 249 (2015), https://pmc.ncbi.nlm.nih.gov/articles/PMC4431559/; H. Kopp Kallner et al., *The Efficacy, Safety and Acceptability of Medical Termination of Pregnancy Provided by Standard Care by Doctors or by Nurse-Midwives: A Randomized Controlled Equivalence Trial*, 122 BJOG 510 (2015), https://pubmed.ncbi.nlm.nih.gov/25040643/; I.K. Warriner et al., *Can Midlevel Health-Care Providers Administer Early Medical Abortion as Safely and Effectively as Doctors? A Randomized Controlled Equivalence Trial in Nepal*, 377 Lancet 1155 (2011), https://pubmed.ncbi.nlm.nih.gov/21458058/; Mahesh Puri et al., *The Role of Auxiliary Nurse-Midwives and Community Health Volunteers in Expanding Access to Medical Abortion in Rural Nepal*, 22 Reprod. Health Matters 94 (2015), https://pubmed.ncbi.nlm.nih.gov/25702073/). Since FDA's 2016 review, additional studies have confirmed FDA's finding that mifepristone remains safe and effective when prescribed and dispensed by qualified nonphysicians. *See, e.g.*, L. Porsch et al., *Advanced Practice Clinicians and Medication Abortion Safety: A 10-Year Retrospective Review*, 101 Contraception 357 (2020), https://www.contraceptionjournal.org/article/S0010-7824(20)30119-0/abstract; Lydia Mainey et al., *The Role of Nurses and Midwives in the Provision of Abortion Care: A Scoping Review*, 29 J. Clinical Nursing 1513 (2020), https://pubmed.ncbi.nlm.nih.gov/32045070/.

[19] 2016 FDA Medical Review at 88 (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf.

[20] *Id.* at 12 (citing Kelly Cleland & Nicole Smith, *Aligning Mifepristone Regulation with Evidence: Driving Policy Change Using 15 Years of Excellent Safety Data*, 92 Contraception 179 (2015), https://www.contraceptionjournal.org/article/S0010-7824(15)00254-1/fulltext).

[21] 2016 FDA Medical Review at 62 (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf.



also evaluated adverse event data associated with Mifeprex.[22] Specifically, GAO found that FDA had reviewed 19 studies that evaluated increasing the gestational age limit, which demonstrated efficacy rates of greater than 90% through 70 days gestation.[23] FDA also reviewed 15 studies that evaluated home administration of misoprostol, including a large literature review of 87 studies that included over 45,000 women. GAO noted that FDA found no evidence that home use of misoprostol increased rates of treatment failure or serious complications.[24] After reviewing 11 studies that evaluated different methods for follow-up care after mifepristone administration, FDA determined that various methods of follow-up, including home pregnancy testing and telephone visits, were acceptable alternatives to an in-clinic follow up.[25] Finally, FDA reviewed four studies addressing the ability of nonphysician health care providers to provide abortion care, finding that efficacy rates were at least 96% across all studies, regardless of gestational age or provider type.[26]

Petitioner is not aware of any peer-reviewed study or other robust evidence (clinical or epidemiological) that casts any doubt on these findings of either the FDA or GAO. Nor has FDA ever provided any contrary studies or evidence to Petitioner or asked Petitioner for comments on any such studies or evidence.

### (iii)    ANDA Approval

On April 11, 2019, FDA approved Petitioner's ANDA to manufacture and market generic mifepristone.[27] FDA's approval of Petitioner's ANDA reflects the Agency's consistent finding that mifepristone is safe and effective and was based on a robust review of vast amounts of data and hundreds of medical studies over more than two decades, including data submitted by Petitioner to support the approval of its ANDA. As required by the FDCA, Petitioner's generic mifepristone and Danco's Mifeprex must have substantively identical labels, in recognition of the fact that they are "bioequivalent" and have "the same therapeutic effect" and thus have the same benefits and risks.[28] FDA accordingly determined that the branded and generic mifepristone should share a single, shared REMS pursuant to 21 U.S.C. § 355-1(i). Petitioner is the sole supplier of generic mifepristone in the United States and currently supplies the majority of the mifepristone used domestically for medication abortions.

---

[22] U.S. Gov't Accountability Off., GAO-18-292, Food and Drug Administration: Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts 11 (2018), https://www.gao.gov/assets/gao-18-292.pdf.

[23] *Id.* at 12-13.

[24] *Id.* at 13-14.

[25] *Id.* at 15.

[26] *Id.*

[27] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., ANDA Approval Letter, ANDA 091178 (Apr. 11, 2019), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2019/091178Orig1s000ltr.pdf.

[28] 21 U.S.C. § 355(j)(2)(A)(iv)-(v), (j)(4)(F)-(G).



*(iv)      2023 Changes*

FDA more recently concluded that in-person dispensing of mifepristone is not necessary to ensure its safe use, following a comprehensive review of published scientific literature and adverse event data. From July 13, 2020 through January 2021, a court injunction barred FDA from enforcing the in-person dispensing requirement during the COVID-19 Public Health Emergency ("PHE").[29] In April 2021, as the COVID-19 PHE continued, FDA further stated it intended to exercise enforcement discretion with respect to the in-person dispensing requirement, finding that requiring a patient to visit a clinic to receive mifepristone could pose COVID-related safety risks to those patients and healthcare personnel.[30] FDA reached this decision following "a thorough scientific review" by experts within FDA's Center for Drug Evaluation and Research ("CDER"), who "evaluated relevant information, including available clinical outcomes data and adverse event reports."[31]

Throughout the remainder of 2021, FDA "undertook a full review" of the mifepristone REMS, evaluating published literature, safety information submitted to FDA during the COVID-19 PHE, adverse event data, the one-year assessment report for the mifepristone REMS, and information provided by advocacy groups, individuals, and the sponsors of the NDA and the ANDA.[32] In December 2021, FDA determined that the in-person dispensing requirement was not necessary and directed sponsors to initiate the process to modify REMS.[33] In particular, after reviewing adverse event data, FDA found no difference in adverse event rates between periods when the in-person dispensing requirement was being enforced and periods when the in-person dispensing requirement was not being enforced, suggesting that "mifepristone may be safely used without an in-person dispensing requirement."[34] FDA further concluded, based on published studies, that dispensing by mail does not jeopardize efficacy of medical abortion, finding that the

---

[29] *Am. Coll. of Obstetricians & Gynecologists v. FDA*, 472 F. Supp. 3d 183, 233 (D. Md. July 13, 2020), *order clarified*, 2020 WL 8167535 (D. Md. Aug. 19, 2020) (preliminarily enjoining FDA from enforcing the in-person dispensing requirement and any other in-person requirements of the mifepristone REMS); *FDA v. Am. Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 578 (Jan. 12, 2021) (staying the preliminary injunction imposed by the District Court).

[30] Letter from Janet Woodcock, Acting Comm'r of Food & Drugs, to Maureen Phipps, Chief Exec. Off., Am. Coll. of Obstetricians & Gynecologists, and William Grobman, President, Soc'y for Maternal Fetal Med. (Apr. 12, 2021), available at https://www.aclu.org/sites/default/files/field_document/fda_acting_commissioner_letter_to_acog_april_12_2021.pdf.

[31] Response Letter from FDA CDER to Am. Ass'n of Pro-Life Obstetricians & Gynecologists and Am. Coll. of Pediatricians, No. FDA-2019-P-1534, at 5 (Dec. 16, 2021), https://www.regulations.gov/document/FDA-2019-P-1534-0016.

[32] *Id.* at 6.

[33] U.S. Food & Drug Admin., REMS Modification Rationale Review (Dec. 16, 2021), available at https://www.accessdata.fda.gov/drugsatfda_docs/summary_review/2023/020687Orig1s025SumR.pdf#page=41 (hereinafter "2021 REMS Modification Rationale Review").

[34] *Id.* at 23.

10



safety and efficacy outcomes reported in these studies were "within the ranges described in mifepristone labeling."[35]

Based on this comprehensive review of the evidence, FDA concluded that mifepristone "will remain safe and effective for medical abortion if the in-person dispensing requirement is removed, provided all the other requirements of the REMS are met, and pharmacy certification is

---

[35] *Id.* at 39; *id.* at 24-36 (citing Daniel Grossman et al., *Mail-order Pharmacy Dispensing of Mifepristone for Medication Abortion After In-person Clinical Assessment*, 107 Contraception 36 (2021), https://pubmed.ncbi.nlm.nih.gov/34555420/; Daniel Grossman et al., *Medication Abortion with Pharmacist Dispensing of Mifepristone*, 137 Obstetrics & Gynecology 613 (2021), https://pubmed.ncbi.nlm.nih.gov/33706339/; Erica Chong et al., *Expansion of a Direct-to-Patient Telemedicine Abortion Service in the United States and Experience During the COVID-19 Pandemic,* 104 Contraception 43 (2021), https://pubmed.ncbi.nlm.nih.gov/33781762/; Courtney Kerestes et al., *Provision of Medication Abortion in Hawai'i During COVID-19: Practical Experience with Multiple Care Delivery Models*, 104 Contraception 49 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8005318/; Abigail R.A. Aiken et al., *Effectiveness, Safety and Acceptability of No-test Medical Abortion (Termination of Pregnancy) Provided via Telemedicine: A National Cohort Study*, 128 BJOG 1464 (2021), https://pubmed.ncbi.nlm.nih.gov/33605016/; Corinne H. Rocca et al., *Effectiveness and Safety of Early Medication Abortion Provided in Pharmacies by Auxiliary Nurse-Midwives: A Non-inferiority Study in Nepal*, 13 PLoS ONE 1 (2018), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0191174; Ellen R. Wiebe et al., *Comparing Telemedicine to In-Clinic Medication Abortions Induced with Mifepristone and Misoprostol*, 2 Contracept X 1 (2020), https://pubmed.ncbi.nlm.nih.gov/32550538/; Ushma D. Upadhyay et al., *Safety and Efficacy of Telehealth Medication Abortion in the US During the COVID-19 Pandemic*, 4 JAMA Network Open 1 (2021), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2783451; Paul Hyland et al., *A Direct-to-Patient Telemedicine Abortion Service in Australia: Retrospective Analysis of the First 18 Months*, 58 Austl. & N.Z. J. Obstetricians & Gynaecologists 335 (2018), https://pubmed.ncbi.nlm.nih.gov/29603139/; Elizabeth G. Raymond et al., *TelAbortion: Evaluation of a Direct to Patient Telemedicine Abortion Service in the United States*, 100 Contraception 173 (2019), https://www.sciencedirect.com/science/article/abs/pii/S0010782419301763; Holly A. Anger et al., *Clinical and Service Delivery Implications of Omitting Ultrasound Before Medication Abortion Provided Via Direct-to-Patient Telemedicine and Mail in the U.S.*, 104 Contraception 659 (2021), https://pubmed.ncbi.nlm.nih.gov/34329607/; John Joseph Reynolds-Wright et al., *Telemedicine Medical Abortion at Home Under 12 Weeks' Gestation: A Prospective Observational Cohort Study During the COVID-19 Pandemic*, 47 BMJ Sex Reprod. Health 246 (2021), https://pubmed.ncbi.nlm.nih.gov/33542062/; Abigail R.A. Aiken et al., *Self Reported Outcomes and Adverse Events After Medical Abortion Through Online Telemedicine: Population Based Study in the Republic of Ireland and Northern Ireland*, 357 BMJ 1 (2017), https://www.bmj.com/content/357/bmj.j2011; Hanna Nortén et al., *10-year Evaluation of the Use of Medical Abortion Through Telemedicine: A Retrospective Cohort Study*, 129 BJOG 151 (2022), https://obgyn.onlinelibrary.wiley.com/doi/abs/10.1111/1471-0528.16765; M. Endler et al. *Safety and Acceptability of Medical Abortion Through Telemedicine After 9 Weeks of Gestation: A Population-Based Cohort Study*, 126 BJOG 609 (2019), https://pubmed.ncbi.nlm.nih.gov/30456778/; Elizabeth G. Raymond et al., *Commentary: No-test Medication Abortion: A Sample Protocol for Increasing Access During a Pandemic and Beyond*, 101 Contraception 361 (2020), https://pubmed.ncbi.nlm.nih.gov/32305289/).



added."[36] FDA determined that this modification would "render the REMS less burdensome to healthcare providers and patients" and that the modified REMS will "continue to ensure that the benefits of mifepristone for medical abortion outweigh the risks."[37] FDA further recognized that removing the in-person dispensing requirement would allow "dispensing of mifepristone by mail via certified prescribers or pharmacies."[38] In January 2023, FDA approved the sponsors' applications to remove the in-person dispensing requirement from the REMS.[39]

Again, Petitioner is not aware of any peer-reviewed study or other robust scientific evidence (clinical or epidemiological) that casts any doubt on these findings. Nor has FDA ever provided any contrary studies or evidence to Petitioner or asked Petitioner for comments on any such studies or evidence. On the contrary, as discussed below, since December 2023, additional research has further confirmed that the dispensing of mifepristone via telehealth is safe and effective.

<blockquote>b. Mifepristone Remains Safe and Effective Under the Current REMS</blockquote>

Mifepristone's safety and efficacy profile has remained strongly supported across multiple iterations of the mifepristone REMS, including after removing the in-person dispensing requirement. As detailed above, the safety and efficacy of mifepristone is supported by a robust body of scientific evidence, reflecting vast amounts of data and hundreds of medical studies evaluating thousands of patients.[40] Moreover, mifepristone is recognized as a safe and effective option for abortion care by numerous clinical practice guidelines and best practices issued by professional groups and other reproductive health experts.[41]

---

[36] 2021 REMS Modification Rationale Review at 39 (Dec. 16, 2021), available at https://www.accessdata.fda.gov/drugsatfda_docs/summary_review/2023/020687Orig1s025SumR.pdf#page=41.

[37] *Id.* at 39-40.

[38] *Id.* at 40.

[39] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., Supplement Approval Letter, NDA 020687/S-025 (Jan. 3, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/020687Orig1s025ltr.pdf; U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., Prior Approval Supplement Approval Letter, ANDA 091178/S-004 (Jan. 3, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/091178Orig1s004ltr.pdf. *See also* U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., Approval Package, Application No. 020687Orig1s025 (Jan. 3, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2023/020687Orig1s025.pdf.

[40] *See* Nat'l Acad. of Sci., Eng'g & Med., *The Safety and Quality of Current Abortion Methods* in *The Safety & Quality of Abortion Care in the U.S.* (2018), https://nap.nationalacademies.org/read/24950/chapter/1.

[41] *See, e.g.*, Am. Coll. of Obstetricians & Gynecologists, *Prac. Bull. No. 225: Medication Abortion Up to 70 Days of Gestation* (Oct. 2020), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2020/10/medication-abortion-up-to-70-days-of-gestation; Nat'l Abortion Fed., 2024



Adverse events with mifepristone are extremely rare, as demonstrated by FDA's summary report of post-marketing adverse events through December 31, 2024.[42] In that report, FDA estimates that approximately 7.5 million women have used mifepristone in the U.S. for medical termination of pregnancy from its approval through December 2024. Among those millions of patients, there have been 36 reported deaths (which are included regardless of any causal attribution to mifepristone), corresponding to an approximate mortality rate of 0.00048%.[43] Moreover, as FDA has recognized, even that small percentage of deaths cannot be causally attributed to mifepristone because of concurrent use of other drugs, other medical or surgical treatments, co-existing medical conditions, and/or information gaps about patient health status and clinical management of the patient.[44]

Other adverse events also remain rare: from November 2012 through December 2024, adverse events were reported in 1,512 cases of mifepristone users in the entire nation, of which 288 required hospitalization (excluding deaths).[45] As the FDA-approved label recognizes, infections and bleeding can occur "very rarely following *spontaneous, surgical, and medical abortions*," and "[n]o causal relationship between the use of [mifepristone] and misoprostol and these events has been established."[46] Evidence suggests that the "critical risk factor" in the reported

---

*Clinical Policy Guidelines for Abortion Care* (2024), https://prochoice.org/wp-content/uploads/2024-CPGs-FINAL-1.pdf; World Health Organization, *Abortion Care Guideline* 95 (Mar. 8, 2022), https://www.who.int/publications/i/item/9789240039483; Royal Coll. of Obstetricians & Gynaecologists, *Best Practice in Abortion Care* (Mar. 2022), https://www.rcog.org.uk/media/geify5bx/abortion-care-best-practice-paper-april-2022.pdf; Nathalie Kapp & Patricia A. Lohr, *Modern Methods to Induce Abortion: Safety, Efficacy and Choice*, 63 Best Prac. & Rsch. Clinical Obstetrics & Gynaecology 37 (2020), https://pubmed.ncbi.nlm.nih.gov/32029379/.

[42] U.S. Food & Drug Admin., Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2024, https://www.fda.gov/media/185245/download?attachment.

[43] *Id.* The 36 total number of reported deaths includes 13 cases associated with sepsis; 2 cases of homicide, 2 cases of combined drug intoxication/overdose, 2 cases of ruptured ectopic pregnancy, 2 cases of drug intoxication, 2 cases of suicide, and 1 case each of the following: substance abuse/drug overdose; methadone overdose; suspected homicide; delayed onset toxic shock-like syndrome; hemorrhage; bilateral pulmonary thromboemboli; unintentional overdose resulting in liver failure; probable anaphylactic medication reaction; septic shock due to necrotizing fasciitis; sepsis with multiple complications possibly secondary to toxic shock syndrome 82 days after mifepristone; sudden death of undetermined etiology despite performance of an autopsy; and a case of natural death due to severe pulmonary emphysema.

[44] U.S. Food & Drug Admin., *Questions and Answers on Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation* (Feb. 11, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation.

[45] U.S. Food & Drug Admin., Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2024, https://www.fda.gov/media/185245/download?attachment.

[46] MIFEPREX Prescribing Information (Mar. 23, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/020687Orig1s026lbl.pdf (emphasis added).

13



cases of infection "is pregnancy itself."[47] Importantly, mifepristone is associated with significantly fewer, and less severe, complications than full-term pregnancy. Approximately 1.6% of women giving birth in U.S. hospitals experience severe maternal morbidity—including hemorrhage, eclampsia, sepsis, and organ failure—which can have significant short- and long-term health consequences.[48] In 2023, the maternal mortality rate was 18.6 deaths per 100,000 live births (0.0186%).[49]

As discussed above, FDA's decision to eliminate the in-person dispensing requirement was fully supported by the scientific evidence available as of December 2021. Since December 2021, further research has demonstrated that the dispensing of mifepristone via telehealth is safe and effective.[50] Again, Petitioner is not aware of any peer-reviewed study or other robust data (clinical

---

[47] Citizen Petition Denial Response from FDA CDER to the Am. Ass'n of Pro Life Obstetricians & Gynecologists 25-26 n.69, No. FDA-2002-P-0364 (Mar. 29, 2016), https://www.regulations.gov/document/FDA-2002-P-0364-0002.

[48] Dorothy A. Fink et al., *Trends in Maternal Mortality and Severe Maternal Morbidity During Delivery-Related Hospitalizations in the United States, 2008 to 2021*, 6 JAMA Network Open 1 (2023), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2806478.

[49] Donna L. Hoyert, Ctrs. for Disease Control & Prevention, *Health E-Stat 100: Maternal Mortality Rates in the United States, 2023* (Feb. 2025), https://www.cdc.gov/nchs/data/hestat/maternal-mortality/2023/Estat-maternal-mortality.pdf; *see also* Elizabeth G. Raymond & David Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215 (2012), https://journals.lww.com/greenjournal/abstract/2012/02000/the_comparative_safety_of_legal_induced_abortion.3.aspx.

[50] *See, e.g.*, Ushma D. Upadhyay et al., *Effectiveness and Safety of Telehealth Medication Abortion in the USA*, 30 Nature Med. 1191 (2024), https://www.nature.com/articles/s41591-024-02834-w; Lauren J. Ralph et al., *Comparison of No-Test Telehealth and In-Person Medication Abortion*, 332 JAMA 898 (2024), https://jamanetwork.com/journals/jama/article-abstract/2820321; Silpa Srinivasulu et al., *Telehealth Medication Abortion in Primary Care: A Comparison to Usual in-Clinic Care*, 37 J. Am. Bd. Fam. Med. 295 (2024), https://pubmed.ncbi.nlm.nih.gov/38740468/; Caitlin Hunter et al., *Test or No-Test: Comparison of Medication Abortion Outcomes and Adverse Events When Forgoing Ultrasound, Laboratory Testing, and Physical Examination*, 47 J. Obstetrics & Gynaecology Can. 1, 7 (2025), https://pubmed.ncbi.nlm.nih.gov/39615625/; Holly Anger & Elizabeth G. Raymond, *Clinical and Service Delivery Outcomes Following Medication Abortion Provided With or Without Pretreatment Ultrasound or Pelvic Examination: An Updated Comparative Analysis*, 140 Contraception 1 (2024), https://pubmed.ncbi.nlm.nih.gov/39059683/; Leonardo Cely-Andrade et al., *Telemedicine for the Provision of Medication Abortion to Pregnant People at up to Twelve Weeks of Pregnancy: A Systematic Literature Review and Meta-Analysis*, 21 Reprod. Health 136, 155 (2024), https://pubmed.ncbi.nlm.nih.gov/39300581/; Martha K. Smith et al., *The Safety and Efficacy of a "No Touch" Abortion Program Implemented in the Greater Toronto Area During the COVID-19 Pandemic*, 46 J. Obstetrics & Gynaecology Can. 1 (2024), https://pubmed.ncbi.nlm.nih.gov/38458271/; Ushma D. Upadhyay et al., *Outcomes and Safety of History-Based Screening for Medication Abortion: A Retrospective Multicenter Cohort Study*, 182 JAMA Internal Med. 482 (2022), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2790319; Marit Pearlman Shapiro et al., No-Test Medication Abortion: A Systemic Review, 141 Obstetrics & Gynecology 23 (2023), https://pubmed.ncbi.nlm.nih.gov/36701607/. *See also* Karin Brandell et al., *Randomized Trial of Very Early Medication Abortion*, 391 New England J. Med. 1685 (2024),



or epidemiological) that contradicts FDA's decision to remove the in-person dispensing requirement.

        c.        <u>Unsubstantiated Claims by Abortion Opponents Do Not Justify Imposing Restrictions on Mifepristone Access</u>

Despite mifepristone's well-established safety and efficacy profile—which has been borne out in hundreds of medical studies over more than two decades as well as use by millions of women—some ideological opponents of abortion have alleged that mifepristone carries unacceptable safety risks. Such opponents have urged FDA either to revoke its approval of mifepristone or to impose burdensome restrictions on patient access. As discussed further below, there is no scientifically robust evidence to support these spurious claims, which fall far short of the evidentiary standard required by the FDCA.

*First*, to withdraw the mifepristone approval, FDA would need to find that: (1) "*clinical or other experience, tests, or other scientific data* show that such drug is *unsafe for use* under the conditions of use upon the basis of which the application was approved," (2) "new evidence of *clinical experience*" or "*tests by new methods*" show that a drug is "*not shown to be safe for use* under the conditions of use upon the basis of which the application was approved," or (3) "new information" demonstrates a "*lack of substantial evidence* that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof."[51] No such evidence exists with respect to mifepristone. Petitioner is not aware of any scientifically robust evidence—including clinical experience, tests, or data—showing that mifepristone is unsafe for use under its conditions of use. Nor is Petitioner aware of any new information that demonstrates a lack of substantial evidence of effectiveness. To the contrary, the overwhelming weight of scientific research and peer-reviewed studies demonstrate that mifepristone is safe and effective for the medical termination of intrauterine pregnancy through 70 days gestation.

*Second*, when evaluating a REMS for potential modification, FDA considers "new safety information."[52] The statute provides explicit instruction on the type of evidence that FDA may consider, defining "new safety information" to mean "information derived from a *clinical trial*, an *adverse event report*, a *postapproval study* . . . , or *peer-reviewed biomedical literature*; data derived from the *postmarket risk identification and analysis system* . . . ; or other *scientific data*

---

https://www.nejm.org/doi/10.1056/NEJMoa2401646; Vera Kelesidou et al., *Combination of Mifepristone and Misoprostol for First-Trimester Medical Abortion: A Comprehensive Review of the Literature*, 79 Obstetrical & Gynecological Survey 54 (2024), https://pubmed.ncbi.nlm.nih.gov/38306292/; Abigail R.A. Aiken et al., *Safety and Effectiveness of Self-Managed Medication Abortion Provided Using Online Telemedicine in the United States: A Population Based Study*, 10 Lancet Reg'l Health – Ams. 1 (2022), https://www.thelancet.com/journals/lanam/article/PIIS2667-193X(22)00017-5/fulltext; Ushma D. Upadhyay et al., *Safety and Effectiveness of Synchronous and Asynchronous Telehealth Medication Abortion Provided by US Virtual Clinics*, 116 Contraception 69 (2022), https://www.contraceptionjournal.org/article/S0010-7824(22)00263-3/abstract.

[51] 21 U.S.C. § 355(e) (emphasis added).

[52] 21 U.S.C. § 355-1(b)(3).



deemed appropriate by the Secretary."[53] Such information must address: (1) "a serious risk or an unexpected serious risk associated with the use of the drug that the Secretary has become aware of (that may be based on a new analysis of existing information) . . . *since the last assessment of the approved [REMS]* for the drug"; or (2) "the effectiveness of the approved [REMS] for the drug obtained *since the last assessment of such strategy*."[54] Petitioner is not aware of any such new clinical trial, adverse event report, postapproval study, peer-reviewed biomedical literature, or other scientific data that merits a modification to the mifepristone label or REMS to make them more restrictive or to reinstate previously removed requirements.[55]

Petitioner is aware that, in late April 2025 and early May 2025, the Ethics and Public Policy Center ("EPPC") issued two documents arguing that FDA should reverse its findings with respect to the mifepristone REMS and label and "reconsider its approval altogether."[56] Secretary Kennedy was expressly questioned about the April 2025 document at a recent congressional hearing where Senator Josh Hawley (a strong opponent of abortion) demanded that FDA undertake a complete review of mifepristone.

At the outset, it is important to note that EPPC is not a medical or scientific organization: EPPC describes its mission as "working to apply the riches of the Jewish and Christian traditions to contemporary questions of law, culture, and politics, in pursuit of America's continued civic and cultural renewal."[57] The EPPC documents on mifepristone were issued as part of the organization's "Life and Family Initiative," which "works nationwide to advance pro-life policies that protect unborn children by restricting abortion at the state and federal levels, via legislation,

---

[53] *Id.* (emphasis added)

[54] *Id.* (emphasis added).

[55] Some abortion opponents have advocated that FDA should re-impose the in-person dispensing requirement or otherwise modify the REMS to mitigate a purported risk that a pregnant individual could be forced or coerced to ingest mifepristone in order to induce an abortion. Any forced or coerced use of mifepristone would be inconsistent with the *existing* FDA-approved label and REMS, as well as both unethical and illegal. Petitioner is unaware of *any* study or data analyzing whether or to what extent such conduct has occurred in the United States, let alone linking such conduct to the recent REMS modification. Petitioner also is unaware of any evidence of such alleged activity indicated in the FDA Adverse Event Reporting System ("FAERS") database. In the absence of any such scientific evidence evaluating this purported risk, FDA cannot reinstate the in-person dispensing requirement or otherwise modify the REMS on the basis of this unfounded allegation. Moreover, if FDA believed such evidence existed, it would be incumbent on FDA to accord Petitioner, who worked with FDA to develop and finalize the current REMS, notice and an opportunity to comment on such material.

[56] Jamie Bryan Hall & Ryan T. Anderson, Ethics & Pub. Pol'y Ctr., *The Abortion Pill Harms Women: Insurance Data Reveals One in Ten Patients Experiences a Serious Adverse Event* (Apr. 28, 2025), https://eppc.org/wp-content/uploads/2025/04/25-04-The-Abortion-Pill-Harms-Women.pdf; Jamie Bryan Hall & Ryan T. Anderson, Ethics & Pub. Pol'y Ctr., *The Abortion Pill Harms Women: Insurance Data Reveals Repeated Abortion Attempts Due to High Failure Rate* (May 12, 2025), https://eppc.org/wp-content/uploads/2025/05/25-05-SHW-Insurance-Data-Reveals-Repeated-Abortion-Attempts-Due-to-High-Failure-Rate.pdf.

[57] Ethics & Pub. Pol'y Ctr., *About Us*, https://eppc.org/about/.

16



regulation, and litigation."[58] Similarly, the authors of the documents at issue, Jamie Bryan Hall and Ryan T. Anderson, are neither physicians nor medical scientists. Hall and Anderson state that the project was conducted by an unnamed "team" of data scientists, analysts, and engineers, with assistance from a group of unnamed physicians. Most critically, the documents were self-published on EPPC's website and not subject to peer review, meaning Hall and Anderson's methodology, data, and conclusions were never scrutinized by experts in the field for accuracy or reliability.

The EPPC documents are, in fact, deeply flawed and present no legitimate basis for FDA to revise the mifepristone REMS or to revoke its approval of the drug. We outline some (but not all) of those flaws below.

In the first document, Hall and Anderson claim that the unnamed team used an unnamed dataset to identify patients whose medical records contained a code for a medication abortion, a prescription for mifepristone, or a code for an abortion or unwanted pregnancy alongside coding consistent with a medication abortion. Among those patients, Hall and Anderson claim that10.93% allegedly also had some mention of some other purported adverse event within 45 days of the prior entry.[59] Hall and Anderson state that they identified "serious adverse events" using an undefined list of "relevant" diagnosis codes and procedure codes. They then grouped those codes into 10 categories, which include, among other categories: (1) emergency room visits (with abortion-related diagnosis and procedure codes); (2) other events that a group of unnamed doctors "judge to be life-threatening" (including ectopic pregnancy); (3) subsequent surgical abortion procedures; or (4) unspecified "other abortion complications," including "life-threatening mental health diagnoses."[60] These categories present several critical and likely fatal issues.

To begin, it is clear that Hall and Anderson did not follow accepted scientific practices in conducting their result-oriented analysis, including, but not limited to, use of a validated algorithm for probing the data. For example, counting abortion-related emergency room visits by themselves as serious adverse events is contrary to the FDCA and FDA guidance.[61] It is also inconsistent with real world evidence: studies have repeatedly demonstrated that the majority of patients with abortion-related emergency room visits receive observation care only.[62] Patients often visit

[58] Ethics & Pub. Pol'y Ctr., *Life and Family Initiative*, https://eppc.org/program/life-and-family-initiative/.

[59] Jamie Bryan Hall & Ryan T. Anderson, Ethics & Pub. Pol'y Ctr., *The Abortion Pill Harms Women: Insurance Data Reveals One in Ten Patients Experiences a Serious Adverse Event* (Apr. 28, 2025), https://eppc.org/wp-content/uploads/2025/04/25-04-The-Abortion-Pill-Harms-Women.pdf.

[60] *Id.*

[61] 21 U.S.C. § 355-1(b)(4); U.S. Food & Drug Admin., *What is a Serious Adverse Event?* (May 18, 2023), https://www.fda.gov/safety/reporting-serious-problems-fda/what-serious-adverse-event ("Emergency room visits that do not result in admission to the hospital should be evaluated for one of the other serious outcomes (e.g., life-threatening; required intervention to prevent permanent impairment or damage; other serious medically important event).").

[62] Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175 (2015), https://pubmed.ncbi.nlm.nih.gov/25560122/; Ushma D. Upadhyay et al., *Abortion-Related Emergency Department Visits in the United States: An Analysis of a*



emergency rooms to receive care for normal uterine cramping and bleeding, to ask questions, or simply to confirm they are no longer pregnant. None of those scenarios would qualify as a serious adverse event under FDA's definition. In any event, it is well established in the scientific literature (and reflected in the mifepristone label) that a small number of patients will visit an emergency room following administration of mifepristone and misoprostol, and this evidence was available to, and considered by, FDA when it approved changes to mifepristone's labeling and REMS. Yet, emergency room visits constitute over 40% of the purported serious adverse events identified by Hall and Anderson.

Hall and Anderson also count any subsequent procedure to *complete* the abortion as a serious adverse event. But, again, it is well-known and expected that approximately 2-7% of patients will need a surgical procedure following mifepristone administration, and this possibility is already included in the FDA-approved mifepristone labeling.[63] Yet again, surgical abortion procedures account for over 25% of the purported serious adverse events identified by EPPC.

Hall and Anderson also include ectopic pregnancy as a serious adverse event, even though ectopic pregnancies are not caused by mifepristone. As already made clear in its labeling, mifepristone is contraindicated in patients with ectopic pregnancy because it is not effective for terminating such pregnancies; however, there is no evidence that mifepristone leads to unusual complications for women with ectopic pregnancies.[64] Yet Hall and Anderson claim, without support, that use of mifepristone in the case of ectopic pregnancy "poses extraordinary, heightened risk" to the patient's health.[65]

The largest category of alleged adverse events in the EPPC's findings—over half—is made up of unspecified "other abortion-specific complications." Hall and Anderson do not list the diagnosis or procedure codes used for this category, and hence it is impossible to determine the codes' relevance (if any) to mifepristone treatment.

---

*National Emergency Department Sample*, 16 BMC Med. (2018), https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-018-1072-0.

[63] MIFEPREX Prescribing Information (Mar. 23, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/020687Orig1s026lbl.pdf; *see also* Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175 (2015), https://pubmed.ncbi.nlm.nih.gov/25560122/; Elizabeth G. Raymond et al., *First-trimester Medical Abortion with Mifepristone 200 mg and Misoprostol: A Systematic Review*, 87 Contraception 26 (2013); Kelly Cleland et al., *Significant Adverse Events and Outcomes After Medical Abortion*, 121 Obstetrics & Gynecology 166 (2013), https://pubmed.ncbi.nlm.nih.gov/23262942/.

[64] Caitlin Shannon et al., *Ectopic Pregnancy and Medical Abortion*, 104 Obstetrics & Gynecology 161 (2004), https://pubmed.ncbi.nlm.nih.gov/15229016/.

[65] Jamie Bryan Hall & Ryan T. Anderson, Ethics & Pub. Pol'y Ctr., *Frequently Asked Questions About the Largest Study on Chemical Abortion* (May 7, 2025), https://eppc.org/wp-content/uploads/2025/05/Frequently-Asked-Questions-About-the-Largest-Study-on-Chemical-Abortion.pdf.



In the second document, Hall and Anderson claim that, among those patients identified as having received a medication abortion based on claims data, within a 45-day window, 3.22% had some entry suggesting repeated mifepristone administration, and 2.84% had some entry suggesting a subsequent procedure to complete the abortion. Hall and Anderson use these "findings" to assert that mifepristone has a "real-world failure rate" of 5.26%.[66] Again, there are several seriously problematic issues with this document. We highlight just two. First, as discussed above, it is known and expected that a small percentage of patients will need a surgical procedure following mifepristone administration to complete the abortion, and this possibility is already included in the mifepristone labeling. Second, Hall and Anderson do not explain how they identified the purported repeated use of mifepristone, or the steps taken (if any) to ensure such entries in the unnamed dataset did not merely reflect duplicate claims. Such entries may also reflect instances in which a patient received two mifepristone prescriptions but only ingested a single dose.

The failure of Hall and Anderson to disclose the "commercially available all-payer health insurance claims database"[67] underlying their "findings;" the methodology (if any) used to address misclassified or missing information; any steps taken to preserve data quality or remove duplicate claims; or the diagnosis and procedure codes used to identify adverse events make it impossible to independently verify or replicate the results. More specifically, EPPC's decision to withhold the identity of the claims database also makes it impossible for FDA, the mifepristone NDA and ANDA holders, the scientific and medical community at large, or anyone else to assess either the reliability or relevance of that dataset with respect to any decision on the approval or REMS requirements for the drug.

As FDA recognized in its guidance regarding the use of electronic health records and medical claims data ("EHR Guidance"), "existing electronic health care data were not developed for research purposes or to support regulatory submissions to FDA, [so] it is important to understand their potential limitations when they are used for that purpose."[68] One potential limitation recognized by FDA is that the purpose of medical claims data is to "support payment for care."[69] Accordingly, as FDA has stated, claims data "may not accurately reflect" the presence, characteristics, severity, or clinical management of a particular condition or event.[70]

---

[66] Jamie Bryan Hall & Ryan T. Anderson, Ethics & Pub. Pol'y Ctr., *The Abortion Pill Harms Women: Insurance Data Reveals Repeated Abortion Attempts Due to High Failure Rate* (May 12, 2025), https://eppc.org/wp-content/uploads/2025/05/25-05-SHW-Insurance-Data-Reveals-Repeated-Abortion-Attempts-Due-to-High-Failure-Rate.pdf.

[67] Jamie Bryan Hall & Ryan T. Anderson, Ethics & Pub. Pol'y Ctr., *The Abortion Pill Harms Women: Insurance Data Reveals One in Ten Patients Experiences a Serious Adverse Event* (Apr. 28, 2025), https://eppc.org/wp-content/uploads/2025/04/25-04-The-Abortion-Pill-Harms-Women.pdf.

[68] U.S. Food & Drug Admin., *Guidance for Industry: Real-World Data: Assessing Electronic Health Records and Medical Claims Data to Support Regulatory Decision-Making for Drug and Biological Products* 4 (2024), https://www.fda.gov/media/152503/download.

[69] *Id.*

[70] *Id.*



FDA has likewise cautioned that investigators should "identify whether the data sources cover all populations relevant to the study" and that "[d]ifferences in terminology and coding systems used in different health care systems" may affect the relevance of the data source.[71] There is no evidence suggesting Hall and Anderson gave any consideration to these issues or other potential limitations of their dataset. Until EPPC discloses the identity of the dataset it claims to have analyzed—and independent reviewers at FDA and the medical community are able to assess its relevance, reliability and integrity (or any of the more detailed data issues FDA has also specified in its EHR Guidance)—any use of (much less reliance on) EPPC's purported "findings" from that unidentified data would violate FDA's own standards and procedures.

In sum, the EPPC documents utterly fail to provide robust scientific evidence regarding the safety and effectiveness of mifepristone. The documents do not constitute "new safety information" for purposes of REMS modification assessments, which the FDCA requires to be derived from a clinical trial, adverse event reports, a postapproval study, peer-reviewed biomedical literature, FAERS data, or other scientific data.[72] To the extent that FDA considers these documents at all, FDA must also consider the overwhelming weight of scientific research and peer-reviewed studies that support mifepristone's safety and efficacy. In light of its many obvious scientific flaws—which are apparent even upon a facial review—the EPPC documents cannot provide a legitimate basis to restrict access to mifepristone—a drug which has been repeatedly verified as safe and effective for terminating early pregnancies through vast amounts of data, hundreds of medical studies, and use by millions of women over more than two decades.

### d.    FDA Must Avoid Undue Burdens on Patient Access to Mifepristone

The FDCA requires FDA to balance safety *and access* in adopting and revising a REMS.[73] Specifically, ETASU imposed under a REMS must "not be unduly burdensome on patient access to the drug," and, "to the extent practicable," must "minimize the burden on the health care delivery system."[74]

In its 2021 review of the mifepristone REMS, FDA correctly determined that removing the in-person dispensing requirement would "render the REMS less burdensome to healthcare providers and patients" and that the modified REMS would "continue to ensure that the benefits

---

[71] *Id.* at 5.

[72] 21 U.S.C. § 355-1(b)(3).

[73] 21 U.S.C. § 355-1(g)(4)(B) (authorizing FDA to require a sponsor to modify a REMS to "ensure benefits of the drug outweigh the risks of the drug" or "minimize the burden on the health care delivery system"); 21 U.S.C. § 355-1(f)(5) (requiring FDA to periodically evaluate whether ETASU "are not unduly burdensome on patient access to the drug" and "to the extent practicable, minimize the burden on the health care delivery system"). Congress was particularly concerned about access to REMS drugs for "patients who have difficulty accessing health care (such as patients in rural or medically underserved areas)." 21 U.S.C. § 355-1(f)(2).

[74] 21 U.S.C. § 355-1(f)(2).



of mifepristone for medical abortion outweigh the risks."[75] Since then, numerous peer-reviewed studies have confirmed that the availability of medication abortion through telehealth improves patient access to care.[76] In particular, studies have shown that telehealth provides an important care option for patients living in rural and medically underserved areas, who would otherwise have to travel long distances to receive in-person care. Telehealth also provides a particular benefit for patients who may find it difficult to take time off work or arrange for childcare in order to travel for abortion care.

FDA appropriately balanced patient safety and access when it determined that the mifepristone REMS should be modified in 2021. Reinstating the prior ETASU, such as the in-person dispensing requirement, would unduly restrict patient access to mifepristone without a legitimate patient safety rationale. Doing so would also violate the FDCA's mandate that REMS requirements be firmly rooted in scientific evidence and clinical data and no more burdensome than necessary to ensure safe use.

### 2. There is No Scientific Evidence Suggesting that Mifepristone Causes Harm to the Environment

FDA has previously and correctly rejected claims that mifepristone somehow causes harm to the environment, and there continues to be no evidence that would support restricting access to

---

[75] 2021 REMS Modification Rationale Review at 39-40, (Dec. 16, 2021), available at https://www.accessdata.fda.gov/drugsatfda_docs/summary_review/2023/020687Orig1s025SumR.pdf#page=41.

[76] Leah R. Koenig et al., *The Role of Telehealth in Promoting Equitable Abortion Access in the United States: Spatial Analysis*, 9 JMIR Pub. Health Surveillance e45671 (2023), https://publichealth.jmir.org/2023/1/e45671; Amy Tressan et al., *Telemedicine Abortion in Primary Care: An Exploration of Patient Experiences*, 22 Annals of Fam. Med. 19 (2024), https://pubmed.ncbi.nlm.nih.gov/38253506/; Leah R. Koenig et al., *Patient Acceptability of Telehealth Medication Abortion Care in the United States, 2021-2022: A Cohort Study*, 114 Am. J. Pub. Health 241, 247-48 (2024), https://pubmed.ncbi.nlm.nih.gov/38237103/; Emily M. Godfrey et al., *Patient Perspectives Regarding Clinician Communication During Telemedicine Compared With In-Clinic Abortion*, 141 Obstetrics & Gynecology 1139, 1143 (2023), https://pubmed.ncbi.nlm.nih.gov/37141602/; Andréa Becker et al., *"It Was So Easy in a Situation That's So Hard": Structural Stigma and Telehealth Abortion*, J. Health & Soc. Behav. (2025), https://journals.sagepub.com/doi/epub/10.1177/00221465241303873; Samantha P. Ruggiero et al., *Patient and Provider Experiences Using a Site-to-Site Telehealth Model for Medication Abortion*, 30 mHealth 1 (2022), https://mhealth.amegroups.org/article/view/100653/html; Courtney Kerestes et al., *Person-Centered, High-Quality Care From a Distance: A Qualitative Study of Patient Experiences of TelAbortion, a Model for Direct-to-Patient Medication Abortion by Mail in the United States,* 54 Perspectives Sexual & Reprod. Health 177 (2022), https://pubmed.ncbi.nlm.nih.gov/36229416/; Leah R. Koenig et al., *Mailing Abortion Pills Does Not Delay Care: A Cohort Study Comparing Mailed to In-Person Dispensing of Abortion Medications in the United States*, 121 Contraception 1 (2023), https://www.contraceptionjournal.org/article/S0010-7824(23)00015-X/fulltext; Kathleen Marie Beardsworth et al., *Miles and Days until Medical Abortion via TelAbortion versus Clinic in Oregon and Washington, USA*, 48 BMJ Sex Reprod Health, e38 (2021), https://srh.bmj.com/content/48/e1/e38.long; Anna E. Fiastro et al., *Telehealth vs In-Clinic Medication Abortion Services,* 6 JAMA Network Open 1-5, 4 (Sept. 1, 2023), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2809068.



mifepristone on this basis. Further, when granting the mifepristone NDA and ANDA, FDA complied with all applicable law and regulations regarding environmental reviews and consultations, including environmental assessment requirements.

As FDA is aware, opponents of medical abortion have alleged that mifepristone or its metabolites cause harm to the environment, despite the lack of any scientific evidence, including by filing the below citizen petitions:

(1)     *Students for Life of America ("SFLA") Citizen Petition (Nov. 2022)*: This petition requested that FDA modify the REMS to require prescribers to include a medical waste bag and catch-kit with all mifepristone prescriptions to "alleviate some amount of human remains (this includes fetal remains) and Mifepristone contaminants in the nation's water supply."[77] SFLA's petition claimed that exposure to mifepristone in the nation's water can cause "teratologic repercussions or congenital anomalies."[78]

(2)     *SFLA Citizen Petition (Apr. 2023)*: This petition requested that FDA revoke approval of the NDA, ANDA, and modifications to the REMS, on the basis that FDA failed to comply with the Endangered Species Act ("ESA") by not consulting with the United States Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS").[79] SFLA claimed that mifepristone in the water supply can have "detrimental effects on the fertility of animals, as well as having unknown detrimental effects on plant life and ecosystems."[80]

(3)     *SFLA Citizen Petition (Aug. 2023)*: This petition requested that FDA revoke approval of the mifepristone NDA, ANDA, and modifications to the REMS, on the basis that FDA failed to comply with certain requirements of the Clean Water Act ("CWA").[81]

(4)     *SFLA Citizen Petition (Dec. 2024)*: This petition requested that FDA "refrain from modifying the approved use of [m]ifepristone to include miscarriage care" until the Agency requires the provision of a medical waste bag and catch-kit and determines compliance with the CWA and ESA.[82]

---

[77] Citizen Petition from Students for Life of America, No. FDA-2022-P-2872, at 2 (Nov. 15, 2022), https://www.regulations.gov/document/FDA-2022-P-2872-0001.

[78] *Id.* at 7.

[79] Citizen Petition from Students for Life of America, No. FDA-2023-P-1528, at 1 (Apr. 19, 2023), https://www.regulations.gov/document/FDA-2023-P-1528-0001.

[80] *Id.* at 15.

[81] Citizen Petition from Students for Life of America, No. FDA-2023-P-3328, at 1 (Aug. 1, 2023), https://www.regulations.gov/document/FDA-2023-P-3328-0001.

[82] Citizen Petition from Students for Life of America, No. FDA-2024-P-5967 (Dec. 18, 2024), https://www.regulations.gov/document/FDA-2024-P-5967-0001.



FDA correctly rejected these requests.[83] There is no scientific evidence whatsoever that suggests mifepristone or the products of conception have any effect, let alone an adverse one, on the environment (including protected species, habitats, or water quality).

As FDA has recognized, the 2000 approval of Mifeprex and the 2019 approval of generic mifepristone complied with all environmental assessment requirements and demonstrated that mifepristone would have no adverse environmental effects.[84] FDA is required under the National Environmental Policy Act ("NEPA") to assess the environmental impacts of qualifying actions and ensure that the public is informed of these analyses.[85] When assessing "environmental effects and feasible alternatives for NEPA," an agency is accorded "substantial deference" as to the "depth and breadth of its inquiry."[86] Under FDA regulations, the approval of an NDA, ANDA, and certain supplements to these applications require at least the preparation of an environmental assessment ("EA"), unless the action qualifies for a categorical exclusion.[87] Action on an ANDA qualifies for a categorical exclusion from the requirement to prepare an EA "if the action does not increase the use of the active moiety."[88]

FDA's approval of the mifepristone NDA complied with all applicable EA requirements, and Petitioner properly claimed a categorical exclusion on its ANDA, meaning no additional EA was required. In 1996, the applicant for the mifepristone NDA submitted an EA in accordance with NEPA and applicable FDA regulations, which was reviewed by FDA to determine whether approval of mifepristone would have a significant environmental impact.[89] The EA evaluated the potential environmental impacts of the manufacture of the drug product, use of the drug product by patients (i.e., excretion by patients), and disposal of pharmaceutical waste. In accordance with FDA guidance, the EA calculated a projected environmental introduction concentration into the

---

[83] Response from FDA CDER to Students for Life of America, No. FDA-2022-P-2872 (Jan. 15, 2025), https://www.regulations.gov/document/FDA-2022-P-2872-0004; Final Response from FDA CDER to Students for Life of America, No. FDA-2023-P-1528 (Jan. 15, 2025), https://www.regulations.gov/document/FDA-2023-P-1528-0005; Response Letter from FDA CDER to Students for Life of America, No. FDA-2023-P-3328 (Jan. 15, 2025), https://www.regulations.gov/document/FDA-2023-P-3328-0004; Response Letter from FDA CDER to Students for Life of America, No. FDA-2024-P-5967 (May 21, 2025), https://www.regulations.gov/document/FDA-2024-P-5967-0003.

[84] Response from FDA CDER to Students for Life of America, No. FDA-2022-P-2872, at 17 (Jan. 15, 2025), https://www.regulations.gov/document/FDA-2022-P-2872-0004.

[85] 42 U.S.C. § 4321 et seq.

[86] *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497, 1513 (2025); *see id.* (according "substantial deference" to the agency's decision as to "*whether and to what extent* to prepare an [environmental impact statement]" (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004)).

[87] 21 C.F.R. § 25.20(l).

[88] 21 C.F.R. § 25.31(a).

[89] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., *Environmental Assessment and Finding of No Significant Impact for NDA 20-687 Mifepristone Tablets* (1996), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_EA.pdf.



aquatic environment from use of *much less than 1 part per billion* using default, conservative screening-level assumptions that all drug substance produced is used, there is even distribution throughout the United States per day, and there are no metabolism or depletion mechanisms.[90] The Material Safety Data Sheet also noted that mifepristone is "[b]iodegradable in natural media," meaning that mifepristone is not expected to accumulate in the environment because it will break down through the action of microorganisms.[91] Based on these materials, FDA made a finding of no significant impact, concluding that mifepristone "can be manufactured, used and disposed of *without any expected adverse environmental effects*," that "[a]dverse effects are not anticipated upon endangered or threatened species," and that approval of the NDA "will not have a significant effect on the quality of the human environment."[92] In support of its ANDA, Petitioner appropriately claimed a categorical exclusion under 21 C.F.R. § 25.31(a) because action on its ANDA would not increase use of the active moiety.

In rejecting the aforementioned citizen petitions, in January 2025, FDA reaffirmed that the 1996 EA complied with NEPA and FDA's regulations, concluding that "FDA appropriately assessed the potential impact on the human environment from excretion by patients who use mifepristone and determined that there would be no significant effects on the quality of the human environment."[93] FDA concluded that the 1996 EA and FDA's finding of no significant impact "show that 'remnants of mifepristone' are not causing harm to the environment and to people through environmental pathways, and also show, by extension, that metabolites from patients using mifepristone have not been 'causing teratologic repercussions or congenital anomalies in animals like birth defects.'"[94]

The findings from the 1996 EA were also reaffirmed by a new environmental analysis conducted by FDA. In January 2025, FDA conducted its own environmental analysis, using publicly available data on current usage rates of mifepristone and applying the default

---

[90] Response from FDA CDER to Students for Life of America, No. FDA-2022-P-2872, at 3, 12-14 (Jan. 15, 2025), https://www.regulations.gov/document/FDA-2022-P-2872-0004; *see also* U.S. Food & Drug Admin., *Guidance for Industry for the Submission of an Environmental Assessment in Human Drug Applications and Supplements* (1995) (hereinafter "1995 EA Guidance"); U.S. Food & Drug Admin., *Guidance for Industry: Environmental Assessment of Human Drug and Biologics Applications* (1998), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/environmental-assessment-human-drug-and-biologics-applications (hereinafter "1998 EA Guidance"). The 1995 EA Guidance was replaced in July 1998 by the 1998 EA Guidance.

[91] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., *Environmental Assessment and Finding of No Significant Impact for NDA 20-687 Mifepristone Tablets*, Appendix D, Material Safety Data Sheet (1996), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_EA.pdf.

[92] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., *Environmental Assessment and Finding of No Significant Impact for NDA 20-687 Mifepristone Tablets* 1-2 (1996), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_EA.pdf (emphasis added).

[93] Response from FDA CDER to Students for Life of America, No. FDA-2022-P-2872, at 19 (Jan. 15, 2025), https://www.regulations.gov/document/FDA-2022-P-2872-0004.

[94] *Id.* at 12 (citing Citizen Petition from Students for Life of America, No. FDA-2022-P-2872, at 2, 9 (Nov. 15, 2022), https://www.regulations.gov/document/FDA-2022-P-2872-0001)).



environmental calculations described in FDA's current environmental guidance. This analysis reaffirmed the findings from the 1996 EA: FDA concluded that its "conservative calculations" using estimates of current use rates of mifepristone "show an exposure level that is *so low that is it predicted to have no effect on the environment*, including threatened and endangered species."[95] As FDA recognized, the SFLA petitions "provide[d] *no evidence* showing that bodily fluid from patients who have used mifepristone (a one-time, single-dose drug product) is causing harm to the nation's aquatic environment."[96] FDA further stated that the Agency is not aware of any evidence "suggesting that products of conception pose an environmental hazard to the water supply" or that "products of conception from induced abortions differ from the naturally occurring products of conception from spontaneous abortions."[97] No new evidence contradicts FDA's conclusions. And, if FDA now believes such evidence exists, it must accord Petitioner notice and an opportunity to comment on such material.

Separately, FDA also correctly concluded that the ESA and CWA do not impose requirements on FDA's approval of drug applications. In rejecting the April 2023 SFLA citizen petition, FDA correctly explained that it does not have "discretionary Federal involvement or control" over approvals of the type that would trigger obligations under ESA Section 7; accordingly, it is not required to consult with FWS or NMFS before approving an NDA or ANDA.[98] Additionally, in rejecting the August 2023 SFLA citizen petition, FDA explained that the CWA does not apply to FDA's approval of mifepristone, because excretion of mifepristone, its metabolites, or any products of conception into wastewater would not be considered a "discharge" or nonpoint "runoff" under the CWA.[99] It remains the case today that the ESA and CWA are inapplicable to FDA's approval of drug applications. If FDA adopts the position that these regimes somehow impact the approval of mifepristone, Petitioner must be accorded notice and opportunity to comment on and challenge such an unfounded interpretation.

\*        \*        \*

In summary, FDA's approval of mifepristone and the current REMS reflects its judgment that the drug is safe and effective and has a favorable benefit-risk balance under the current conditions of use. FDA's decisions regarding mifepristone have been based on the agency's review of vast amounts of data and hundreds of medical studies over more than two decades. Further, FDA's decisions regarding mifepristone have twice been found to be legally and factually valid by the GAO.

---

[95] *Id.* at 16-17 (emphasis added).

[96] *Id.* at 8-9 (emphasis added).

[97] *Id.* at 13.

[98] Final Response from FDA CDER to Students for Life of America 8, No. FDA-2023-P-1528 (Jan. 15, 2025), https://www.regulations.gov/document/FDA-2023-P-1528-0005.

[99] Response Letter from FDA CDER to Students for Life of America 8-10, No. FDA-2023-P-3328 (Jan. 15, 2025), https://www.regulations.gov/document/FDA-2023-P-3328-0004.



Accordingly, FDA should take no action that would reduce patient access to mifepristone and/or increase the burdens associated with prescribing or dispensing mifepristone, as such actions are not scientifically or medically warranted, or consistent with applicable law.

### 3.    Any FDA Withdrawal of Petitioner's ANDA Approval Must Follow All Applicable Procedures Afforded by Law and Regulation

As FDA is well aware, FDA's longstanding approvals regarding mifepristone have come under legal challenge. These ill-advised and unfounded attacks on FDA's decisions pursuant to its congressional mandate are of grave concern to Petitioner, which has invested considerable effort and expense in reliance on FDA's past regulatory actions with respect to mifepristone, and with the understanding that any withdrawal of an FDA approval is subject to a well-established FDA regulatory process. Petitioner therefore must respectfully insist that any steps to withdraw or otherwise restrict FDA's approval of Petitioner's ANDA for mifepristone as currently labeled— whether in effectuation of a court order or otherwise—follow all applicable procedures afforded by law and regulation, and that FDA permit Petitioner to continue marketing and selling mifepristone under current conditions of use until those procedures have been completed.

### a.    FDA's Approval of Petitioner's ANDA is Facing a Legal Challenge

On November 18, 2022, the Alliance for Hippocratic Medicine filed a complaint in the U.S. District Court for the Northern District of Texas challenging FDA's approvals of Danco's NDA for Mifeprex and Petitioner's ANDA for mifepristone, as well as other FDA actions related to mifepristone. On April 7, 2023, the district court granted in part the plaintiffs' preliminary injunction motion, purporting to "stay[] the effective date of FDA's September 28, 2000, [a]pproval of mifepristone" and subsequent actions on mifepristone that the plaintiffs challenged, including the REMS modifications in 2016 and 2021 and the approval of Petitioner's ANDA in 2019.[100] That order, however, was stayed pending appeal; on June 13, 2024, the Supreme Court ultimately held that the plaintiffs lacked Article III standing to challenge FDA's actions relating to mifepristone.[101] The case was subsequently remanded to the district court.[102]

But that was not the end of the legal threat to Petitioner's ANDA. On remand, intervenor-plaintiff States in the lawsuit, now captioned *Missouri v. FDA*, have alleged that FDA "lacked legal authority" when approving Petitioner's ANDA.[103] Intervenor-plaintiffs have asserted that Petitioner's ANDA approval "must be held unlawful, stayed, set aside, vacated, and preliminarily and permanently enjoined."[104] Because Petitioner's ANDA for generic mifepristone remains under

---

[100] *All. for Hippocratic Med. v. FDA*, 668 F. Supp. 3d 507, 560 (N.D. Tex. 2023).

[101] *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024).

[102] *All. for Hippocratic Med. v. FDA*, 117 F.4th 336, 340 (5th Cir. 2024).

[103] Amended Complaint ¶ 764, *Missouri v. FDA*, No. 2:22-cv-223-Z (N.D. Tex. Jan. 16, 2025), ECF No. 217.

[104] *Id.* ¶ 787.



attack, Petitioner is acutely interested in FDA's adherence to all applicable procedures governing any potential withdrawal of approved drug applications.[105]

As a result of this legal threat, Petitioner has previously and repeatedly insisted that FDA confirm that any withdrawal of approval for Petitioner's ANDA for mifepristone would follow all applicable procedures afforded by law to Petitioner as the ANDA holder, and that FDA would permit Petitioner to continue marketing and selling mifepristone until those procedures have been completed. Petitioner communicated these requests in letters to FDA in March and April 2023, as it considered the potential impact of the district court's order in *Alliance for Hippocratic Medicine v. FDA*.[106] FDA responded to one such letter by declining to provide the assurances sought by Petitioner, instead stating that FDA would "need to review the Court's opinion and order before determining what steps may be necessary to comply with it."[107] FDA did not respond to Petitioner's other communications on this topic.

b.    Statute and Regulations Require FDA to Follow Specific Procedures to Withdraw an ANDA

Petitioner believes that FDA should confirm that any steps to withdraw the approval of Petitioner's ANDA for mifepristone—whether in purported effectuation of a court order or otherwise—will follow all applicable procedures afforded by law and regulation to Petitioner as the ANDA holder, and that Petitioner may continue marketing and selling mifepristone until those procedures have been completed.

(i)    *Statutory Withdrawal Procedures*

Any withdrawal of Petitioner's ANDA must comport with the statutory provisions governing the withdrawal of an approved drug application. Congress granted FDA, and FDA alone, the authority to oversee the withdrawal of an approved drug application.[108] Withdrawal requires a finding by FDA that one of the relevant statutory criteria has been met, as well as "due notice and opportunity for hearing to the applicant."[109] As discussed above, under the FDCA, and

---

[105] Petitioner has intervened in the *Missouri v. FDA* lawsuit to defend against the Intervenor-plaintiff States' unfounded attacks on the ANDA approval and other FDA regulatory actions, including on the basis that the lawsuit is procedurally improper for multiple reasons. As Petitioner has made clear in its filings in the case, Intervenor-plaintiffs' legal challenges should be dismissed.

[106] *See* Letter from Evan Masingill, Chief Exec. Officer, GenBioPro, Inc., to the Honorable Robert M. Califf, M.D., Comm'r, FDA (Mar. 1, 2023); Letter from Evan Masingill, Chief Exec. Officer, GenBioPro, Inc., to the Honorable Robert M. Califf, M.D., Comm'r, FDA (Apr. 9, 2023); Letter from Evan Masingill, Chief Exec. Officer, GenBioPro, Inc., to the Honorable Robert M. Califf, M.D., Comm'r, FDA (Apr. 13, 2023).

[107] Letter from Patrizia Cavazzoni, MD, Dir., Ctr. for Drug Evaluation and Rsch., FDA, to Evan Masingill, Chief Exec. Officer, GenBioPro, Inc. (Mar. 24, 2023).

[108] 21 U.S.C. § 355(e).

[109] *Id.*



as relevant here, the Secretary of HHS may withdraw approval of an application *only* if the Secretary finds that:

> [C]linical or other experience, tests, or other scientific data show that such drug is unsafe for use under the conditions of use upon the basis of which the application was approved . . . [or] on the basis of new information before him with respect to such drug, evaluated together with the evidence available to him when the application was approved, that there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof.[110]

The Secretary, in turn, has delegated the responsibility for making the requisite finding to the FDA Commissioner.[111] Any withdrawal of a drug approval on safety or efficacy grounds therefore requires a finding that the evidence demonstrates that the drug's benefit-risk balance requires withdrawal. As the Supreme Court has emphasized, the FDCA does "not provide any mechanism other than the Commissioner's suspension authority under [section 355(e)], whereby an NDA once effective could cease to be effective."[112]

### (ii)    FDA Regulations on Withdrawal Procedures

The regulations that implement 21 U.S.C. § 355(e)'s requirements of notice and opportunity to be heard set out the specific and detailed procedures FDA must follow when withdrawing a drug approval. In addition to notice and the opportunity for a hearing on a proposal to withdraw a drug, FDA regulations also expressly permit the applicant to submit studies, data, and other information.[113] Specifically with regard to the holder of an ANDA such as Petitioner, the regulations require an opportunity to submit written comments and, if a hearing is granted, the opportunity to participate and to submit written objections to an initial decision.[114]

The participation of the manufacturer in withdrawal proceedings is crucial to upholding the legitimacy of (and public confidence in) FDA's decision-making. Moreover, manufacturers such as Petitioner are often the most knowledgeable party regarding the drug's use, safety profile, and the related health care delivery systems. The due process protections embodied within these statutory and regulatory procedures are also constitutionally necessary for the protection of Petitioner's property interest in its mifepristone ANDA.

---

[110] *Id.*

[111] FDA Staff Medical Guides, Staff Manual Guides 1410.10, Delegations of Authority to the Commissioner of Food and Drugs 1.A(1) (Nov. 29, 2022), https://www.fda.gov/media/81983/download.

[112] *Weinberger v. Hynson, Wescott & Dunning, Inc.*, 412 U.S. 609, 633 (1973).

[113] 21 C.F.R. §§ 314.150, 314.200, 314.530.

[114] 21 C.F.R. § 314.151.



          (iii)     *Authority to Suspend Approval Without Pre-Deprivation Process*

While the FDCA permits the suspension of an ANDA without pre-deprivation process, this power may be used only in exceptional circumstances.[115] Such suspension requires a finding of "an imminent hazard to the public health."[116] FDA regulations, in turn, provide that an "imminent hazard to the public health" is considered to exist only when "the evidence is sufficient to show that a product or practice, posing a *significant threat* of danger to health, creates a public health situation: (1) that should be corrected immediately to *prevent injury* and (2) that should not be permitted to continue while a hearing or other formal proceeding is being held."[117]

The legislative history of the suspension statute makes clear that this authority is to be used only in extraordinary situations. Congress believed that the suspension authority, "which could have grave effects upon a manufacturer and upon the confidence of the public in a drug which might later be found appropriate for continued availability to physicians, should only be exercised under the most extreme conditions and with the utmost care."[118] In the event that FDA finds an "imminent hazard" and orders the immediate suspension of an application approval, the approval holder is entitled to immediate procedural protections, including "prompt notice," and "an expedited hearing."[119] The holders of any ANDAs whose approval rests on a suspended NDA must be allowed to participate in the post-suspension proceeding for the NDA.[120]

          c.     <u>Suspension of Mifepristone Outside FDA Procedure Would Be Unlawful</u>

To date, there has been no finding of imminent hazard made with respect to mifepristone—nor could there be given the mountain of replicated scientific data establishing the drug is safe and effective as used by millions of women for over twenty years in the United States. Therefore, without the requisite "imminent hazard" finding—and the procedural protections that accompany such a finding—FDA may not deprive Petitioner of its protected property interests in marketing its ANDA for mifepristone.

HHS and FDA's procedures for withdrawing or suspending drug approvals are far more than regulatory formalities. In addition to harming the constitutional rights of NDA and ANDA holders, suspension of approvals outside FDA and HHS's express procedures disrupts the evidence-based mandate of FDA. It undermines public confidence in FDA's approval of drugs by incorrectly suggesting that FDA approval is not grounded in scientific principles or by implying

---

[115] 21 U.S.C. § 355(e)

[116] *Id.*

[117] 21 C.F.R. § 2.5 (emphasis added).

[118] 108 Cong. Rec. 17366 (Aug. 23, 1962).

[119] 21 U.S.C. § 355(e); *see* 21 C.F.R. § 314.150(a)(1).

[120] 21 C.F.R. § 314.150(a)(1).



that FDA misinterpreted those scientific principles in such a way that a drug must be immediately pulled from the market.

Crucially, since FDA's approval of Petitioner's ANDA in 2019, FDA has never presented Petitioner with any scientific evidence that would justify withdrawal or suspension of its approval. Petitioner must be afforded an opportunity to be heard on any such evidence prior to any withdrawal or suspension.

In sum, the statutory and regulatory procedures governing the withdrawal and suspension of an application approval are necessary to protect Petitioner's property interests in its mifepristone ANDA, as well as the patient desire for medication access. Accordingly, Petitioner requests that FDA confirm that any withdrawal of the approval of Petitioner's ANDA for mifepristone, or any other action that would impair the approval or labeling—whether in effectuation of a court order or otherwise—must follow all applicable procedures afforded by law and regulation to Petitioner as the ANDA holder, and that Petitioner may continue marketing and selling mifepristone until those procedures have been completed.

### 4.    Conclusion

For the foregoing reasons, Petitioner respectfully requests that FDA:

(1) refrain from taking any action that would reduce patient access to mifepristone and/or increase the burdens associated with prescribing or dispensing mifepristone; and

(2) confirm that any FDA withdrawal of approval for mifepristone, including in response to any court order, will follow all applicable rules and procedures for any withdrawal, suspension or other action under the APA, the FDCA, and implementing regulations, and that Petitioner will be permitted to continue to market and sell mifepristone in the United States until those procedures have been completed.

### C.    ENVIRONMENTAL IMPACT

We claim categorical exclusion under 21 C.F.R. § 25.31. Therefore, an environmental impact analysis is not required.

### D.    ECONOMIC IMPACT

Pursuant to 21 C.F.R. § 10.30(b), an economic impact statement will be submitted upon request of the Commissioner.

### E.    CERTIFICATION

The undersigned certifies that, to the best knowledge and belief of the undersigned, this petition includes all information and views on which the petition relies, and that it includes representative data and information known to the petitioner which are unfavorable to the petition.



Respectfully submitted,

Evan Masingill
Chief Executive Officer
GenBioPro, Inc.
3651 Lindell Road
STE D1041
Las Vegas, NV 89103
855-643-3463

31