**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

THE STATE OF LOUISIANA, BY AND THROUGH
ITS ATTORNEY GENERAL, LIZ MURRILL,
AND ROSALIE MARKEZICH,

        *Plaintiffs*,

    v.

U.S. FOOD AND DRUG ADMINISTRATION,
ET AL.,

        *Defendants*.

Civil Action No.: 6:25-cv-01491-DCJ-DJA

Judge David C. Joseph

Magistrate Judge David J. Ayo

**BRIEF FOR AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND
GYNECOLOGISTS AND SAMARITAN'S PURSE AS *AMICI CURIAE*
SUPPORTING PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF**

Brian W. Arabie (Bar No. 27359)
SIGLER, ARABIE & CANNON, LLC
630 Kirby Street
Lake Charles, LA 70601
(337) 439-2033
brian@siglerlaw.com

Christopher E. Mills*
SPERO LAW LLC
557 East Bay St. #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law
*\* Admitted pro hac vice*

## TABLE OF CONTENTS

Table of Authorities ....................................................................................................... ii

Introduction and Summary of the Argument .................................................................. 1

Interest of *Amici Curiae* ................................................................................................ 2

Argument ........................................................................................................................ 2

    I.    ACOG is driven by ideology, not science. ..................................................... 2

         A.    ACOG has a long history of abortion advocacy. ........................................ 4

         B.    ACOG's ideology drives its abortion advocacy. ........................................ 7

         C.    ACOG's guidelines and statements are suffused with ideology, not evidence. ........ 10

         D.    ACOG's abortion ideology infects its views here. ..................................... 15

    II.    FDA's cited studies do not support the safety of telemedicine abortions. ....................... 18

Conclusion ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ................................................ 9, 16

*Glossip v. Gross*, 576 U.S. 863 (2015) .................................................................................. 15

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ........................................................................ 4, 16

*Memphis Ctr. for Reprod. Health v. Slatery*, 14 F.4th 409 (6th Cir. 2021) .................................... 8

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528 (7th Cir. 1997)... 21

*Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724 (8th Cir. 2008) ......................... 8

*Planned Parenthood S. Atl. v. State*, 882 S.E.2d 770 (S.C. 2023) ......................................... 12, 13

*Roe v. Wade*, 410 U.S. 113 (1973) ................................................................................. 5, 6, 9

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ...................................................................... 9, 14

*Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747 (1986) ........................ 9

*United States v. Skrmetti*, 605 U.S. 495 (2025) ................................................................... 15

*Wilk v. AMA*, 895 F.2d 352 (7th Cir. 1990) ......................................................................... 3

**STATUTES**

18 U.S.C. § 1841 ............................................................................................................... 16

La. Stat. Ann. § 40:1061.1 ................................................................................................. 16

**OTHER AUTHORITIES**

AAPLOG, *ACOG Declines Debate Invitation* (May 11, 2023), https://perma.cc/B2V8-SBKF.... 7

Abigail R.A. Aiken, *Effectiveness, Safety and Acceptability of No-Test Medical Abortion (Termination of Pregnancy) Provided via Telemedicine*, 128 BJOG 1464 (2021) .................. 24

*Abortion Pill Maker Revealed*, CBS News (Oct. 13, 2000), https://perma.cc/5L3Q-EQLZ........ 19

*ACOG Guide to Language and Abortion*, https://perma.cc/44VW-3JBL (as of Jan. 22, 2026) .. 13

*ACOG Guide to Language and Abortion*, WebArchive (Sept. 21, 2023), https://tinyurl.com/bdef55f5 ................................................................................. 12, 13

ACOG, *ACOG President Condemns the Passage of 'Born-Alive' Legislation* (Jan. 11, 2023), https://perma.cc/J8J7-7N32 ............................................................................................. 8

ACOG, *Addressing Climate Change*, https://perma.cc/T2TB-QXK2 ........................................ 11

ACOG, *Barriers to Breastfeeding*, https://perma.cc/4GLV-VYGX ........................................... 14

ACOG, *Clinical Practice Guideline Methodology* (Sept. 2021), https://perma.cc/ZB88-FBGM ................................................................................................ 10

ACOG, *Early Pregnancy Loss*, https://perma.cc/8SD8-N4R2 ................................................. 13

ACOG, *Facts Are Important: Gestational Development and Capacity for Pain*, https://perma.cc/G9P2-CLY6 ............................................................................................. 9

ACOG, *Fetal Heart Rate Monitoring During Labor*, https://perma.cc/JBW8-LU9R ................. 13

ACOG, *Gun Violence and Safety*, https://perma.cc/25MH-6PSL .................................................... 11

ACOG, *Health Care for Transgender and Gender Diverse Individuals*,
    https://perma.cc/2YZS-KEEK ................................................................................. 15

ACOG, *Manual of Standards in Obstetric-Gynecologic Practice* (1959) ..................................... 5

ACOG, *Medication Abortion Up to 70 Days of Gestation*,
    https://perma.cc/C25E-6K96 ................................................................. 1, 10, 15, 16, 17

ACOG, *Methods for Estimating the Due Date*, https://perma.cc/EL97-LK3S ............................ 17

ACOG, *Mitchell D. Creinin*, https://perma.cc/KE42-RD57 ......................................................... 15

ACOG, *Opposition to Immigration Practices*, https://perma.cc/7DCH-LWTW ......................... 11

ACOG, *Second-Trimester Abortion*, https://perma.cc/5LWK-QJTK ............................................ 10

ACOG, *Self-Managed Abortion*, https://perma.cc/L7KB-AJQ4 ................................................... 18

ACOG, *Statement on "Personhood" Measures* (Nov. 9, 2022), https://perma.cc/9376-B5A4 ..... 8

ACOG, *Statement on Supreme Court Affirmative Action Ruling* (Jun. 29, 2023),
    https://perma.cc/X8KG-5VVZ ................................................................................ 11

ACOG, *Training and Workforce after* Dobbs, https://perma.cc/D4VS-KBJB ............................ 12

ACOG, *Tubal Ectopic Pregnancy*, https://perma.cc/HW5J-WSQF ............................................. 17

ACOG, *Violence and Racism in the Criminal Legal System*, https://perma.cc/5YH3-VN8U ..... 11

Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the
    Sterilization of Carrie Buck* (2016) ...................................................................... 3

Arvind Vatkar et al., *Understanding the Levels of Evidence in Medical Research*,
    15(5) J. Orthopaedic Case Reports 6 (2025), https://perma.cc/Z4KR-4DW6 ......................... 11

Becky Staiger et al., *Obstetrician and Gynecologist Physicians' Practice Locations Before and
    After the* Dobbs *Decision*, 8(4) JAMA Network (2025), https://perma.cc/7G93-7YJL ........... 11

Ben Knudsen et al., *Analysis of the Political Viewpoint of Policy Statements from Professional
    Medical Organizations*, 9 JMIR Formative Res. (2025), https://perma.cc/R9RE-W2H3 ........ 11

Brief of ACOG et al. as *Amici Curiae*, *FDA v. Alliance for Hippocratic Med.*,
    Nos. 23-235, 23-236, 2024 WL 399937 (U.S. Jan. 30, 2024) ....................................... 1, 13, 16

Brief of ACOG et al., *Roe v. Wade*, No. 70-18, 1971 WL 128053 (U.S. 1971) ............................ 6

Brief of *Amici Curiae* ACOG et al., *Little Rock Fam. Plan. Services v. Rutledge*,
    No. 19-2690, 2020 WL 248815 (Jan. 8, 2020) ......................................................... 8

Brief of *Amici Curiae* ACOG et al., *Planned Parenthood of the Heartland, Inc. v. Reynolds*,
    No. 22-2036 (Iowa March 20, 2023), https://perma.cc/9U3V-42HW ................................. 1, 12

Brief of *Amicus Curiae* AAPLOG, *June Medical Services LLC v. Gee*,
    Nos. 18-1323, 18-1460, 2019 WL 7397763 (U.S. Dec. 27, 2019) ..................................... 7

iii

Brittni Frederiksen, *A National Survey of OBGYNs' Experiences After* Dobbs, KFF (Jun. 21, 2023), https://perma.cc/W432-CVJS ................................................................ 7

Carlo V. Bellieni & Giuseppe Buonocore, *Is Fetal Pain a Real Evidence?*, 25 J. Maternal-Fetal & Neonatal Med. 1203 (2012) .................................................... 8

Carole Novielli, *Exposing ACOG: The Medical Organization that Supports and Covers for the Abortion Industry*, Live Action (June 24, 2021), https://perma.cc/QBL3-6BG7 ....................... 7

Carole Novielli, *The Population Council, which Brought the Abortion Pill to the U.S., has a Shocking History that's Nothing to Celebrate*, Live Action (Nov. 14, 2017), https://perma.cc/Y7SP-6TZE ..................................................................................... 19

Carrie N. Baker, *Abortion Pills: US History and Politics* (2024) ................................................ 19

Cheryl Tan & Adam Lewandowski, *The Transitional Heart: From Early Embryonic and Fetal Development to Neonatal Life*, 47 Fetal Diagnosis & Therapy 373 (2020) ............................. 12

Christopher Zahn et al., *In the Abortion Debate, Honesty Matters*, Wash. Post (Aug. 30, 2023), https://bit.ly/4a6qxVk .................................................................... 4

Cleveland Clinic, *Overview* (Mar. 19, 2024), https://perma.cc/9YB5-ZFFG ............................... 8

Complaint, *Alliance for Hippocratic Med. v. FDA*, No. 22-cv-223, 2022 WL 17091784 (N.D. Tex. Nov. 18, 2022) ........................................................................................... 2

Courtney Kerestes et al., *Provision of Medication Abortion in Hawai'i during COVID-19: Practical Experience with Multiple Care Delivery Models*, 104 Contraception 49 (2021) ...................................................................... 19, 24

Darren Hutchinson, *First-Trimester Fetal Echocardiography*, 30 J. Am. Soc'y Echocardiography 763 (2017) ........................................................... 13

David A. Grimes, *An Overview of Clinical Research*, 359 Lancet 57 (2002) .............................. 20

Elizabeth Raymond et al., *TelAbortion: Evolution of a Direct to Patient Telemedicine Abortion Service in the United States*, 100 Contraception 173 (2019) .............................................. 18, 21

Enrica Bianchi et al., *Juno Is the Egg Izumo Receptor and Is Essential for Mammalian Fertilization*, 508 Nature 483 (2014) .............................................................................. 8

Erica Chong et al., *Expansion of a Direct-to-Patient Telemedicine Abortion Service in the United States and Experience during the COVID-19 Pandemic*, 104 Contraception 43 (2021) ............................................................... 18, 21, 22

FDA, *What is a Serious Adverse Event?*, https://perma.cc/2VCW-4BZU ................................... 22

Gallup, *Where Do Americans Stand on Abortion?* (July 7, 2023), https://perma.cc/HV96-U5JN .......................................................................... 9

Gilbert Berdine, *The Hippocratic Oath and Principles of Medical Ethics*, 3(9) Southwest Respiratory & Critical Care Chronicles 28 (2015), https://perma.cc/GJ4V-RQLA ................... 4

Gina Kolata, *U.S. Approves Abortion Pill*, N.Y. Times, Sept. 29, 2000, at A1 .......................... 19

Gynuity Health Projects, *Funders*, https://bit.ly/3NVcxGH (Mar. 3, 2020) ............................... 20

Gynuity Health Projects, *Medication Abortion*, https://perma.cc/6R6S-6MM9 .................. 18, 21

Gynuity Health Projects, *Staff*, https://perma.cc/JQ4Y-C926 ...................................................... 19

Hector O. Chapa, *Why I Left the ACOG Board of Directors*, Live Action (May 1, 2025), https://perma.cc/34B8-RYDK ....................................................................................................... 10

Holly A. Anger et al., *Clinical and Service Delivery Implications of Omitting Ultrasound before Medication Abortion Provided via Direct-to-Patient Telemedicine and Mail in the U.S.*, 104 Contraception 659–65 (2021) ......................................................................................... 18, 23

Howard Balshem et al., *GRADE Guidelines*, 64 J. Clinical Epidemiol. 401 (2011), https://perma.cc/2KDY-6BW5 ....................................................................................................... 17

Ibis Reproductive Health, *Funders*, https://bit.ly/3Oiv5Rc (Oct. 3, 2018)................................. 20

Intervenor Danco Laboratories, LLC's Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction, *Alliance for Hippocratic Med. v. FDA*, No. 22-cv-223, 2023 WL 2974521 (N.D. Tex. Feb. 10, 2023)........................................................................... 19

Jason D. Wright et al., *Scientific Evidence Underlying the American College of Obstetricians and Gynecologists' Practice Bulletins*, 118(3) Obstetrics & Gynecology 505 (2011), https://perma.cc/7RUY-W44R ...................................................................................................... 10

Johns Hopkins Med., *The First Trimester*, https://perma.cc/8N6H-M6CN .................................. 8

Jordan Boyd, *American College Of OB-GYNs Bans Pro-Life Doctors From Conference After They Show Up*, Federalist (Feb. 28, 2023), https://bit.ly/4a2XbHt ........................................... 7

Julia Bunting, *Reaffirming Our Resolve to Uphold Global Reproductive Rights*, Population Council (May 17, 2022), https://perma.cc/92F4-RWLK............................................................. 19

Katharine Q. Seelye, *Accord Opens Way for Abortion Pill in U.S. in 2 Years*, N.Y. Times (May 17, 1994), at A1........................................................................................................... 19

Katherine Bishop et al., *Ultrasound Examination of the Fetal Heart*, 72 Obstetrical & Gynecological Survey 54 (2017) .............................................................................................. 12

Keith L. Moore et al., *The Developing Human E-Book: Clinically Oriented Embryology* (Kindle ed. 2020) ........................................................................................................................ 8

Maarit J. Mentula et al., *Immediate Adverse Events after Second Trimester Medical Termination of Pregnancy*, 26(4) Human Reproduction 927 (2011) ........................................................... 17

Marty Makary, *Blind Spots: When Medicine Gets It Wrong, and What It Means for Our Health* (2024)........................................................................................................................................... 3

Michelle La Mothe, *A 20-Year Journey: The History of the Abortion Pill*, Free Republic (Feb. 9, 2006), https://perma.cc/W7PC-4B5P ......................................................................... 19

Nancy Aries, *The American College of Obstetricians and Gynecologists and the Evolution of Abortion Policy, 1951–1973: The Politics of Science*, 93 Am. J. Pub. Health 1810 (2003), https://perma.cc/3W8V-NMP4 .............................................................................................. 4, 5, 6

Natalie Krebs, *Iowa Doesn't Have Enough OB-GYNs. The State's Abortion Ban Might Be Making It Worse.*, Iowa Public Radio (Jan. 5, 2026), https://perma.cc/P3RX-23AM ............. 12

Petition for Original Jurisdiction, *Planned Parenthood S. Atl. v. South Carolina*, No. 2023-001449 (S.C. Sept. 14, 2023), https://perma.cc/5KKH-AQ2Y ............................... 13

Physicians for Reproductive Health, *Mitchell Creinin* (Apr. 25, 2020), https://perma.cc/4EDR-6FP6 ............................................................................ 10

Population Council, *Annual Report 2019*, https://perma.cc/3NT7-JSA5 ..................................... 19

Rachel K. Jones, *Abortion Incidence and Service Availability in the United States, 2020*, 54(4) Perspectives on Sexual & Reproductive Health 128 (2022), https://perma.cc/A5E9-RQX4.................................................................................... 5

Richard Rokyta, *Fetal Pain*, 29 Neuroendocrinology Letters 807 (2008) ..................................... 8

Shannen W. Coffin, *Kagan's Abortion Distortion*, Nat'l Rev. (June 29, 2010), https://perma.cc/5H6N-MASN ................................................................................... 14

Stacy Weiner, *The Fallout of* Dobbs *on the Field of OB-GYN*, AAMC (Aug. 23, 2023), https://perma.cc/2MQZ-S7FS.................................................................................... 11

Stuart W. G. Derbyshire et al., *Reconsidering Fetal Pain*, 46 J. Med. Ethics 3 (2020) ................. 9

Tamar Reisma et al., *Case Report: Induced Lactation in a Transgender Woman*, 3.1 Transgender Health 24 (2018), https://perma.cc/2TJ9-SSEZ............................................... 14

Thomas W. Sadler, *Langman's Medical Embryology* (14th ed. 2019)........................................ 8

Tina Raine-Bennett et al., *Disparities in the Incidence of Ectopic Pregnancy in a Large Health Care System in California, 2010–2019*, 26(3) Permanente J. 61, https://perma.cc/45B6-QTP5 ..................................................................................... 17

U.S. Dep't of Health & Human Services, *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (May 1, 2025), https://perma.cc/A3228Z8L ......................... 3, 15

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

**I.** The American College of Obstetricians and Gynecologists (ACOG) applauds itself "as a leading provider of authoritative scientific data,"[1] including about the abortion drug regime. Especially about induced abortion, it is not. Rather, ACOG has become an interest group committed to its leadership's pro-abortion ideology. ACOG's history, guidelines, and policy positions show that it has long prioritized ideological advocacy over science on abortion.

Presumably those ideological blinders are why ACOG's "authoritative" arguments about induced abortion to courts across the country are routinely contradicted by the scientific evidence. ACOG has misled courts about fetal development facts. It has rewritten its "evidence-based" guidelines to bolster pro-abortion litigation positions. And it so reflexively supports unregulated abortions—without consideration of the mother's safety or the preborn child's life—that its arguments deviate from its own bulletins. While ACOG's bulletin found "limited or inconsistent" evidence supporting the safety of medication abortion "by telemedicine,"[2] ACOG told the Supreme Court that telemedicine abortions are unqualifiedly "safe and effective."[3]

There is significant reason to distrust ACOG's ideological claims about abortion. ACOG functions as a pro-abortion activist group, and it does not accurately represent scientific evidence about induced abortion, the views of its membership, or the expertise of the over 80% of obstetricians and gynecologists in the United States who do not perform abortions.

**II.** Though the FDA relied on a few studies purportedly involving dispensing abortion drugs by mail without in-person evaluation, none supports its action. The studies largely required in-person, pre-abortion testing, so the studies do not reflect real-world use enabled by FDA. None offered a statistically significant comparison involving wholly remote abortion. And most found higher emergency visits after telemedicine abortion compared to the current label information.

---

[1] Brief of *Amici Curiae* ACOG et al. 13, *Planned Parenthood of the Heartland, Inc. v. Reynolds*, No. 22-2036 (Iowa March 20, 2023), https://perma.cc/9U3V-42HW.

[2] ACOG, *Medication Abortion Up to 70 Days of Gestation*, https://perma.cc/C25E-6K96.

[3] Brief of ACOG et al. as *Amici Curiae* 20, *FDA v. Alliance for Hippocratic Med.*, Nos. 23-235, 23-236, 2024 WL 399937 (U.S. Jan. 30, 2024) (hereinafter "ACOG Brief").

**INTEREST OF *AMICI CURIAE***

The American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) is a nonprofit professional medical organization with about 8,000 medical professional members, including many experts in reproductive healthcare. AAPLOG equips its members and other medical practitioners with an evidence-based rationale for protecting the lives of the pregnant mother and her unborn child. Its CEO, Dr. Christina Francis, has filed a declaration detailing the problems with the FDA's relaxation of the prescription regime for abortion drugs. Doc. 20-21. And AAPLOG has previously explained in detail its evidence-based concerns about the harms of mifepristone, particularly when dispensed without an in-person evaluation.[4]

AAPLOG was formed in 1973 as a "special interest group" within ACOG after ACOG leadership departed from science and the Hippocratic Oath by committing ACOG to elective abortions on demand without consulting membership. AAPLOG has an interest in showing that ACOG's abortion advocacy stems from its ideology, not scientific evidence or practice. ACOG does not represent all OB-GYNs, and its views here should be interpreted by the Court for what they are: ideological advocacy favoring unregulated abortion throughout pregnancy.

Samaritan's Purse is a nondenominational, evangelical Christian organization formed in 1970 to provide spiritual and physical aid to hurting people around the world. The organization seeks to follow the command of Jesus to "go and do likewise" in response to the story of the Samaritan who helped a hurting stranger. Samaritan's Purse operates in over 100 countries providing emergency relief, community development, and resources for children. It is committed to encouraging mothers to carry their children to term and to support them in doing so.

**ARGUMENT**

**I.    ACOG is driven by ideology, not science.**

Major medical interest groups have a history of being wrong, blinded by ideology, self-interest, ignorance, or a false "consensus." Hence eugenics, lobotomies, opioids, thalidomide,

---

[4] *See* Complaint, *Alliance for Hippocratic Med. v. FDA*, No. 22-cv-223, 2022 WL 17091784 (N.D. Tex. Nov. 18, 2022).

smoking, and peanut allergies.[5] Indeed, the American Medical Association's "systematic, long-term wrongdoing" has led courts to "doubt[] the AMA's genuineness regarding its concern for scientific method in patient care." *Wilk v. AMA*, 895 F.2d 352, 363, 366 (7th Cir. 1990). Especially on topics of political interest, the positions of these groups often reflect nothing more than underlying ideological commitments, as major medical interest groups release statements and guidelines that fit their desired narrative, regardless of the medical evidence.

This should not be surprising. As the United States Department of Health and Human Services explained in a recent report, "fundamentally, these organizations operate as trade associations."[6] Even if individual clinicians may be "motivated by altruism," "it should not be assumed that the collective actions of an organization" subject to "institutional biases, reliance on external guidance from advocacy-oriented groups, and internal political dynamics" are.[7] These organizations "may impede or even oppose evidence-based medicine" because of ideology or financial interests, and they "foster[] environments in which clinicians feel compelled to self-censor."[8] Worse, these organizations will often "target[] individuals and groups that question or critically examine prevailing practices."[9] These problems are especially severe on topics that are often "framed as" "civil rights issue[s]"—like abortion.[10]

The major player here is ACOG, whose views are routinely treated as fact by defenders of the FDA's relaxed abortion drug regime—and relied on by the drug manufacturers here.[11] But ACOG's cheerleading of drug-induced abortions is not based on the best available evidence, mothers' safety, or any interest in the preborn child—a life whose existence ACOG ignores (and

---

[5] *See generally* Marty Makary, *Blind Spots: When Medicine Gets It Wrong, and What It Means for Our Health* (2024); Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* 66 (2016) (noting that "every article on the subject of eugenic sterilization published in a medical journal between 1899 and 1912 endorsed the practice").

[6] U.S. Dep't of Health & Human Services, *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* 205 (May 1, 2025), https://perma.cc/A3228Z8L.

[7] *Id.* at 205, 211.

[8] *Id.* at 205–06.

[9] *Id.* at 209.

[10] *Id.* at 210.

[11] Doc. 54-4, at 24.

3

recently removed from their logo completely). Rather than being medically sound, ACOG's views here are rooted in its pro-abortion ideology.

### A.    ACOG has a long history of abortion advocacy.

Though ACOG now cheerleads any abortion "without restrictions, without limitations and without barriers,"[12] it was not always so. The ancient Hippocratic Oath prohibited doctors from performing abortions: "I will neither give a deadly drug to anybody if asked for it, nor will I make a suggestion to this effect. Similarly I will not give to a woman an abortive remedy."[13] Physicians who practice in accord with the Hippocratic Oath do not perform elective abortions or euthanasia. When the continued union of the mother and her baby poses a genuine, imminent threat to the mother's life, OB-GYNs are trained to separate the mother and the baby. If this emergency separation takes place when the baby could survive outside the womb, the separation is done in a way that maximizes the chances of survival for both mother and baby. Rarely is this separation necessary before the baby can survive outside the womb. Pre-viability maternal-fetal separations were historically termed therapeutic abortions. They posed no violation of Hippocratic ethics, because the decision facing the doctor was the loss of one life (the baby) or two lives (both the baby and the mother). By contrast, an elective (or induced) abortion occurs absent a threat to the mother's life. An induced abortion's purpose is to produce a dead baby. *See, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 139–40 (2007).

Early on, ACOG recognized the contradiction between the Hippocratic Oath and induced abortions, and its "policy on abortion derived from the view that professional standards should be based on scientific evidence."[14] ACOG was formed in the 1950s, and its 1959 *Manual of Standards in Obstetric-Gynecologic Practice* accepted abortion only "where the death of the mother might

---

[12] Christopher Zahn et al., *In the Abortion Debate, Honesty Matters*, Wash. Post (Aug. 30, 2023), https://bit.ly/4a6qxVk.

[13] Gilbert Berdine, *The Hippocratic Oath and Principles of Medical Ethics*, 3(9) Southwest Respiratory & Critical Care Chronicles 28, 30 (2015), https://perma.cc/GJ4V-RQLA.

[14] Nancy Aries, *The American College of Obstetricians and Gynecologists and the Evolution of Abortion Policy, 1951–1973: The Politics of Science*, 93 Am. J. Pub. Health 1810, 1812 (2003), https://perma.cc/3W8V-NMP4.

reasonably be expected to result from natural causes, growing out of or aggravated by the pregnancy, unless the child is destroyed."[15] The Manual noted that "medical and surgical care" had "progressed so that many previously strict indications [for abortion] are no longer valid," and the "incidence of this operation" should "rarely exceed[] 0.5 percent."[16] (Since *Roe v. Wade*, annually around 20–30% of pregnancies in America have ended in abortion.[17])

In these early years, ACOG leaders wanted to avoid "debates about social mores," as they were concerned "that the emergence of abortion and sterilization as political issues would challenge the scientific basis on which physicians' decisions were based."[18] In other words, ACOG recognized then that induced abortion exists to solve a social problem, not a medical one. And ACOG's leadership was right in surmising that its involvement in pushing for induced abortion would undermine ACOG's ability to make decisions on the basis of scientific evidence.

But ACOG could not withstand societal pressure for long, especially as individual hospitals eagerly expanded therapeutic abortions "for mental health reasons."[19] In the 1960s, pro-abortion ACOG leaders began making subtle changes to its abortion policy, altering the definition of "therapeutic" with a novel and vague component about the mother's "health," considering "the patient's total environment, actual or reasonably foreseeable."[20] ACOG's board recognized that the new policy "relied less heavily on scientific rationales," and only 50% of ACOG's membership supported it.[21] Yet even that policy continued to say that "the College will not condone nor support the concept that an abortion be considered or performed for any unwanted pregnancy."[22]

ACOG's position rapidly evolved starting in 1970, albeit without any open discussion of

---

[15] ACOG, *Manual of Standards in Obstetric-Gynecologic Practice*, at 35 (1959).
[16] *Id.*
[17] Rachel K. Jones, *Abortion Incidence and Service Availability in the United States, 2020*, 54(4) Perspectives on Sexual & Reproductive Health 128, 131 (2022), https://perma.cc/A5E9-RQX4.
[18] Aries, *supra* note 14, at 1813.
[19] *Id.* at 1813.
[20] *See id.* at 1814–15.
[21] *Id.* at 1815.
[22] *Id.*

the issue among ACOG's full membership.[23] After some States began to allow more abortions, ACOG "eliminat[ed] the distinction between therapeutic and nontherapeutic abortions."[24] But there was a problem: the need for a "medical indication" remained, meaning that most health insurance companies refused to reimburse for most abortions, which were supported only by "psychosocioeconomic" grounds—*i.e.*, convenience.[25] ACOG could not abide that impact to "physician fees," so it quickly added "psycho-socio-economic maladjustment of a patient" as a "valid medical indication for a legal abortion" to its guidelines.[26]

Soon thereafter, ACOG filed *amicus* briefs in *Doe v. Bolton* and *Roe v. Wade* announcing that "[a] decision to perform an abortion should be regarded as strictly a medical decision and a medical responsibility."[27] ACOG overruled the objection of a board member—who would help found AAPLOG soon thereafter—that ACOG had never formally decided that an abortion "should be an open option available to any woman who does not want to have the child."[28] The objector explained that ACOG had not made any consideration of the relative "rights of a mother" and "the fetus."[29] ACOG's leadership did not dispute those points, framing the briefs instead as a way for ACOG to attack policies that "could be seen as work restrictions on physicians."[30] The objector's "concern about the lack of discussion" by ACOG's membership "was not and could not be discussed," because that would have required addressing ACOG's actual motivations.[31] "Science" merely provided "the ideological veneer for [ACOG's] political position[s]."[32]

Since *Doe* and *Roe*, ACOG has filed dozens of briefs in abortion-related cases, but *amici* are unaware of any instance in which it has filed or joined a brief in support of any regulation

---

[23] *See id.* at 1816.
[24] *Id.*
[25] *Id.* at 1817.
[26] *Id.*
[27] Brief of ACOG et al. 3, *Roe v. Wade*, No. 70-18, 1971 WL 128053 (U.S. 1971).
[28] Aries, *supra* note 14, at 1817.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.* at 1810.

whatsoever on abortion, even when ample scientific evidence and the medical standard of care for comparable procedures would support that regulation.[33] Remarkably, the "authoritative scientific data" that ACOG presents in court manages to favor unregulated abortion in every single case. Only one explanation exists for this remarkable streak: ACOG's ideology. ACOG has *never* formulated its pro-abortion advocacy by member input or unbiased scientific inquiry, but as a top-down imposition of the ideology of ACOG leadership. This imposition cannot be questioned, which is why ACOG no longer lets AAPLOG exhibit at its conferences[34] and turned down a recent invitation to debate AAPLOG at Duke's Civil Discourse Project—stating that it "will not debate" because "the role of abortion in our patients' lives is settled science."[35]

That ideology—centrally, ACOG's belief that the preborn child has no significance and that women do not deserve fully informed consent about the harms of induced abortion—has nothing to do with scientific evidence, and in fact is contradicted by that evidence. A medical interest group advocating for abortion purely as an ideological matter should wield no more authority than any other abortion advocate.

**B. ACOG's ideology drives its abortion advocacy.**

From this history, two motivations are apparent for ACOG's abortion cheerleading: self-interest and ideology. First, ACOG is an industry group that, like most industry groups, dislikes regulation, and abortion is a source of revenue for some ACOG members. And abortion *advocacy* is a significant source of fundraising for ACOG.[36] But ACOG leadership's extreme abortion advocacy is out of step with the over 80% of OB-GYNs who do not perform abortions.[37]

Second and more importantly, ACOG is committed to advancing abortion and does not

---

[33] *See* Brief of *Amicus Curiae* AAPLOG 20–27, *June Medical Services LLC v. Gee*, Nos. 18-1323, 18-1460, 2019 WL 7397763 (U.S. Dec. 27, 2019).

[34] Jordan Boyd, *American College Of OB-GYNs Bans Pro-Life Doctors From Conference After They Show Up*, Federalist (Feb. 28, 2023), https://bit.ly/4a2XbHt.

[35] AAPLOG, *ACOG Declines Debate Invitation* (May 11, 2023), https://perma.cc/B2V8-SBKF.

[36] *See* Carole Novielli, *Exposing ACOG: The Medical Organization that Supports and Covers for the Abortion Industry*, Live Action (June 24, 2021), https://perma.cc/QBL3-6BG7.

[37] *See* Brittni Frederiksen, *A National Survey of OBGYNs' Experiences After Dobbs*, KFF (Jun. 21, 2023), https://perma.cc/W432-CVJS.

believe that the child carries any significance until (at least) birth.[38] ACOG believes that elective abortions at any stage—viability, 30 weeks, 39 weeks—should be allowed and promoted. ACOG even advocates for abortions for eugenic reasons—based on the preborn child's race, sex, or disability—attacking laws limiting eugenic abortions as "undermin[ing] physician ethics."[39] ACOG's position that the preborn child has no significance is a purely ideological belief unmoored from "evidence-based medicine," science, history, and logic.

The science is clear: at the moment of fertilization, a new, distinct, living human being comes into existence.[40] A preborn child "is alive and possesses its unique DNA."[41] At five weeks' gestation, the preborn child's heart starts beating, and the heart is fully formed by around nine weeks.[42] By six weeks, brain waves are detectable.[43] By ten weeks, multiple organs begin to function, and the child has the neural circuitry for spinal reflex, an early response to pain.[44] By twelve weeks, the child can open and close fingers and sense stimulation from the outside world.[45] Scientifically, the preborn child meets all the criteria for a living human being.

ACOG's position also has no historical or legal support. "[A]n unbroken tradition of

---

[38] ACOG, *Statement on "Personhood" Measures* (Nov. 9, 2022), https://perma.cc/9376-B5A4 ("Assigning rights to [unborn children] compromises access to essential facets of medical care."); *cf.* ACOG, *ACOG President Condemns the Passage of 'Born-Alive' Legislation* (Jan. 11, 2023), https://perma.cc/J8J7-7N32 (ACOG opposing born-alive protections).

[39] Brief of *Amici Curiae* ACOG et al. 26, *Little Rock Fam. Plan. Services v. Rutledge*, No. 19-2690, 2020 WL 248815 (Jan. 8, 2020).

[40] *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 736 (8th Cir. 2008) (en banc).

[41] *Memphis Ctr. for Reprod. Health v. Slatery*, 14 F.4th 409, 450 (6th Cir. 2021) (Thapar, J., concurring in judgment in part and dissenting in part) (citing Enrica Bianchi et al., *Juno Is the Egg Izumo Receptor and Is Essential for Mammalian Fertilization*, 508 Nature 483, 483 (2014)); *see* Doc. 20-21 ¶ 9.

[42] See Keith L. Moore et al., *The Developing Human E-Book: Clinically Oriented Embryology* 8945, 2662 (Kindle ed. 2020).

[43] Thomas W. Sadler, *Langman's Medical Embryology* 72 (14th ed. 2019); *see generally id.* at 59–95.

[44] *See* Johns Hopkins Med., *The First Trimester*, https://perma.cc/8N6H-M6CN; Carlo V. Bellieni & Giuseppe Buonocore, *Is Fetal Pain a Real Evidence?*, 25 J. Maternal-Fetal & Neonatal Med. 1203, 1203–08 (2012); Richard Rokyta, *Fetal Pain*, 29 Neuroendocrinology Letters 807, 807–14 (2008).

[45] *See* Cleveland Clinic, *Overview* (Mar. 19, 2024), https://perma.cc/9YB5-ZFFG.

prohibiting abortion" "persisted from the earliest days of the common law until 1973." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 250 (2022). Even *Roe v. Wade* recognized that the State's "important and legitimate interest in protecting the potentiality of human life" becomes "compelling" later in pregnancy. 410 U.S. 113, 162 (1973). "Only a handful of countries, among them China and North Korea, permit elective abortions after twenty weeks; the rest have coalesced around a 12–week line." *Dobbs*, 597 U.S. at 351 (Roberts, C.J., concurring in the judgment).

ACOG's position has no logical or popular support. There is no sound reason to view the humanity of a 28-week-old child in utero differently from a child born at the same time. Location or dependency are not markers of humanity. And ACOG's position is far outside the mainstream: Gallup found that 70% of Americans think third-trimester abortions generally should be illegal.[46]

Last, ACOG's position is barbaric. Late-term abortions generally involve "dismember[ment]" "limb from limb" of a viable human child who can feel pain, until the child "bleeds to death." *Stenberg v. Carhart*, 530 U.S. 914, 958–59 (2000) (Kennedy, J., dissenting). Despite updated scientific evidence of the presence of fetal pain capability by 12 weeks,[47] ACOG continues to deny the existence of fetal pain until "after at least 24–25 weeks"[48]—again ignoring medical knowledge for the purpose of advancing its pro-abortion agenda. And, of course, ACOG supports abortions long after even *it* recognizes that preborn children feel pain.

In short, ACOG has a metaphysical, unscientific, and ideological belief that preborn life is less than human and deserves no protection at any point. ACOG has a right to its beliefs, as harmful to mothers and preborn children as they are. But no one should pretend that its guidelines and views on any abortion-related issue stems from anything else, including some neutral "expertise."

---

[46] Gallup, *Where Do Americans Stand on Abortion?* (July 7, 2023), https://perma.cc/HV96-U5JN; *cf. Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 778 (1986) (Stevens, J., concurring) ("I should think it obvious that the State's interest in the protection of an embryo . . . increases progressively and dramatically as the organism's capacity to feel pain, to experience pleasure, to survive, and to react to its surroundings increases day by day.").

[47] Stuart W. G. Derbyshire et al., *Reconsidering Fetal Pain*, 46 J. Med. Ethics 3 (2020).

[48] ACOG, *Facts Are Important: Gestational Development and Capacity for Pain*, https://perma.cc/G9P2-CLY6.

9

**C.  ACOG's guidelines and statements are suffused with ideology, not evidence.**

ACOG's guidelines and policy statements confirm that ideology is its guiding star on abortion. As an ACOG Board of Directors member who recently resigned put it, ACOG and other American "professional medical organizations have gone from being primarily medical organizations with political undertones, to being primary political organizations with medical undertones."[49]

A comprehensive study found "that only a third of the recommendations put forth by [ACOG's] practice bulletins are based on high-quality, consistent scientific evidence."[50] Most were "based on limited or inconsistent evidence" or even less—"consensus and expert opinion."[51] And only 28% of ACOG's recommendations mirrored those of Britain's Royal College of Obstetricians and Gynaecologists.[52] As this study explained, "[m]any experts have pointed out the problems that arise when guidelines rely on expert opinion that is subject to bias."[53] ACOG's abortion drug bulletin was written by an ACOG committee "in collaboration with Mitchell D. Creinin, MD, and Daniel A. Grossman, MD"—two abortionists who believe that "[p]hysicians need to be activists" about abortion.[54] ACOG's relevant abortion "practice bulletins," including on medication and second-trimester abortions, do not claim to constitute systematic reviews.[55] As ACOG agrees, systematic reviews are atop "the hierarchy of evidence,"[56] for they "offer complete

---

[49] Hector O. Chapa, *Why I Left the ACOG Board of Directors*, Live Action (May 1, 2025), https://perma.cc/34B8-RYDK.

[50] Jason D. Wright et al., *Scientific Evidence Underlying the American College of Obstetricians and Gynecologists' Practice Bulletins*, 118(3) Obstetrics & Gynecology 505, 509 (2011), https://perma.cc/7RUY-W44R.

[51] *Id.*

[52] *Id.* at 511.

[53] *Id.*

[54] ACOG, *Medication Abortion*, *supra* note 2; Physicians for Reproductive Health, *Mitchell Creinin* (Apr. 25, 2020), https://perma.cc/4EDR-6FP6.

[55] *See* ACOG, *Medication Abortion*, *supra* note 2; ACOG, *Second-Trimester Abortion*, https://perma.cc/5LWK-QJTK.

[56] ACOG, *Clinical Practice Guideline Methodology* (Sept. 2021), https://perma.cc/ZB88-FBGM.

insights" on the available literature, "minimiz[ing] bias."[57] But its abortion practice bulletins, including the one about abortion drugs, are drafted *without* such a review.

Ideological bias infects not only ACOG's abortion briefs and guidelines, but also its policy statements. One recent study examined all 37 ACOG policy statements between 2016 and 2023 and found that the vast majority should be characterized as "liberal"—while *none* was characterized as conservative.[58] Indeed, "ACOG had the highest" proportion "of liberal policy statements" even compared to other major medical interest groups.[59] On the whole, when any of these groups expresses a political view, it "is 40 times more likely to espouse a liberal rather than conservative viewpoint."[60] Many of the ideological issues that ACOG feels compelled to weigh in on have little relation to its purported expertise—climate change,[61] immigration,[62] gun laws,[63] "decarceration of prisons,"[64] and race-based discrimination under the guise of affirmative action.[65]

A professional medical organization's recommendations should be based on scientific evidence, not ideology. But when it comes to ACOG and abortion, this is not the case. For instance, ACOG has long bemoaned a supposed exodus of OB-GYNs from States regulating abortion, with its President going so far as to assert that "OB-GYNS experience moral injury when they are prevented from providing" abortions.[66] As it turns out, a recent peer-reviewed study published in an AMA journal found no evidence supporting this theory.[67] The only statistically significant

---

[57] Arvind Vatkar et al., *Understanding the Levels of Evidence in Medical Research*, 15(5) J. Orthopaedic Case Reports 6, 7 (2025), https://perma.cc/Z4KR-4DW6.

[58] Ben Knudsen et al., *Analysis of the Political Viewpoint of Policy Statements from Professional Medical Organizations*, 9 JMIR Formative Res., at 7 (2025), https://perma.cc/R9RE-W2H3.

[59] *Id.* at 8.

[60] *Id.* at 10.

[61] ACOG, *Addressing Climate Change*, https://perma.cc/T2TB-QXK2.

[62] ACOG, *Opposition to Immigration Practices*, https://perma.cc/7DCH-LWTW.

[63] ACOG, *Gun Violence and Safety*, https://perma.cc/25MH-6PSL.

[64] ACOG, *Violence and Racism in the Criminal Legal System*, https://perma.cc/5YH3-VN8U.

[65] ACOG, *Statement on Supreme Court Affirmative Action Ruling* (Jun. 29, 2023), https://perma.cc/X8KG-5VVZ.

[66] Stacy Weiner, *The Fallout of* Dobbs *on the Field of OB-GYN*, AAMC (Aug. 23, 2023), https://perma.cc/2MQZ-S7FS.

[67] Becky Staiger et al., *Obstetrician and Gynecologist Physicians' Practice Locations Before and After the* Dobbs *Decision*, 8(4) JAMA Network (2025), https://perma.cc/7G93-7YJL.

finding was "that the share of physicians who are OBGYNs decreased less in [states likely to introduce abortion regulations] than in [states generally allowing abortion], opposite to the expected finding if OBGYNs were leaving states where abortion is threatened."[68] The study's lead author explained: "We were surprised, and we cut the data in every possible way that we could."[69] ACOG, meanwhile, won't let evidence interfere with a good story, ignoring this study and continuing to claim on its Advocacy page that OB-GYNs are avoiding states with commonsense regulations.[70]

ACOG cannot even be trusted to accurately convey basic facts about fetal development. For years, ACOG told courts that "a fetal heartbeat exists only after the chambers of the heart have developed and can be detected via ultrasound, which typically occurs around 17 to 20 weeks' gestation."[71] It typically cited its own "Guide to Language and Abortion," which repeated this claim while admonishing that "people writing about reproductive health [should] use language that is medically appropriate, clinically accurate, and without bias."[72]

Planned Parenthood and other litigants routinely relied on this claim. So did courts. For instance, the Chief Justice's opinion concurring in a 3-2 South Carolina Supreme Court decision invalidating a state fetal heartbeat law cited ACOG for the proposition that "[t]he chambers of the heart do not develop until a fetus is at least at seventeen to twenty weeks of gestation."[73]

The problem? ACOG's claim was egregiously wrong. The heart's chambers are formed *and* can be viewed *long* before 17 to 20 weeks. "The 4 chambers form by the end of week 7,"[74] and the "fetal heart is already fully developed by 9 ½ weeks gestation."[75] A recent study found

---

[68] *Id.* at 7.

[69] Natalie Krebs, *Iowa Doesn't Have Enough OB-GYNs. The State's Abortion Ban Might Be Making It Worse.*, Iowa Public Radio (Jan. 5, 2026), https://perma.cc/P3RX-23AM.

[70] ACOG, *Training and Workforce after* Dobbs, https://perma.cc/D4VS-KBJB.

[71] *E.g.*, Brief, *supra* note 1, at 22–23.

[72] *ACOG Guide to Language and Abortion*, WebArchive (Sept. 21, 2023), https://bit.ly/46mueoN.

[73] *Planned Parenthood S. Atl. v. State*, 882 S.E.2d 770, 788 (S.C. 2023) (Beatty, C.J., concurring).

[74] Cheryl Tan & Adam Lewandowski, *The Transitional Heart: From Early Embryonic and Fetal Development to Neonatal Life*, 47 Fetal Diagnosis & Therapy 373, 376 (2020).

[75] Katherine Bishop et al., *Ultrasound Examination of the Fetal Heart*, 72 Obstetrical & Gynecological Survey 54, 59 (2017).

that a four-chambered heart could be identified in 80% of women by week 10.[76]

There is no scientific dispute on this point—nor was there ever. ACOG just repeated medically incorrect facts to further its ideological position on abortion. Even Planned Parenthood eventually admitted that "[a]fter consulting with experts," it "understand[s] that a heart forms earlier than" ACOG said.[77] And ACOG *knows* it was wrong—that's why it eventually deleted its grossly inaccurate claim from its Abortion Guide.[78] But it never admitted or took responsibility for misleading courts and policymakers. And its Guide continues to mislead, reprimanding those who use the term "fetal heartbeat" (instead of "cardiac activity") even though ACOG's own guidance on non-abortion issues refers to the "fetus's heartbeat" and the "fetal heart rate."[79]

In prior abortion drug litigation, ACOG filed an *amicus* brief in the Supreme Court boasting of its purported "deep expertise in medical research," trumpeting that "[c]ourts frequently rely on *amici*'s medical and scientific expertise in cases involving pregnancy."[80] Incredibly, ACOG supported this claim by a citation to the exact page of the South Carolina Supreme Court opinion that mistakenly relied on ACOG's false claim about fetal heart development.[81] In essence, ACOG is bragging that it successfully misled courts, in a brief about the very issues before this Court.[82]

Nor is this some isolated incident. ACOG has long tailored its supposed scientific policy statements to its ideological agenda. In striking down Nebraska's partial-birth abortion regulation in 2000, the Supreme Court relied on language that "purported to come from a 'select panel'" of

---

[76] Darren Hutchinson, *First-Trimester Fetal Echocardiography*, 30 J. Am. Soc'y Echocardiography 763, 763, 766–67 (2017).

[77] Petition for Original Jurisdiction 5 n.6, *Planned Parenthood S. Atl. v. South Carolina*, No. 2023-001449 (S.C. Sept. 14, 2023), https://perma.cc/5KKH-AQ2Y.

[78] *Compare 2023 ACOG Guide*, *supra* note 72, with *ACOG Guide to Language and Abortion*, https://perma.cc/44VW-3JBL (as of Jan. 22, 2026).

[79] *See 2026 ACOG Guide*, *supra* note 78; ACOG, *Fetal Heart Rate Monitoring During Labor*, https://perma.cc/JBW8-LU9R; ACOG, *Early Pregnancy Loss*, at 198, https://perma.cc/8SD8-N4R2.

[80] ACOG Brief 6.

[81] *Id.* at 6 n.2 (citing *Planned Parenthood S. Atl.*, 882 S.E.2d at 787–88, while failing to note that this was a concurring opinion).

[82] *Id.* at 18.

ACOG stating that partial-birth abortion "may be the best or most appropriate procedure in a particular circumstance to save the life or preserve the health of a woman."[83] *See Stenberg*, 530 U.S. at 932, 935–36. Lower courts likewise parroted the statement, deferring to it because it was supposedly produced by "expert medical professionals."[84]

"The problem is that the critical language of the ACOG statement was not drafted by scientists and doctors."[85] "Rather, it was inserted into ACOG's policy statement at the suggestion of" a Clinton White House policy advisor concerned that the original statement—that ACOG's panel "could identify no circumstances under which this procedure . . . would be the only option to save the life or preserve the health of the woman"—"would be a disaster."[86] So the advisor "drafted the critical language" changing ACOG's position, and ACOG's executive board dutifully copied the language "into its final statement"—where it became Science not subject to dispute.[87] That ACOG was sharing the draft statement with the Clinton Administration is revealing enough; that ACOG then edited its statement in line with political demands reveals the emperor's clothes.

Consider too ACOG's recent guidance on breastfeeding, which says that "[t]ransgender women who desire to breastfeed may induce lactation with a combination of medications and breast pumping."[88] ACOG supports this claim with a single reference: a case report of one man who took a cocktail of a drug that is unavailable in the United States (because of an "association with cardiac arrhythmias, cardiac arrest, and sudden death when used intravenously") and a drug whose byproduct is "excreted in human milk" to the infant and has "tumorigenic potential."[89] Even with this dangerous cocktail, the man still had to use formula at six weeks "due to concerns about

---

[83] Shannen W. Coffin, *Kagan's Abortion Distortion*, Nat'l Rev. (June 29, 2010), https://perma.cc/5H6N-MASN.
[84] *Id.*
[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] ACOG, *Barriers to Breastfeeding*, https://perma.cc/4GLV-VYGX.
[89] Tamar Reisma et al., *Case Report: Induced Lactation in a Transgender Woman*, 3.1 Transgender Health 24, 25 (2018), https://perma.cc/2TJ9-SSEZ.

insufficient milk volume" to support the baby's growth.[90] No test results were reported for the "milk" or the baby.[91] This one man who used dangerous drugs to achieve an insufficient supply of milk is ACOG's *only* support for its unqualified assertion that "[t]ransgender women who desire to breastfeed may induce lactation with a combination of medications and breast pumping." ACOG called this incident "successful[]."[92] Naturally, ACOG also supports medically transitioning minors suffering from gender dysphoria, despite increasing evidence of the harms (and ACOG's lack of relevant expertise).[93] It is ideology all the way down.

In sum, ACOG's guidelines and policy statements on politically charged issues like abortion are tethered to ideology, not science.

### D. ACOG's abortion ideology infects its views here.

All this brings us to the issue here: abortion drugs. ACOG's practice bulletin on these drugs is not based on a rigorous review of the evidence, but on the ideology of an ACOG committee and two abortionists—at least one of whom has financial ties to the manufacturer of mifepristone that were not disclosed in the bulletin.[94] By its own account, most of ACOG's recommendations here are *not* "based on good and consistent scientific evidence."[95] Yet ACOG insists that abortion drugs are "safe and effective."[96] "But just because a purported expert says something does not make it so." *Glossip v. Gross*, 576 U.S. 863, 958 (2015) (Sotomayor, J., dissenting). "In politically contentious debates over matters shrouded in scientific uncertainty, courts should not assume that self-described experts are correct." *United States v. Skrmetti*, 605 U.S. 495, 547 (2025) (Thomas, J., concurring). The Supreme Court has often rejected ACOG's positions, explaining that "[t]he law need not give abortion doctors unfettered choice in the course of their medical practice."

---

[90] *Id.*

[91] *Id.*

[92] ACOG, *Health Care for Transgender and Gender Diverse Individuals*, https://perma.cc/2YZS-KEEK.

[93] *See generally Treatment for Pediatric Gender Dysphoria*, *supra* note 6.

[94] See ACOG, *Mitchell D. Creinin*, https://perma.cc/KE42-RD57.

[95] *Medication Abortion*, *supra* note 2.

[96] *Id.*

*Gonzales*, 550 U.S. at 163; *see id.* at 170–71 (Ginsburg, J., dissenting); *see Dobbs*, 597 U.S. 215.

First, when ACOG proclaims the "safety" of abortion drugs, it is subordinating any interest in fetal or maternal health to its extreme abortion beliefs. Physicians providing obstetric care to pregnant women are in fact caring for *two* patients. Abortion drugs are not only harmful for mothers, as the Plaintiffs show, but they are in no sense "safe" for the preborn child—a life recognized by the laws of this State and many others. *See* La. Stat. Ann. § 40:1061.1(A)(1); *cf.* 18 U.S.C. § 1841. Those drugs are intended to—and usually do—end that life. ACOG's bulletin defines "[m]edication abortion failure" as "the need for uterine aspiration because of ongoing pregnancy"[97]—in other words, the need to vacuum a fetus with a beating heart out of the uterus, if the fetus survives the abortion drug cocktail. ACOG's brief on this issue to the Supreme Court managed to run thousands of words without a single apparent reference to the preborn child.[98]

Second, ACOG's sweeping claims about the safety of FDA's relaxed REMS for abortion drugs are unsupported by evidence—and often contradicted by ACOG's own out-of-court statements. For instance, ACOG told the Supreme Court that "[f]or prescription of mifepristone for use in medication abortion or early pregnancy loss, telehealth protocols offer the same protections as in-person dispensing and provide an equivalent level of care."[99] Putting aside the obvious falsity of this statement—anyone with passing familiarity with Zoom knows it is not "equivalent" to in-person interaction—it is contradicted by ACOG's own bulletin. Though that bulletin is itself an ideological document unmoored from a rigorous evidentiary review, even it concedes that the "scientific evidence" for the proposition that "[m]edication abortion can be provided safely and effectively by telemedicine" is "limited or inconsistent."[100] That evidentiary deficiency is no technical fault: it means that the true relationship between drug-induced abortion

---

[97] *Id.*

[98] *See* ACOG Brief.

[99] *Id.* at 23.

[100] *Medication Abortion*, *supra* note 2.

without an in-person evaluation and safety/efficacy may be the opposite of what ACOG claims.[101]

One obvious example: a Zoom call would not enable the abortionist to diagnose an ectopic pregnancy, which would make prescription of the abortion drugs even more dangerous to the mother. ACOG's own bulletin acknowledges this danger but seems to dismiss it by suggesting that only patients with "a medical history of ectopic pregnancy" or "medical risk factors" "should have pretreatment clinical evaluation, which may include ultrasonography."[102] Yet ACOG's bulletin on ectopic pregnancies explains that "[o]ne half of all women who receive a diagnosis of an ectopic pregnancy do not have any known risk factors."[103] And ectopic pregnancies comprise 2% of all pregnancies,[104] disproportionately affecting people of color.[105]

Likewise, ACOG sweeps away the problem that under a telehealth regime, women are highly likely to take the abortion pill regime later than the ten-week gestational age cutoff that the FDA has approved. ACOG here suggests that "evidence has shown that a patient's certain last menstrual period [LMP] when within the prior 56 to 63 days is accurate."[106] But once again, ACOG's own statement on gestational age—reaffirmed in 2025—is to the contrary, explaining that only "approximately one half of women accurately recall their LMP."[107] And the FDA has limited the abortion regime to under ten weeks for good reasons: drug-induced abortions after that have much higher rates of surgical intervention and infections.[108]

The point is that an honest broker of scientific evidence would admit (at minimum) that it could not determine on the available evidence whether drug-induced abortion via telehealth is safe.

---

[101] *Cf.* Howard Balshem, *GRADE Guidelines*, 64 J. Clinical Epidemiol. 401, 404 (2011), https://perma.cc/2KDY-6BW5.

[102] ACOG, *Medication Abortion*, *supra* note 2.

[103] ACOG, *Tubal Ectopic Pregnancy*, at 91, https://perma.cc/HW5J-WSQF; *see* Doc. 20-21 ¶ 23.

[104] *Tubal Ectopic Pregnancy*, *supra* note 103, at 91.

[105] *See, e.g.*, Tina Raine-Bennett et al., *Disparities in the Incidence of Ectopic Pregnancy in a Large Health Care System in California, 2010–2019*, 26(3) Permanente J. 61, https://perma.cc/45B6-QTP5.

[106] *Medication Abortion*, *supra* note 2.

[107] ACOG, *Methods for Estimating the Due Date*, at 2, https://perma.cc/EL97-LK3S.

[108] *See, e.g.*, Maarit J. Mentula et al., *Immediate Adverse Events after Second Trimester Medical Termination of Pregnancy*, 26(4) Human Reproduction 927 (2011).

But ACOG is not such a broker. What's more, ACOG supports dispensing these drugs online without even a "telehealth" visit or any interaction or review by a medical professional at all.[109]

*    *    *

No business likes to be regulated. And ACOG in particular has financial incentives and ideological commitments at play. Courts should not pretend otherwise. Because ACOG loudly advocates for unlimited and unregulated induced abortion as an ideological position, and for complete self-regulation by abortionists as a policy matter, the Court should not consider ACOG to be a neutral authority on abortion issues.

## II.    FDA's cited studies do not support the safety of telemedicine abortions.

FDA relied primarily on five studies to "support dispensing mifepristone and misoprostol by mail after a telemedicine visit": Raymond 2019, Chong 2021, Anger 2021, Kerestes 2021, and Aiken 2021.[110] The drug manufacturers rely on them, too. *E.g.*, Doc. 54-4, at 18. But these studies offer scant support; if anything, they confirm that remote abortions are more dangerous.

Before getting to the studies' details, consider what the FDA ignored: the shared origin of most of these studies in Gynuity Health Projects, which describes itself as "at the forefront of efforts to increase women's access to medication abortion."[111] Three of the studies (Raymond, Chong, and Anger) were based on work sponsored by Gynuity.[112] Six co-authors of Raymond were Gynuity affiliates,[113] as were six of Chong's co-authors[114] and five of Anger's co-authors.[115] The fourth study, Kerestes, was also partially based on Gynuity; 71 of 75 participants who received

---

[109] ACOG, *Self-Managed Abortion*, https://perma.cc/L7KB-AJQ4.

[110] Doc. 1-50, at 69–75 (ECF page numbers).

[111] Gynuity Health Projects, *Medication Abortion*, https://perma.cc/6R6S-6MM9.

[112] Doc. 1-50, at 69–70.

[113] Elizabeth Raymond et al., *TelAbortion: Evolution of a Direct to Patient Telemedicine Abortion Service in the United States*, 100 Contraception 173 (2019).

[114] Erica Chong et al., *Expansion of a Direct-to-Patient Telemedicine Abortion Service in the United States and Experience during the COVID-19 Pandemic*, 104 Contraception 43 (2021).

[115] Holly A. Anger et al., *Clinical and Service Delivery Implications of Omitting Ultrasound before Medication Abortion Provided via Direct-to-Patient Telemedicine and Mail in the U.S.*, 104 Contraception 659–65 (2021).

18

mailed drugs were from the Gynuity study.[116]

Gynuity's founder and president, Beverly Winikoff—also a co-author on all three of the Gynuity-based studies—was previously "employed for 25 years at the Population Council where she was Director for Reproductive Health."[117] The Population Council, which had early connections with eugenics[118] and counts Planned Parenthood among its donors,[119] boasts how it "developed and secured [FDA] approval" for abortion drugs during Winikoff's time.[120] In 1994, a French pharmaceutical company donated rights for medical uses of mifepristone in the United States to the Population Council,[121] which sublicensed mifepristone to Danco, a new company incorporated in the Cayman Islands.[122] In 2000, Danco received approval from the FDA to distribute it.[123] Danco has said that it is dependent on the mifepristone abortion pill for all its revenue.[124] While at the Population Council during the 1980s and 1990s, Winikoff was meeting with the FDA to push for mifepristone's approval with minimal restrictions.[125]

Fast forward to 2015, when Winikoff (now at Gynuity) convened the "Coalition to Improve Access to Mifepristone" with Planned Parenthood, NARAL, and others.[126] The Coalition urged

---

[116] Doc. 1-50, at 70; *see* Courtney Kerestes et al., *Provision of Medication Abortion in Hawai'i during COVID-19: Practical Experience with Multiple Care Delivery Models*, 104 Contraception 49 (2021).

[117] Gynuity Health Projects, *Staff*, https://perma.cc/JQ4Y-C926.

[118] Carole Novielli, *The Population Council, which Brought the Abortion Pill to the U.S., has a Shocking History that's Nothing to Celebrate*, Live Action (Nov. 14, 2017), https://perma.cc/Y7SP-6TZE.

[119] *E.g.*, Population Council, *Annual Report 2019*, https://perma.cc/3NT7-JSA5.

[120] Julia Bunting, *Reaffirming Our Resolve to Uphold Global Reproductive Rights*, Population Council (May 17, 2022), https://perma.cc/92F4-RWLK.

[121] Katharine Q. Seelye, *Accord Opens Way for Abortion Pill in U.S. in 2 Years*, N.Y. Times (May 17, 1994), at A1.

[122] *Abortion Pill Maker Revealed*, CBS News (Oct. 13, 2000), https://perma.cc/5L3Q-EQLZ.

[123] Gina Kolata, *U.S. Approves Abortion Pill*, N.Y. Times, Sept. 29, 2000, at A1.

[124] Intervenor Danco Laboratories, LLC's Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction at 1–2, 25, *Alliance for Hippocratic Med. v. FDA*, No. 22-cv-223, 2023 WL 2974521 (N.D. Tex. Feb. 10, 2023).

[125] Michelle La Mothe, *A 20-Year Journey: The History of the Abortion Pill*, Free Republic (Feb. 9, 2006), https://perma.cc/W7PC-4B5P.

[126] Carrie N. Baker, *Abortion Pills: US History and Politics* 79 (2024).

19

Danco "to petition the FDA to modify the Mifeprex label" and loosen its prescription regime, but "Danco said they didn't have the funds to file a supplemental NDA to make the change."[127] So the Coalition "agreed to help Danco raise" funds for the application via foundations that continue to fund Gynuity and other "groups advocating for medication abortion."[128] Gynuity continued to push FDA to relax the REMS protocol even more than Danco sought, and Winikoff timed "a special issue of the journal *Contraception*" "to support removal of the REMS."[129]

The links between Gynuity and Danco reveal especially problematic conflicts when it comes to studies cheerleading medication abortion: Danco has funded Ibis Reproductive Health, which funds Gynuity—which churns out studies purportedly supporting Danco's drug.[130] But none of the studies discloses a conflict of interest along these lines.

Not only were the primary studies that the FDA relied on run by organizations and individuals invested in the abortion drug industry, but the studies do not support FDA's action. To begin, none of the five studies performed a controlled comparison between prescribing mifepristone via the existing regime and mifepristone fully via telemedicine and mail. Without this critical comparison, it is impossible for any of these studies to provide sound evidence about the relative safety or efficacy of fully remote abortions. Plus, two studies were purely descriptive and had no control group at all. "[D]escriptive studies, which do not have a comparison group, do not allow assessment of associations."[131] The other three had non-randomized control groups (generally involving different dosages and gestational ages) that still were never compared to a fully remote group. As Judge Posner put it, "a statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation." *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 537

---

[127] *Id.*

[128] *Id.* at 79, 216.

[129] *Id.* at 81.

[130] *See, e.g.*, Ibis Reproductive Health, *Funders*, https://bit.ly/3Oiv5Rc (Oct. 3, 2018); Gynuity Health Projects, *Funders*, https://bit.ly/3NVcxGH (Mar. 3, 2020).

[131] David A. Grimes, *An Overview of Clinical Research*, 359 Lancet 57, 58 (2002).

(7th Cir. 1997). Because these studies did not conduct a relevant comparison even to the limited extent they tried to control for any variables, they are among the weakest forms of evidence and cannot show relative safety or efficacy. FDA glossed over this core deficiency.

Turning to the specific studies, though Raymond purported to evaluate the safety "of a direct-to-patient telemedicine service that enabled people to obtain medical abortion without visiting an abortion provider in person," the study required initial tests at in-person facilities.[132] Each participant "had pre-treatment laboratory tests and ultrasound," with the package containing abortion drugs mailed only if the mother was determined to be eligible after the in-person tests.[133] Likewise, participants in Chong "obtained any needed preabortion tests locally" before being sent the study packages.[134] Describing the project that was the basis for Raymond, Chong, and Anger, Gynuity states that women "obtain screening tests at facilities close to them," then have "post-abortion tests at facilities close to [them]."[135] Thus, none of these studies examined the fully remote provision of abortion drugs—what the FDA authorized, supposedly depending on these studies.

Further, even though Raymond and Chong had more in-person safeguards than the FDA now requires, the results of this partially-remote distribution of mifepristone were troubling. Raymond reported that outcomes were wholly unknown for 23% of the participants.[136] And "[o]f the 217[] package recipients who provided meaningful follow-up data[], one was hospitalized for postoperative seizure and another for excessive bleeding, and 27 had other unscheduled clinical encounters, 12 of which resulted in no treatment."[137] Thus, even excluding the twelve whose unscheduled clinical encounters did not result in any treatment, almost 8% of study participants (17/217) required in-person follow up treatment. Even FDA conceded that required follow-up emergency care in this study was about *double* that in the existing labeling for mifepristone.[138]

---

[132] Raymond, *supra* note 113, at 73.
[133] *Id.* (emphasis added).
[134] Chong, *supra* note 114, at 43.
[135] Gynuity Health Projects, *Medication Abortion*, *supra* note 111.
[136] Raymond, *supra* note 113, at 176.
[137] *Id.* at 173.
[138] Doc. 1-50, at 29.

Chong—which included the patients from Raymond—reported similar findings of increased emergency visits: "[t]here were seventy unplanned visits (6%) to emergency rooms or urgent care centers for reasons related to the abortion," and "[t]en serious adverse events (SAEs) occurred, including five transfusions (0.4%)."[139] Though the study asserted that the adverse events were not attributable to telemedicine, this does not account for the other emergency room visits, or the further 92 (7.8%) "[o]ther outpatient visit[s]" that are reported in the study's results tables.[140] And Chong likely underestimated adverse events because of high loss of patients before follow-up (13%) and exclusion of certain adverse events.[141] Chong also underscores the lack of controls in the Gynuity studies, as their sample was "more educated, and more likely to identify as white" than the population of "people obtaining abortions in the United States"—and reported a 0% ectopic pregnancy rate, compared to the 2% population rate.[142]

Before moving on from Chong, the mismatch between that article's data and its conclusions is striking—and reinforces the ideological problems. Chong engaged in no statistical analysis. It engaged in no comparative analysis of telemedicine versus in-person medication abortions. And though (by its own account) "FDA required that our protocol retain the screening ultrasound requirement,"[143] the study skipped that requirement for a quarter of participants—without reporting comparative outcomes for this cohort. So the study is incapable of providing *any* statistical proof. Yet Chong made sweeping assertions about its findings, claiming to show that "[m]edical abortion using telemedicine" "can be safely provided without a pretreatment ultra-sound."[144] Again, the study reported no comparisons between *either* telemedicine/in-person

---

[139] Chong, *supra* note 114, at 46.

[140] *Id.* at 45.

[141] *See id.* at 48; *compare id.* at 45, *with* FDA, *What is a Serious Adverse Event?*, https://perma.cc/ 2VCW-4BZU (showing that Chong used a more limited definition of "serious adverse event" than FDA does).

[142] Chong, *supra* note 114, at 46, 48.

[143] *Id.* at 46.

[144] *Id.* at 43.

22

abortions *or* ultrasound/no-ultrasound telemedicine abortions, much less controlled for any relevant variable. But the study's concluding sentence announced that "our data *disprove*[*s*] the notion that medication abortion pills must be dispensed in-person."[145] This absurd claim—from a study with no comparisons, no controls, no randomization, an unrepresentative sample, and an intentional disregard of the required study protocol—confirms the unreliability of the Gynuity studies.

The next study, Anger, tried to use Gynuity's departure from their own research protocol—skipping ultrasounds or pelvic exams for some patients—to compare outcomes for participants who had a pre-abortion ultrasound or pelvic exam and those who did not.[146] But as the study conceded, "patients were not randomized [into these two groups] and the two groups differed on factors that may affect outcomes."[147] If anything, the study again provides evidence *against* abandoning in-person testing. According to the study, the likelihood that "[a]bortion was not complete with pills alone" was "significantly higher" for patients in the no-test group.[148] Concerningly, "[t]he proportion of participants who had unplanned clinical encounters after treatment was" also "significantly higher" in the no-test group.[149] Despite these statistically significant negative results, the Gynuity authors announced that "[o]verall, our results support the continued use of no-test [medication abortion]."[150] Inexplicably, even though the prior Gynuity studies had reported and tried to justify rates of emergency follow-up, Anger chose not to even report the "number of ED/urgent care visits" after abortion.[151] Given the express goal of these studies to advance drug-induced abortion, one wonders whether follow-up emergencies were even higher than the prior (high) rates found by the other Gynuity studies.

Next, Kerestes provided observations about different groups, but failed to conduct any statistical analysis or control for any variables. By its own account, its sample sizes were so small

---

[145] *Id.* at 48 (emphasis added).
[146] Anger, *supra* note 115, at 2.
[147] *Id.* at 6.
[148] *Id.* at 3.
[149] *Id.*
[150] *Id.* at 6.
[151] Doc. 1-50, at 72.

that the study was too "underpowered" to generate results of statistical significance.[152] Kerestes purported to divide patients into three groups: one had telemedicine with in-person pickup of the abortion drugs, another had telemedicine with abortion drugs mailed, and the third had traditional in-person visits. But 71 out of 75 in the group central to the FDA's actions—the second one, with purportedly no clinical interactions at all—actually *had* a pre-abortion ultrasound, because they were patients reused from the Gynuity studies who "were required to have an ultrasound or pelvic examination performed before being mailed medications."[153] So the study provided practically no information on the critical question before the FDA. And once again, if anything the results counsel against the FDA's actions, as they show that the rates of emergency room visits for abortion-related concerns were almost twice as high for the pickup group compared to the in-clinic group, and approaching three times as high for the mail group.[154]

Last, FDA itself declined to put much reliance on Aiken because its "design did not capture all serious safety outcomes, thus limiting the certainty of the findings."[155] (None of the studies did, in fact.) Not only did Aiken fail to report basic outcomes like hospitalizations related to abortion and emergency-room visits, but all the groups it compared included patients who had in-person dispensing—meaning that the study is incapable of offering comparisons relevant to FDA's action.[156] So while FDA dismissed Aiken on the ground that "the study's design did not capture all serious safety outcomes," it should have also dismissed its findings on efficacy because the study did not have any relevant comparison.[157] Further, Aiken was "unable actively to follow up patients after their abortion," depriving the study of relevant outcome data.[158] Yet GenBioPro places "particular" emphasis on this flawed study—despite FDA's dismissal. Doc. 54-4, at 18.

---

[152] Kerestes, *supra* note 116, at 53.

[153] *Id.* at 50–51.

[154] *Id.*

[155] Doc. 1-50, at 73–75.

[156] *Id.* at 74 ("Outcomes stratified by type of mifepristone dispensing were not reported.").

[157] *Id.* at 75.

[158] Abigail R.A. Aiken, *Effectiveness, Safety and Acceptability of No-Test Medical Abortion (Termination of Pregnancy) Provided via Telemedicine*, 128 BJOG 1464, 1471 (2021).

24

The FDA concluded that "[t]aken together, the three Gynuity study reports and Kerestes support dispensing mifepristone and misoprostol by mail after a telemedicine visit" as "safe and effective."[159] This conclusion makes little sense: none of these studies even *tried* to examine wholly remote abortion pill prescription, much less examine that issue in a controlled, statistically rigorous way. To the extent these studies offered any observations of relevance, they consistently found that follow-up emergency medical care was far more likely in telemedicine abortions. Even the FDA had to eventually concede that "[t]he studies we reviewed are not adequate on their own to establish the safety of the model of dispensing mifepristone by mail."[160] And the FDA failed to acknowledge or address the disconnect between these studies' limited results and their sweeping rhetorical conclusions—and what that says about the integrity of the underlying Gynuity project. Despite that project's express pro-abortion goals, the studies produced results that only cast doubt on the "safety" of FDA's 2023 changes to the mifepristone REMS.

## CONCLUSION

For these reasons, the Court should grant preliminary relief.

Respectfully submitted,

/s/ *Brian W. Arabie*
Brian W. Arabie (Bar No. 27359)
SIGLER, ARABIE & CANNON, LLC
630 Kirby Street
Lake Charles, LA 70601
(337) 439-2033
brian@siglerlaw.com

/s/ *Christopher E. Mills*
Christopher E. Mills*
SPERO LAW LLC
557 East Bay St. #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law
* *Admitted pro hac vice*

February 12, 2026

---

[159] Doc. 1-50, at 73, 75.
[160] *Id.* at 80.

25

**CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2026, I presented the foregoing to the Clerk of Court by filing and uploading to the CM/ECF system, which will send notification of such filing to all parties.

/s/   *Brian W. Arabie*
Brian W. Arabie (Bar No. 27359)
SIGLER, ARABIE & CANNON, LLC
630 Kirby Street
Lake Charles, LA 70601
(337) 439-2033
brian@siglerlaw.com