# EXHIBIT B

# ABORTION PILLS

## US History and Politics

### CARRIE N. BAKER

This content downloaded from 73.155.33.47 on Wed, 04 Feb 2026 21:58:09 UTC
All use subject to https://about.jstor.org/terms

# ABORTION PILLS

This content downloaded from 73.155.33.47 on Wed, 04 Feb 2026 21:58:09 UTC
All use subject to https://about.jstor.org/terms

# ABORTION PILLS

## US HISTORY AND POLITICS

### CARRIE N. BAKER

Amherst
College
Press

This content downloaded from 73.155.33.47 on Wed, 04 Feb 2026 21:58:09 UTC
All use subject to https://about.jstor.org/terms

Copyright © 2024 by Carrie N. Baker
Some rights reserved



This work is licensed under the Creative Commons Attribution-NonCommercial-NoDerivatives
4.0 International License. To view a copy of this license, visit http://creativecommons.org/licenses/by-nc-
nd/4.0/ or send a letter to Creative Commons, PO Box 1866, Mountain View, California, 94042, USA.

Note to users: A Creative Commons license is valid only when it is applied to the person or entity that
holds rights to the licensed work. This work contains components (e.g. poetry quotations, song lyrics,
and/or images) that have been published with permission from their respective rightsholders and to
which the rightsholders of this work cannot apply the license. It is ultimately your responsibility
to independently evaluate the copyright status of any work or component part of a work you use, and if
necessary, seek permission from the appropriate rights holders, in light of your intended use.

The complete manuscript of this work was subjected to a partly closed ("single-anonymous") review
process. For more information, visit https://acpress.amherst.edu/peerreview/.

Published in the United States of America by Amherst College Press
Manufactured in the United States of America
Library of Congress Control Number: 2024933972

DOI: https://doi.org/10.3998/mpub.14469549

ISBN 978-1-943208-85-2 (paper)
ISBN 978-1-943208-86-9 (open access)
ISBN 978-1-943208-87-6 (hardcover)

This content downloaded from 73.155.33.47 on Wed, 04 Feb 2026 21:58:09 UTC
All use subject to https://about.jstor.org/terms

# *Table of Contents*

*Acronyms*                                                                                      vii

Introduction: Kelly's Story                                                      1

*What Are Abortion Pills? Terms and Definitions*    5
*Methods and Sources*    6
*The Story of Abortion Pills in a Nutshell*    7
*Book Outline*    9

**1**    "Medical McCarthyism": RU 486 Development and the Fight
for FDA Approval, 1980–2000                                          11

*Anti-Abortion Campaign to Block RU 486 from the US Market*    17
*The Feminist Campaign to Bring RU 486 to the United States*    22
*FDA Approval of Mifepristone*    38

**2**    "Thankful for Crumbs": The Fight to Expand Abortion
Pill Access, 2000–2019                                                    55

*FDA Risk Evaluation and Mitigation Strategy (REMS) and
  Mifepristone Research*    62
*Self-Induced Abortion?*    66
*Campaign to Remove FDA Restrictions*    78
*Political Shifts and Movement Mobilization*    84

**3**    "Greased the Wheels": COVID-19 Pandemic and the Rise of
Telemedicine Abortion                                                    95

*Virtual Abortion Clinics*    103
*Organizing to Support Increased Access to Abortion Pills Outside of the
  Medical System*    108
*Supreme Court Stops Telemedicine Abortion*    110
*The Pendulum Swings: Biden Administration Expands Abortion Pill Access*    115

This content downloaded from 73.155.33.47 on Wed, 04 Feb 2026 21:58:25 UTC
All use subject to https://about.jstor.org/terms

vi • Table of Contents

**4** "Trying to Shake Abortion Pills Free from the Gatekeepers":
Eroding Abortion Rights and Expanding Self-Managed Abortion          121

*Texas Bans Abortion: S.B. 8 Spurs Self-Managed Abortion*    121
*New Research Supports the Safety of Telemedicine and
    Self-Managed Abortion*    128
*FDA Loosens REMS Restrictions on Mifepristone*    132
*Spreading the Word About Abortion Pills*    136
*Legal Risks of Self-Managed Abortion*    139

**5** "Mail Those Pills No Matter What": The End of *Roe* Spurs Efforts
to Expand Abortion Pill Access          149

*The Immediate Aftermath of* Roe's *Fall*    150
*The Push for Telemedicine Abortion Provider Shield Laws*    155
*Litigation and Legislation to Expand Abortion Pill Access
    at the State Level*    161
*Federal Initiatives to Expand Abortion Pill Access*    167
*Expanding Abortion Pill Access Outside of the Medical
    System and the Law*    172
*Reframing Abortion Pills and Early Abortion*    179

**6** "Putting the Genie Back in the Bottle": Post-*Dobbs* Attempts
to Block Mifepristone          185

*Abortion Pill Disinformation*    187
*Anti-Abortion Campaign to Remove Mifepristone from the Market*    194

Conclusion: "Putting Pills Directly in the Hands of Those Who
Need Them"          215

*Appendix A: Abortion Pill Timeline*          239

*Appendix B: Glossary*          241

*Appendix C: Interviews*          243

*Acknowledgments*          247

*Endnotes*          249

This content downloaded from 73.155.33.47 on Wed, 04 Feb 2026 21:58:25 UTC
All use subject to https://about.jstor.org/terms

## *Acronyms*

| | |
|---|---|
| AAP | Abortion Access Project |
| ACLU | American Civil Liberties Union |
| ACOG | American College of Obstetricians and Gynecologists |
| ADF | Alliance Defending Freedom |
| AHT | Advances in Health Technology |
| ANSIRH | Advancing New Strategies in Reproductive Health |
| ARM | Abortion Rights Mobilization |
| CPC | crisis pregnancy center |
| CRR | Center for Reproductive Rights |
| EMAA | Expanding Medication Abortion Access |
| ETASU | Elements to Assure Safe Use |
| FDA | US Food and Drug Administration |
| FMF | Feminist Majority Foundation |
| FRC | Family Research Council |
| FTC | Federal Trade Commission |
| GLC | Generative Learning Community for self-managed abortion |
| HHS | Department of Health and Human Services |
| HIS | Indian Health Service |
| IND | Investigational New Drug |
| M+A Hotline | Miscarriage and Abortion Hotline |
| NAF | National Abortion Federation |
| NARAL | National Abortion Rights Action League |
| NAWHERC | Native American Women's Health Education Resource Center |
| NDA | New Drug Application |
| NOW | National Organization for Women |
| NRLC | National Right to Life Committee |
| NWHN | National Women's Health Network |
| OARS | Online Abortion Resource Squad |

This content downloaded from 73.155.33.47 on Wed, 04 Feb 2026 21:58:39 UTC
All use subject to https://about.jstor.org/terms

viii • Acronyms

| | |
|---|---|
| REMS | Risk Evaluation and Mitigation Strategy |
| RHEDI | Reproductive Health Education in Family Medicine |
| RHTP | Reproductive Health Technologies Project |
| SASS | Self-Managed Abortion. Safe and Supported |
| SHERo | Sisters Helping Every Woman Rise and Organize |
| SIA Legal Team | Self-Induced Abortion Legal Team |
| S.T.O.P. | Surveillance Technology Oversight Project |
| WRRAP | Women's Reproductive Rights Assistance Project |

This content downloaded from 73.155.33.47 on Wed, 04 Feb 2026 21:58:39 UTC
All use subject to https://about.jstor.org/terms

approval of a generic with the FDA. The head of the FDA at the time, Dr. Scott Gottlieb, was focused on increasing the number of generic medications on the market in order to encourage competition, especially for drugs in the REMS program.[219] On April 11, 2019, the FDA approved GenBioPro's generic mifepristone.[220] Coeytaux said the generic made a huge difference:

> The minute GenBioPro was in the act, all sorts of things started happening. Danco reduced its price because there was competition. All the stuff that we did with the providers during COVID—we couldn't have done it with Danco. Danco wasn't interested at all in anything innovative because they were happily doing their thing and already had their people on board. So having competition in the market was critical.[221]

FDA approval of the generic set price competition in motion: GenBioPro set their price lower than Danco, which then dropped their price. Lower prices and more options increased access to mifepristone for clinicians and patients across the country. The generic also established competition for new services from the drug sponsors, such as mail order at scale, but it also extinguished the rationale for Danco to pursue the miscarriage indication since most pharmacies could swap out brand-named mifepristone for the generic, regardless of what the prescription was written for.[222] Dr. Mitchell Creinin, however, believed that the drop in price had only a "marginal benefit" for patients because clinics did not drop their prices for medication abortion.[223]

But anti-abortion advocates pushed back against increasing access. In March of 2019, the Trump administration's FDA issued a warning letter to Dr. Gomperts, demanding that she stop "causing the introduction of a misbranded and unapproved new drug into interstate commerce."[224] The FDA threatened to seize the drugs. Gomperts explained what she did next: "I stayed in my bed for three days, researching and reading everything that existed on the FDA regulations, calling all the people I could call in the US. I came to the conclusion that it's okay, I can do this."[225] Then she fought back. In September 2019, Gomperts sued the FDA, alleging they had seized between three and ten doses of abortion drugs she had prescribed through Aid Access since March and that the government had blocked Aid Access from receiving payments from some patients.[226] The lawsuit was eventually dismissed, but Gomperts continued to mail the medication and did not experience any more interference.

Anti-abortion states also tried to block the increasing access by fighting for restrictions at the state level, including passing laws banning mailing of abortion pills, requiring ultrasounds which limited telemedicine access, and requiring that physicians alone may prescribe mifepristone. For three weeks in June of 2019, the Missouri health department required doctors prescribing abortion pills to conduct an extra medically unnecessary pelvic exam on their patients before the state-mandated waiting period so that patients had to have two pelvic exams to receive the pills—one when they initially

This content downloaded from 73.155.33.47 on Wed, 04 Feb 2026 21:59:26 UTC
All use subject to https://about.jstor.org/terms

saw the doctor and a second when patients came back for the pills. In other words, doctors were forced by the state to insert their fingers into patients' vaginas while pressing their abdomens to feel their reproductive organs, for no medical reason. One doctor described the requirement as "state sanctioned, essentially, sexual assault."[227] After three weeks, doctors at the one remaining abortion clinic in Missouri, a Planned Parenthood clinic in Kansas City, refused to comply with the order, and the state health department backed down, rescinding the requirement.[228] During that time period, over one hundred women experienced invasive, medically unnecessary, and unwanted vaginal probes, by order of the state. In response, Planned Parenthood created a new clinic across the river in Illinois so as not to be subject to the Missouri Department of Health.[229] Meanwhile, states increasingly passed abortion bans, hoping to tee up a case for the Supreme Court to finally overturn *Roe v. Wade*. These developments spurred Plan C to push harder to make abortion pills available by telemedicine and mail. The declaration of a pandemic in March 2020 created new opportunities to make this vision a reality.

This content downloaded from 73.155.33.47 on Wed, 04 Feb 2026 21:59:26 UTC
All use subject to https://about.jstor.org/terms

falsely deemed "nonessential," but the number of abortions in surrounding states
increased, likely due to women traveling from restrictive states to find abortion
health care. The Guttmacher report noted other factors that likely contributed to
state variation and overall increase in the number of abortions, including increased
fundraising by local and national abortion funds so they could help more people
pay for their abortions, increased abortion restrictions and bans (twenty-five states
enacted 168 laws between 2017 and 2020, some of which were blocked by courts),
and seventy-five new provisions to protect abortion rights (repealing restrictions,
expanding insurance coverage, and allowing more qualified clinicians such as nurse
practitioners, physician assistants, or certified nurse midwives to provide at least
some abortion care). "The Supreme Court is poised to overturn *Roe v. Wade* at a
time when need for abortion care has been increasing," concluded the report. "This
means the impact of the ruling could be even more devastating than predicted by
prior analyses, particularly for people across the country who already struggle to
access abortion care."[78]

In December of 2020, the Generative Learning Community (GLC) for self-managed
abortion expanded, opening membership to more organizations. GLC grew to over
seventy organizations and held meetings every other month as a "gathering space" for
"shared learning and problem solving" on self-managed abortion. GLC also engaged in
"culture change work" to normalize self-managed abortion.[79] GLC had two goals: "to
give every person the option to end a pregnancy safely and with support, within the for-
mal healthcare system, or outside it" and to "ensure no one risks punishment or impris-
onment for their reproductive choices or for supporting a person who is self-managing
the end of a pregnancy."[80] Their purpose was to normalize self-managed abortion by
promoting a "positive narrative, and avoiding harmful messages, about self-managed
abortion."[81] They focused on "developing tools and actions for use in communications"
and committed to "do nothing that puts pregnant people, or those who support them,
at increased risk of investigation, prosecution, and punishment for their reproductive
choices." This limited approach later led to a break with Plan C because of their work
to make pills available to people in states with abortion bans, which inevitably created
some legal risks.[82]

The GLC focused primarily on normalizing abortion pills inside the reproduc-
tive health movement. "The medical community could get overly controlling about
mifepristone," explained Kirsten Moore. "What the GLC did was hold a mirror up to
the medical professionals and say, 'you know you're overthinking this, you're over-
traumatizing this.' They consistently normalized the idea that patients can manage their
abortions on their own," said Moore, noting that GLC held a full-day workshop on self-
managed abortion at a NAF meeting in early 2022. "It's about getting the movement
itself to move into the twenty-first century."[83]

This content downloaded from 73.155.33.47 on Wed, 04 Feb 2026 15:18:58 UTC
All use subject to https://about.jstor.org/terms

## THE PENDULUM SWINGS: BIDEN ADMINISTRATION EXPANDS ABORTION PILL ACCESS

Immediately after the 2020 election of Joseph Biden, reproductive rights advocates asked the new administration to review the FDA's abortion pill restrictions. "These restrictions place more of a burden than a benefit on providers and their patients," said Kirsten Moore, referring to the FDA standard for imposing the REMS restriction. "Based on opinion research we conducted last year, people like the idea that women have access to an option for ending an early pregnancy," said Moore. "And they like the idea that it's an FDA-approved drug that's been around for twenty years. We think it's time to revisit these restrictions and move forward."[84]

Even before the election, medical professionals and activists were calling on Biden to reverse the Trump policy and end the FDA restriction on the abortion pill altogether. A coalition of more than ninety women's rights organizations released a "Blueprint for Sexual and Reproductive Health, Rights and Justice" that made two demands with regard to mifepristone. The first was that President Biden issue an executive order on his first day in office directing the Secretary of Health and Human Services to lift the in-person distribution requirement for mifepristone during the pandemic. The second demand was that within ninety days of assuming office, the president direct the FDA to review the mifepristone REMS to determine whether it should be modified or removed to "best reflect scientific evidence and real-world use."[85] On January 27, 2021, Guttmacher Institute's president and CEO Herminia Palacio and Dr. Daniel Grossman of ANSIRH wrote an op-ed in *The Washington Post* urging Biden to remove the in-person distribution requirement. "Facts matter, and the facts couldn't be clearer," they wrote. "In this moment, when the country is looking to the administration to heed public health experts, it must suspend this requirement for the duration of the public health emergency and direct the FDA to ensure its medication abortion policies are aligned with the scientific evidence."[86] At a more personal level, Sarah Christopherson of NWHN found people to speak directly with President Biden about mifepristone. "I spent some time organizing high-net-worth major donors. I had some leftover contacts and some leftover favors to call in from people I knew would be receptive and get it, and be good spokeswomen for it," said Christopherson.[87]

On February 9, 2021, eleven female Democratic members of the House Committee on Oversight and Reform wrote a letter to the Acting Commissioner of the FDA Janet Woodcock[88] urging her to lift the in-person abortion pill distribution requirement. In the letter, they emphasized the FDA's illogical policy on mifepristone: "Of the more than 20,000 drugs regulated by FDA, mifepristone is the only drug that FDA requires patients to obtain in person at a hospital, clinic, or medical office, but it does not restrict the ability of patients to self-administer—unsupervised—at home or at a location of

This content downloaded from 73.155.33.47 on Wed, 04 Feb 2026 15:18:58 UTC
All use subject to https://about.jstor.org/terms

their choosing." They described a strong safety record of mifepristone, and the risks imposed on patients by the in-person distribution requirement. They concluded, "In light of the clear danger that the reinstated requirement poses to people seeking comprehensive reproductive health care at the height of the coronavirus pandemic, we urge you to immediately eliminate the medically unnecessary in-person dispensing requirement for mifepristone."[89]

On March 18, fifty-five reproductive health, rights, and justice groups sent a letter to President Biden urging his administration to lift FDA restrictions on mifepristone. The letter emphasized the burden of the FDA restrictions on marginalized communities:

> Consistent with your important commitment to follow the science in responding to COVID-19, as well as your critical promise to tackle issues of systemic equity across the government, it is imperative that your administration prioritize safe access to medication abortion. Burdensome restrictions on medication abortion, which are not based in medical evidence, deepen the health inequities already experienced by those who are struggling to make ends meet, particularly people of color, who comprise a majority of medication abortion patients and are now being hit hardest by the COVID-19 pandemic.[90]

Along with the letter, they delivered a petition with over 200,000 signatures of supporters.

On April 12, 2021, under the leadership of Dr. Janet Woodcock, the FDA finally lifted the in-person distribution requirement for the duration of the COVID-19 public health emergency, allowing clinicians to resume telemedicine abortion services.[91] In a letter to ACOG and the Society for Maternal-Fetal Medicine, Dr. Woodcock wrote that the FDA would waive the requirement that clinicians dispense mifepristone to their patients in a clinic or hospital setting. The letter said research studies on telemedicine abortion "do not appear to show increases in serious safety concerns occurring with medical abortion as a result of modifying the in-person dispensing requirement during the COVID-19 pandemic."[92] ACOG issued a statement praising the new guidelines: "We are pleased to see mifepristone regulated on the basis of the scientific evidence during the pandemic, rather than political bias against comprehensive reproductive health care, and we look forward to working with policy makers to ensure this principle governs post-pandemic care."[93] Advocates celebrated the decision for following the science. "We know from twenty years of research that medication abortion is extremely safe—even safer than some over-the-counter medications. It's past time to permanently lift the restrictions and make medication abortion more accessible for those who need it," said Dr. Grossman of ANSIRH. Online pharmacies resumed distribution of mifepristone by mail. Sarah Christopherson said all the strategies contributed toward their success: "I don't think any one strategy would have been sufficient on its own. I think it took all of them. It took the medical studies, proving how safe it was. It took EMAA

This content downloaded from 73.155.33.47 on Wed, 04 Feb 2026 15:18:58 UTC
All use subject to https://about.jstor.org/terms