UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **THE STATE OF LOUISIANA,**<br>**By and through its Attorney General,**<br>**LIZ MURRILL, and ROSALIE**<br>**MARKEZICH**<br><br>          **v.**<br><br>**U.S. FOOD AND DRUG**<br>**ADMINISTRATION; MARTIN A.**<br>**MAKARY, M.D., M.P.H., in his official**<br>**capacity as Commissioner of Food and**<br>**Drugs, U.S. Food and Drug Administration;**<br>**GEORGE FRANCIS TIDMARSH, M.D.,**<br>**PH.D., in his official capacity as Director,**<br>**Center for Drug Evaluation and Research,**<br>**U.S. Food and Drug Administration; U.S.**<br>**DEPARTMENT OF HEALTH AND**<br>**HUMAN SERVICES; and ROBERT F.**<br>**KENNEDY, JR., in his official capacity as**<br>**Secretary, U.S. Department of Health and**<br>**Human Services** | **CASE NO. 25-1491**<br><br>**JUDGE DAVID C. JOSEPH**<br><br>**MAGISTRATE JUDGE DAVID J. AYO** |

**BRIEF OF NATIONAL DOMESTIC VIOLENCE HOTLINE AND  LEGAL VOICE
AS *AMICI CURIAE*
IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY RELIEF**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF *AMICI CURIAE* .................................................................................. 1

ARGUMENT ...................................................................................................................... 3

   I.   Survivors of Intimate Partner Violence Need Access to Reproductive Health Care, Including Abortion Care. ......................................................................... 3

      A.   Many People in the United States Experience Intimate Partner Violence........... 3

      B.   Abusers Exert "Coercive Control" in Many Forms, and Systemic Inequities and Barriers Exacerbate the Impacts of Coercive Control. ......................................... 4

      C.   Abusers Interfere with Survivors' Reproductive Choices, Including Coercing and Forcing Victims into Unwanted Pregnancies, Putting those Survivors at Risk. ................................................................................................................. 6

      D.   After Experiencing Pregnancy Coercion and Birth Control Sabotage, Survivors May Seek Abortion Care, Which Can Be Essential to Escaping Further Abuse. 9

   II.   Reducing Access to Mifepristone Will Have Grave Consequences for the Lives and Health of Intimate Partner Violence Survivors. ........................................ 13

   III.   Undoing the 2023 REMS Will Not Prevent Reproductive Coercion and Will Instead Give More Power to Abusers By Limiting Survivors' Health Options. ................... 16

   CONCLUSION ................................................................................................................ 18

TABLE OF AUTHORITIES

**Cases**

*City of Dallas v. Delta Air Lines, Inc.*,
    847 F.3d 279 (5th Cir. 2017) ................................................ 13

**Statutes**

LA Rev. Stat. § 14:34.9 ........................................................ 17

LA Rev. Stat. § 14:35.3 ........................................................ 17

LA Rev. Stat. § 14:38.1 ........................................................ 17

LA Rev. Stat. § 17:3399.13 .................................................... 17

LA Rev. Stat. § 40:969D ....................................................... 17

LA Rev. Stat.§ 14.37.7........................................................... 17

**Other Authorities**

2015 Washington State Civil Legal Needs Study Update, Civil Legal Needs Study Update Committee, Washington State Supreme Court 15 (Oct. 2015), https://www.courts.wa.gov/disability-justice-task-force/public/OCLA-2015-Civil-Legal-Needs-Study-Update.pdf........................................................ 13

Alexandra Thompson et al., *The Disproportionate Burdens of the Mifepristone REMS*, 104 Contraception 16 (2021) ........................................................ 16

Alexia Cooper & Erica L. Smith, *Homicide Trends in the United States, 1980–2008, Annual Rates for 2009 and 2010* at 10 (2011), U.S. Dep't Just., Bureau of Just. Stats., http://bjs.gov/content/pub/pdf/htus8008.pdf (between 1980 and 2008 40% of homicides of women were committed by intimate partners)........................................ 12

Am. Bar Ass'n Comm'n on Domestic Violence, *10 Custody Myths and How to Counter Them*, 4 ABA Comm'n on Domestic Violence Quarterly E-Newsletter 3 (July 2006), https://xyonline.net/sites/xyonline.net/files/ABACustodymyths.pdf ...................... 13

Amaranta D. Craig et al., *Exploring Young Adults' Contraceptive Knowledge and Attitudes: Disparities by Race/Ethnicity and Age*, 24 Women's Health Issues e281 (2014)..................... 9

Ann L. Coker, *Does Physical Intimate Partner Violence Affect Sexual Health? A Systematic Review*, 8 Trauma, Violence, & Abuse 149, 151–53 (2007) .................................... 7

Ashley Beeman, *The Need for More States to Adopt Specific Legislation Addressing Abusive Use of Litigation in Intimate Partner Violence*, 20 Seattle J. Soc. Just. 825 (2022); ...................... 4

Beth A. Bailey, *Partner Violence During Pregnancy: Prevalence, Effects, Screening, and Management*, 2 Int'l J. Women's Health 183 (2010) .......................................... 12

Bianca Wilson et al., *LGBT Poverty in the United States: Trends at the Onset of COVID-19*, UCLA School of Law Williams Institute 3–4 (Feb. 2023), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Poverty-COVID-Feb-2023.pdf ........................................................ 6

*Car Access: Everyone Needs Reliable Transportation Access and In Most American Communities that Means a Car*, National Equity Atlas, https://nationalequityatlas.org/indicators/Car_access .................................................................................................................................. 16

Carmela DeCandia et al., *Closing the Gap: Integrating Services for Survivors of Domestic Violence Experiencing Homelessness*, The National Center on Family Homelessness 4 (2013), https://www.air.org/sites/default/files/2021-06/Closing%20the%20Gap_Homelessness%20and%20Domestic%20Violence%20toolkit.pdf .................................................................................................................................. 13

Carmody and Assocs., *The Justice Gap in Montana: As Vast as Big Sky Country* 24 (2014), https://courts.mt.gov/External/supreme/boards/a2j/docs/justicegap-mt.pdf ............................ 13

Claudia Garcia-Moreno et al., *Understanding and Addressing Violence Against Women: Intimate Partner Violence* 1 (2012), World Health Organization, http://apps.who.int/iris/bitstream/10665/77432/1/WHO_RHR_12.36_eng.pdf. ......................... 3

Corinne Peek-Asa et al., *Rural Disparity in Domestic Violence Prevalence and Access to Resources*, 20 J. Women's Health 1743, 1747 (Nov. 2011) ....................................................... 6

Cynthia Prather et al., *Racism, African American Women, and Their Sexual and Reproductive Health: A Review of Historical and Contemporary Evidence and Implications for Health Equity*, 2 Health Equity 249, 253 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6167003/pdf/heq.2017.0045.pdf ................ 11

Denise D'Angelo et al., *Rape and Sexual Coercion Related Pregnancy in the United States*, 66(3) Am. J. Prev. Med. 389-398 (2024) ........................................................................................... 9

Dhaval Dave et al., *Abortion restrictions and intimate partner violence in the Dobbs Era*, 104 J. Health Econ. 103074 (2025) ................................................................................................... 14

Dominque Bourassa & Jocelyn Berube, *The Prevalence of Intimate Partner Violence among Women and Teenagers Seeking Abortion Compared with Those Continuing Pregnancy*, 29 J. Obstetrics & Gynaecology Can. 415 (2007) ............................................................................. 9

Elizabeth Miller et al., *Reproductive Coercion: Connecting the Dots Between Partner Violence and Unintended Pregnancy*, 81 Contraception 457, 457 (2010) ................................................ 8

Elizabeth Tobin-Tyler et al., *How State Antiabortion Lawsuits and Increased Surveillance Empower Domestic Abusers*, 334-4 JAMA 297 (2025) ........................................................... 7

Ellen Ridley et al., *Domestic Violence Survivors at Work: How Perpetrators Impact Employment*, Me. Dep't Lab. & Fam. Crisis Services 1, 4 (Oct. 2005), https://www1.maine.gov/labor/labor_stats/publications/dvreports/survivorstudy.pdf .............. 5

Ema Alsina et al., *Interventions to Prevent Intimate Partner Violence: A Systematic Review and Meta-Analysis* 30(3-4) Violence Against Women, 953 (2024) ............................................... 17

Emiko Petrosky et al., *Racial and Ethnic Differences in Homicides of Adult Women and the Role of Intimate Partner Violence — United States, 2003–2014*, 66 Morbidity and Mortality Weekly Rep. 741 (July 21, 2017) ............................................................................................................ 12

Erika Sussman & Sara Wee, *Accounting for Survivors' Economic Security: An Atlas for Direct Service Providers, Mapbook 1*, Ctr. for Survivor Agency & Just. 1 (2016), https://csaj.org/wp-content/uploads/2021/10/Accounting-for-Survivors-Economic-Security-Atlas-Mapping-the-Terrain-.pdf .................................................................................................................... 5, 16

*Fact Sheet: Gender and Racial Wage Gaps Persist as the Economy Recovers*, Institute for Women's Policy Research 2 (Sept. 2022), https://iwpr.org/wp-content/uploads/2022/10/Annual-Gender-Wage-Gap-by-Race-and-Ethnicity-2022.pdf ......... 16

Grace KT, Anderson JC, *Reproductive Coercion: A Systematic Review*, 19 Trauma Violence Abuse 371-390 (2018) ................................................................................................. 7

Gunnar Karakurt et al., *Mining Electronic Health Records Data: Domestic Violence and Adverse Health Effects*, 3 J. of Fam. Violence 79, 79–87 (2017) ............................................... 10

*Intimate Partner Violence Screening Fact Sheet and Resources*, National Center for Excellence in Primary Care Research, Agency for Healthcare Research and Quality, https://archive.ahrq.gov/ncepcr/tools/healthier-pregnancy/fact-sheets/intimate-partner-violence-provider-fact-sheet.pdf ................................................................................. 12

Issue Brief: Improving Access to Maternal Health Care in Rural Communities, Center for Medicare & Medicaid Services 3, 8, 10 (2019), https://www.cms.gov/About-CMS/Agency-Information/OMH/equity-initiatives/rural-health/09032019-Maternal-Health-Care-in-Rural-Communities.pdf ...................................................................................................... 11

Jamila K. Stockman et al., *Intimate Partner Violence and Its Health Impact on Disproportionately Affected Populations, Including Minorities and Impoverished Groups*, 24 J. Womens Health (Larchmt) 62 (2015) ................................................................................................ 3

Jeanne Alhusen, *Intimate Partner Violence During Pregnancy: Maternal and Neonatal Outcomes*, 24 J. Womens Health (Larchmt) 100, 100–06 (2015) .......................................................... 11

Joan S. Meier, *Domestic Violence, Child Custody, and Child Protection: Understanding Judicial Resistance and Imagining the Solutions*, 11 Am. U. J. Gender Soc. Pol'y & L. 657 (2003) ... 10

John Creamer et al., *Poverty in the United States: 2021*, U.S. Census Bureau Population Reports 29–30 (Sept. 2022), https://www.census.gov/content/dam/Census/library/publications/2022/demo/p60-277.pdf .... 5

Judith McFarlane, *Pregnancy Following Partner Rape: What We Know and What We Need to Know*, 8 Trauma, Violence, & Abuse 127, 130 (2007) .......................................................... 10

Julie A. Gazmararian et al., *Prevalence of Violence Against Pregnant Women*, 275 JAMA 1915, 1918 (1996) ........................................................................................................... 12

Julie Goldscheid, *Gender Violence and Work: Reckoning with the Boundaries of Sex Discrimination Law*, 18 Colum. J. Gender & L. 61, 75–77 (2008) ............................................. 5

Karla Fischer et al., *The Culture of Battering and the Role of Mediation in Domestic Violence Cases*, 46 SMU L. Rev. 2117 (1993) ......................................................................... 4

Karuna S. Chibber et al., *The Role of Intimate Partners in Women's Reasons for Seeking Abortion*, 24 Women's Health Issues e131, e134 (2014) .................................................................. 10

Katie Edwards et al., *Intimate Partner Violence and the Rural-Urban-Suburban Divide: Myth or Reality? A Critical Review of the Literature*, 16 Trauma, Violence, & Abuse 359 (2015)...... 15

Latoya Hill et al., *Racial Disparities in Maternal and Infant Health: Current Status and Efforts to Address Them*, Kaiser Family Foundation (2022), https://www.kff.org/racial-equity-and-health-policy/issue-brief/racial-disparities-in-maternal-and-infant-health-current-status-and-efforts-to-address-them/.......................................................................................................................... 11

Lauren Maxwell et al., *Estimating the Effect of Intimate Partner Violence on Women's Use of Contraception: A Systematic Review and Meta-Analysis*, 10 PLoS One 1 (2015).................... 7

Leigh Goodmark, *A Troubled Marriage: Domestic Violence and the Legal System* 42 (2012) .... 4

Lisa A. Tucker, *Symposium: The Law of Parents and Parenting: Domestic Violence as a Factor in Child Custody Determinations: Considering Coercive Control*, 90 Fordham L. Rev. 2673, 2674 (2022).......................................................................................................................... 5

Louisiana Dept. of Health, *Louisiana Pregnancy-Associated Mortality Review: Maternal Morality in Louisiana 2020 Report* 13-14 (2020) https://ldh.la.gov/assets/oph/Center-PHCH/FamilyHealth/2020_PAMR_Report_April2024.pdf.................................................... 12

Maeve Wallace et al., *States' Abortion Laws Associated With Intimate Partner Violence-Related Homicide Of Women And Girls In The US, 2014-20*, 43(5) Health Aff (Millwood) 682 (2024). .................................................................................................................................................. 12

Maeve Wallace, *Trends in Pregnancy Associated Homicide, United States 2020*, 112 Am J Public Health 1333-36 (2022)........................................................................................................... 12

Marcela Howell et al., *Contraceptive Equity for Black Women*, In Our Own Voice: Nat'l Black Women's Reprod. Just. Agenda 1, 2–3 (2020), http://blackrj.org/wp-content/uploads/2020/04/6217-IOOV_ContraceptiveEquity.pdf ............................................... 9

Mary Prezekop, *One More Battleground: Domestic Violence, Child Custody, and the Batterers' Relentless Pursuit of their Victims Through the Courts*, 9 Seattle J. Soc. Just. 1053 (2011)... 13

Maryam Siddiqui et al., *Increased Perinatal Morbidity and Mortality Among Asian American and Pacific Islander Women in the United States*, 124 Anesth Analg. 879 (2017)......................... 11

Megan Hall et al., *Associations between Intimate Partner Violence and Termination of Pregnancy: A Systemic Review and Meta-Analysis*, 11 PLoS Med. 1, 2 (2014)....................................... 8, 9

Melisa M. Holmes et al., *Rape-Related Pregnancy: Estimates and Descriptive Characteristics from a National Sample of Women*, 175 Am. J. Obstetrics & Gynecology 320, 322 (1996)..... 9

Melissa E. Dichter et al., *Coercive Control in Intimate Partner Violence: Relationship with Women's Experience of Violence, Use of Violence, and Danger*, Psychol. Violence 8(5), 596-604 (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6291212/ ............................................. 4

Miller, Elizabeth et al., *Pregnancy Coercion, Intimate Partner Violence, and Unintended Pregnancy*, 81 Contraception 316, 316-317 (2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC2896047/pdf/nihms164544.pdf .............................. 7

Munira Z. Gunja et al., *The U.S. Maternal Mortality Crisis Continues to Worsen: An International Comparison,* The Commonwealth Fund (Dec. 1, 2022), https://www.commonwealthfund.org/blog/2022/us-maternal-mortality-crisis-continues-worsen-international-comparison ..................................................................................... 11

Na'amah Razon et al., *Exploring the Impact of Mifepristone's Risk Evaluation and Mitigation Strategy (REMS) on the Integration of Medication Abortion into US Family Medicine Primary Care Clinics*, 109 Contraception 19, 20–21 (2022) ................................................................ 15

Naomi R. Cahn, *Civil Images of Battered Women: The Impact of Domestic Violence on Child Custody Decisions*, 44 Vand. L. Rev. 1041, 1051 (1991) ......................................................... 13

Nat Stern et al., *Unheard Voices of Domestic Violence Victims: A Call to Remedy Physician Neglect*, 15 Geo. J. Gender & L. 613, 633 (2014) .......................................................... 10

Natalie J. Sokoloff & Ida Dupont, *Domestic Violence at the Intersections of Race, Class, and Gender: Challenges and Contributions to Understanding Violence Against Marginalized Women in Diverse Communities*, 11 Violence Against Women 38 (2005) ................................. 5

National Domestic Violence Hotline, *Reproductive Coercion and Abuse Report* 8, https://www.thehotline.org/wp-content/uploads/media/2025/04/ReproductiveCoercionAndAbuseReport.pdf .......................... 7

Phyllis Holditch Niolonet al., *Preventing Intimate Partner Violence Across the Lifespan: A Technical Package of Programs, Policies, and Practices*, Nat'l Center for Injury Prevention & Control, Division of Violence Prevention (2017), https://stacks.cdc.gov/view/cdc/45820...... 17

Ruth Leemis et al., *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Intimate Partner Violence* 1, 14 (2022), Ctrs. for Disease Control & Prevention, https://www.cdc.gov/nisvs/documentation/NISVSReportonIPV_2022.pdf............................... 3

Samantha Artiga et al., *Health Coverage by Race and Ethnicity 2010-2021*, Kaiser Family Foundation (Dec. 20, 2022), https://www.kff.org/racial-equity-and-health-policy/issue-brief/health-coverage-by-race-and-ethnicity/ ..................................................................... 9, 16

Sarah CM Roberts et al., *Risk of Violence from the Man Involved in the Pregnancy After Receiving or Being Denied an Abortion*, 12 BMC Med. 1, 5 (2014), https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-014-0144-z ........................ 9

*see also* Heike Thiel de Bocanegra et al., *Birth Control Sabotage and Forced Sex: Experiences Reported by Women in Domestic Violence Shelters*, 16 Violence Against Women 601 (2010) 8

Sheela Maru et al., *Utilization of Maternal Health Care Among Immigrant Mothers in New York City, 2016–2018*, 98 J. Urban Health 711, (2021)................................................................... 11

U.S. Food and Drug Administration, Medical Review of Mifepristone (Application No. NDA 020687), Center for Drug Evaluation and Research, Dkt. 1, Exh. 51 (Oct. 6, 2025).............. 15

*Unintended Pregnancy in the United States*, America's Health Rankings: United Health Foundation, https://www.americashealthrankings.org/explore/measures/unintended_pregnancy. ............. 10

United Nations, What is Domestic Abuse? https://www.un.org/en/coronavirus/what-is-domestic-abuse ....................................................................................................................... 4

Usha Ranji et al., *Beyond the Numbers: Access to Reproductive Health Care for Low-Income Women in Five Communities*, Kaiser Family Foundation (2019), https://www.kff.org/report-section/beyond-the-numbers-access-to-reproductive-health-care-for-low-income-women-in-five-communities-executive-summary/ ................................................................................... 9

Victoria Tran, *Asian Americans are Falling Through the Cracks in Data Representation and Social Services*, Urban Institute (June 19, 2018), https://www.urban.org/urban-wire/asian-americans-are-falling-through-cracks-data-representation-and-social-services ........................ 5

*Violence Against Women*, World Health Organization (March 9, 2021), https://www.who.int/news-room/fact-sheets/detail/violence-against-women ........................... 3

Yvonne Lindgren, *The Doctor Requirement: Griswold, Privacy, and at-Home Reproductive Care*, 32 Const. Comment. 341 (2017) ............................................................................................ 14

## INTEREST OF *AMICI CURIAE*

*Amici* Legal Voice and The National Domestic Violence Hotline (The Hotline) are non-profit, non-partisan public interest organizations that advocate for and serve survivors of intimate partner violence ("IPV"). *Amici* serve IPV survivors through a variety of avenues, including legal services, personalized safety planning, resource connection, community education, coalition-building, and legal and policy advocacy. These organizations are familiar with the challenges that IPV survivors face in exercising their autonomy and understand the specific barriers that make it especially difficult for IPV survivors to access reproductive health care, including abortion care. *Amici* are also knowledgeable about how access to medication abortion can be essential to IPV survivors' health, well-being, and safety. As advocates for survivors of IPV, *amici* have a strong interest in ensuring that survivors can exercise bodily autonomy, including accessing medication abortion.

Survivors of IPV are entitled to make their own reproductive choices, free from interference or coercion by abusive partners, family members, or the state. Limiting access to mifepristone by staying or vacating the Food and Drug Administration's ("FDA")'s 2023 Risk Evaluation and Mitigation Strategy would harm survivors and reduce their safety and autonomy. Plaintiffs have asked this Court to stay or postpone the 2023 REMS or order the FDA to suspend or withdraw the 2023 REMS, in order to reinstate an In-Person Dispensing Requirement for mifepristone. (Pltfs.' Mot. for Preliminary Relief 1, ECF No. 20.) There is no legal or factual basis for the Court to grant Plaintiffs' request and doing so would cause serious harm to pregnant people and survivors. As detailed by the Proposed-Intervenors, the determination to lift the In-Person Dispensing Requirement was well-reasoned and supported by significant, reliable evidence of

mifepristone's safety, including when dispensed via telemedicine.[1] This determination is also supported by evidence that the In-Person Dispensing Requirement burdened patient access and the healthcare delivery system. Preserving survivors' ability to access abortion, including by telemedicine, is essential to survivor safety.

Reproductive coercion of any form—whether it takes the form of interfering with birth control, preventing a partner from accessing abortion, or pressuring a partner to have an abortion— is wrong. No one should be forced to, tricked into, or pressured to have an abortion. As a society, we must continue to develop and invest in prevention, intervention, and survivor support to prevent all types of intimate partner violence. Ultimately, the solution to reproductive coercion is to address the underlying dynamics of abuse and coercion, not to take away or limit medication that is necessary to many survivors' reproductive freedom, health, and safety.

Restricting access to mifepristone will cause irreparable harm to the many Americans who face IPV, need abortions to protect their own health and safety, and face unique barriers to access this time-sensitive care because of the nature of abusive relationships. Abusive partners often exert control and maintain power within the relationship by undermining survivors' autonomy to make reproductive decisions, limiting access to health care, and forcing pregnancy. Being forced to carry a pregnancy to term for lack of access to abortion care exposes survivors of IPV to a higher likelihood of further violence, poses significant health risks, and increases the chance of being trapped in violent relationships. The consequences of such entrapment range from heightened abuse during pregnancy to death. As difficult as it is for all survivors of IPV to escape abusive relationships and exercise their reproductive autonomy, IPV survivors of color—who already

---

[1] *See* ECF 52-4, 54-4.

experience disproportionately high rates of unintended pregnancy and increased health risks—face systemic inequities that make doing so even more difficult.

Granting Plaintiffs' motion would jeopardize the health and safety of IPV survivors by forcing them to travel in person to a health center in order to access a safe and essential abortion medication—travel that, for many survivors, will be dangerous or impossible. Amici urge the Court to deny Plaintiffs' motion.

## ARGUMENT

### I.     Survivors of Intimate Partner Violence Need Access to Reproductive Health Care, Including Abortion Care.

#### A.     Many People in the United States Experience Intimate Partner Violence.

Nearly half of the women in the United States have been affected by IPV, which the World Health Organization defines as "behaviour by an intimate partner or ex-partner that causes physical, sexual or psychological harm, including acts of physical aggression, sexual coercion, psychological abuse and controlling behaviors."[2] Almost *60 million* women in the United States[3] report that they have experienced sexual violence, physical violence, and/or stalking by an intimate partner during their lifetimes.[4] No community is immune to intimate partner violence, but the numbers are even starker for women of color: More than half of all multi-racial, Native, and Black people in the United States reported experiencing IPV in their lifetimes.[5] Rates of IPV are also

---

[2] *Violence Against Women*, World Health Organization (March 9, 2021), https://www.who.int/news-room/fact-sheets/detail/violence-against-women; *see also* Claudia Garcia-Moreno et al., *Understanding and Addressing Violence Against Women: Intimate Partner Violence* 1 (2012), World Health Organization, http://apps.who.int/iris/bitstream/10665/77432/1/WHO_RHR_12.36_eng.pdf.

[3] People of many gender identities can become pregnant and people of many gender identities experience IPV. This brief specifically references "women" where the underlying research or quoted material focuses on women.

[4] Ruth Leemis et al., *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Intimate Partner Violence* 1, 14 (2022), Ctrs. for Disease Control & Prevention, https://www.cdc.gov/nisvs/documentation/NISVSReportonIPV_2022.pdf .

[5] *Id.*; *see also* Jamila K. Stockman et al., *Intimate Partner Violence and Its Health Impact on Disproportionately Affected Populations, Including Minorities and Impoverished Groups*, 24 J. Womens Health (Larchmt) 62 (2015).

disproportionately high for Asian and Latina immigrant women who face additional structural barriers including language difficulties, immigration status, and lack of faith in or resources to utilize the legal system, all layered on top of the overall stress of assimilation.[6]

**B.      Abusers Exert "Coercive Control" in Many Forms, and Systemic Inequities and Barriers Exacerbate the Impacts of Coercive Control.**

Researchers generally define intimate partner violence as a pattern of behavior by an abuser to gain or maintain control over their victim through a variety of tactics, not limited to physical violence.[7] Physical abuse is only one aspect of IPV. Abusers also exert control by isolating survivors from family and friends, monitoring their whereabouts and relationships,[8] limiting their financial resources, tracking their use of transportation and time away from home,[9] and threatening to harm or kidnap children, among other tactics.[10] Abusers also exert coercive control through reproductive coercion, discussed further below. These various forms of "coercive control" limit survivors' access to the resources necessary to escape the abusive relationship. It is an intentional, repetitive pattern of acts that lessens the victim's independence, as "individuals experiencing coercive control are often isolated from friends, family, or other support systems."[11] Together, these actions position the abuser to use violence with relative impunity because the survivor's support system, economic security, and resources to seek safety from abuse are compromised. For these reasons, legislatures and courts worldwide are increasingly recognizing that domestic abuse

---

[6] Stockman, *supra* note 5.

[7] *See* Ashley Beeman, *The Need for More States to Adopt Specific Legislation Addressing Abusive Use of Litigation in Intimate Partner Violence*, 20 Seattle J. Soc. Just. 825, 827 (2022); United Nations, What is Domestic Abuse? https://www.un.org/en/coronavirus/what-is-domestic-abuse (last accessed Feb. 18, 2026).

[8] Karla Fischer et al., *The Culture of Battering and the Role of Mediation in Domestic Violence Cases*, 46 SMU L. Rev. 2117, 2126–27 (1993).

[9] *Id.* at 2121–22, 2131–32; *see also* Leigh Goodmark, *A Troubled Marriage: Domestic Violence and the Legal System* 42 (2012).

[10] Fischer et al., *supra* note 8, at 2122–23.

[11] Melissa E. Dichter et al., *Coercive Control in Intimate Partner Violence: Relationship with Women's Experience of Violence, Use of Violence, and Danger*, Psychol. Violence 8(5), 596-604 (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6291212/.

is more accurately viewed as a pattern of behavior designed to establish power and control, and not merely a series of isolated physical incidents.[12]

Poverty and lack of access to resources make it even more difficult for survivors to escape IPV. Economic coercive control may include sabotaging employment or restricting access to money.[13] It takes money to flee an abusive relationship—for hotel rooms, gas, food, and childcare. Longer term costs include mental and physical health care needs, stable housing, legal representation, and finding flexible employers who will accommodate time off requests for court appearances and safety-related needs. Yet many IPV survivors do not have those resources. Indeed, women living in poverty are nearly twice as likely to experience domestic violence.[14] And making matters worse, many IPV survivors lose their jobs as a direct consequence of the abuse they experienced.[15]

Survivors from marginalized communities face systemic inequities that exacerbate the conditions for coercive control.[16] One in four Native Americans, nearly one in five Black Americans, more than one in six Latinx Americans, and more than one in six Asian Americans from certain ethnic groups, live in poverty.[17] People of color are even more likely to live in poverty

---

[12] *See* Lisa A. Tucker, *Symposium: The Law of Parents and Parenting: Domestic Violence as a Factor in Child Custody Determinations: Considering Coercive Control*, 90 Fordham L. Rev. 2673, 2674 (2022).

[13] Julie Goldscheid, *Gender Violence and Work: Reckoning with the Boundaries of Sex Discrimination Law*, 18 Colum. J. Gender & L. 61, 75–77 (2008).

[14] Erika Sussman & Sara Wee, *Accounting for Survivors' Economic Security: An Atlas for Direct Service Providers, Mapbook 1*, Ctr. for Survivor Agency & Just. 1 (2016), https://csaj.org/wp-content/uploads/2021/10/Accounting-for-Survivors-Economic-Security-Atlas-Mapping-the-Terrain-.pdf.

[15] Ellen Ridley et al., *Domestic Violence Survivors at Work: How Perpetrators Impact Employment*, Me. Dep't Lab. & Fam. Crisis Services 1, 4 (Oct. 2005), https://www1.maine.gov/labor/labor_stats/publications/dvreports/survivorstudy.pdf.

[16] *See generally* Natalie J. Sokoloff & Ida Dupont, *Domestic Violence at the Intersections of Race, Class, and Gender: Challenges and Contributions to Understanding Violence Against Marginalized Women in Diverse Communities*, 11 Violence Against Women 38 (2005).

[17] John Creamer et al., *Poverty in the United States: 2021*, U.S. Census Bureau Population Reports 29–30 (Sept. 2022), https://www.census.gov/content/dam/Census/library/publications/2022/demo/p60-277.pdf; Victoria Tran, *Asian Americans are Falling Through the Cracks in Data Representation and Social Services*, Urban Institute (June 19, 2018), https://www.urban.org/urban-wire/asian-americans-are-falling-through-cracks-data-representation-and-social-services.

if they also are LGTBQ+, disabled, or non-citizens.[18] And women from these communities are more likely to experience IPV.[19]

Women living in rural areas, who face more frequent and severe rates of IPV than women in urban areas, face additional challenges.[20] They have to drive, on average, more than 25 miles to access domestic violence intervention programs.[21] Access to health care providers and hospitals is scarcer outside urban areas, often making it more difficult for rural survivors to receive needed care. Rural communities generally have access to fewer resources, and those limited resources must be spread out in a larger geographic area.[22] These barriers further isolate a survivor from necessary resources.[23] Under these circumstances, the importance of access to telehealth and medication abortion services is even greater.

### C.    Abusers Interfere with Survivors' Reproductive Choices, Including Coercing and Forcing Victims into Unwanted Pregnancies, Putting those Survivors at Risk.

Along with other forms of coercive control, abusers frequently use "reproductive coercion" to control their partners. Abusers interfere with their partners' contraceptive use by discarding or damaging contraceptives, removing prophylactics during sex without consent, forcibly removing internal-use contraceptives, or retaliating against their partners or threatening harm for

---

[18] Bianca Wilson et al., *LGBT Poverty in the United States: Trends at the Onset of COVID-19*, UCLA School of Law Williams Institute 3–4 (Feb. 2023), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Poverty-COVID-Feb-2023.pdf.
[19] *See supra* § I.A.
[20] Corinne Peek-Asa et al., *Rural Disparity in Domestic Violence Prevalence and Access to Resources*, 20 J. Women's Health 1743, 1747 (Nov. 2011).
[21] *Id.* at 1747-48.
[22] *Id.* at 1743.
[23] *See supra* note 20 at 1748.

contraceptive use.[24] Reproductive coercion can also take the form of coercing a partner to have an abortion or not to have an abortion.[25]

The stories of the survivors who have faced reproductive coercion are harrowing and can best be understood through their own words, collected by the National Domestic Violence Hotline.

> My partner knowingly and forcefully kept having sex after [my] consent was withdrawn. I became pregnant as a result of rape. I was raped again once I discovered I was pregnant while I was in an incredibly vulnerable state. After the first rape, I wanted to go to the pharmacy as soon as possible to get the morning-after pill. However, I had no way of getting there and feared trying to go on my own, of what he would have tried to do if I left. I had to wait until he took me, which was well over the amount of time I wanted to go, and obviously, the pill by this point was ineffective, as I became pregnant as a result.[26]

> ---

> My husband has taken my birth control because he told me it was making me gain weight. He has come with me to ob-gyn appointments expecting to talk to the doctor about my birth control. He has cheated multiple times and forced me to continue to have unprotected sex.[27]

> ---

> My former partner refused to allow me the recommended six-week post-partum recovery period of no penetration after the birth of our first child. He warned me when I got out of the hospital that he would not hold off on having sex for six weeks, so I needed to get that notion out of my head. Two weeks after giving birth, he initiated penetration with no discussion or permission while we were in bed for the night. Since my pregnancy and onward, he had become more violent and refusing sex was not an option for me. I did not begin birth control immediately after birthing my first child. I was in survival mode and looking for the first opportunity to escape from my abusive partner, hopefully with my baby. I did not know how he would respond to me being on birth control. After a couple of months

---

[24] Elizabeth Tobin-Tyler et al., *How State Antiabortion Lawsuits and Increased Surveillance Empower Domestic Abusers*, 334-4 JAMA 297 (2025); Ann L. Coker, *Does Physical Intimate Partner Violence Affect Sexual Health? A Systematic Review*, 8 Trauma, Violence, & Abuse 149, 151–53 (2007); Elizabeth Miller et al., *Pregnancy Coercion, Intimate Partner Violence, and Unintended Pregnancy*, 81 Contraception 316, 316-317 (2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC2896047/pdf/nihms164544.pdf; Lauren Maxwell et al., *Estimating the Effect of Intimate Partner Violence on Women's Use of Contraception: A Systematic Review and Meta-Analysis*, 10 PLoS One 1 (2015).

[25] KT Grace and JC Anderson, *Reproductive Coercion: A Systematic Review*, 19 Trauma Violence Abuse 371-390 (2018) .

[26] National Domestic Violence Hotline, *Reproductive Coercion and Abuse Report* 8, https://www.thehotline.org/wp-content/uploads/media/2025/04/ReproductiveCoercionAndAbuseReport.pdf

[27] *Id.* at 17.

of unprotected sex, I did not know if I was pregnant again and was afraid to start birth control if I was.[28]

---

During those two years, I couldn't take birth control. My ex-husband would have sex with me when I was sleeping. I confided in my ex-mother-in-law, who told me that a husband can't rape his wife. He just wanted me to keep having babies until I had a boy. Yet, he'd punish [me] for the expense of having children to take care of or [for] the time it took away from him. The whole thing was a nightmare. After my third and last child, I covertly went on birth control using a patch. My ex-husband thought it was a bandage.[29]

When the National Domestic Violence Hotline surveyed over 3,000 women seeking help, 23 percent reported that their abusive partner pressured them into becoming pregnant when they did not want to and 20 percent reported that their partner prevented them from using birth control.[30] Survivors reported many forms of reproductive coercion, including prohibiting birth control use, hiding birth control, refusing to use condoms, and rape.[31] As a result, survivors of IPV are significantly less likely to be able to use contraceptives than their non-victimized counterparts.[32]

It is hardly surprising, therefore, that reproductive coercion in abusive relationships dramatically increases the risk of unintended pregnancy.[33] Again, systemic inequities further compound the risks associated with reproductive coercion. Marginalized communities already experience disproportionately high rates of unintended pregnancy,[34] largely due to a lack of access

---

[28] *Id.* at 11.

[29] *Id.* at 17.

[30] *Id.* at 11; *see also* Heike Thiel de Bocanegra et al., *Birth Control Sabotage and Forced Sex: Experiences Reported by Women in Domestic Violence Shelters*, 16 Violence Against Women 601 (2010).

[31] *See supra* note 26 at 8-9.

[32] Megan Hall et al., *Associations between Intimate Partner Violence and Termination of Pregnancy: A Systemic Review and Meta-Analysis*, 11 PLoS Med. 1, 2 (2014); *see also* Maxwell et al., *supra* note 24.

[33] Elizabeth Miller et al., *Reproductive Coercion: Connecting the Dots Between Partner Violence and Unintended Pregnancy*, 81 Contraception 457, 457 (2010).

[34] Theresa Y. Kim et al., *Racial/Ethnic Differences in Unintended Pregnancy: Evidence from a National Sample of U.S. Women*, 50 Am. J. Preventative Med. 427, 427 (2016).

to sexual health information,[35] health insurance,[36] and affordable contraceptives,[37] as well as a history of coercion by and mistrust of state and medical institutions.[38]

> **D.** **After Experiencing Pregnancy Coercion and Birth Control Sabotage, Survivors May Seek Abortion Care, Which Can Be Essential to Escaping Further Abuse.**

Meaningful access to abortion care, while important to all women, is particularly critical for IPV survivors, and especially those whose unintended pregnancies resulted from reproductive coercion. An estimated one in twenty women in the United States experienced a pregnancy from rape, sexual coercion, or both during their lifetimes.[39]

Dozens of studies have found a strong association between IPV and the decision to terminate pregnancy.[40] A survivor may choose to terminate a pregnancy that results from reproductive coercion,[41] that results from rape,[42] or out of fear of increased violence and/or being trapped in an abusive relationship if the pregnancy continues.[43] A survivor of IPV also may

---

[35] Amaranta D. Craig et al., *Exploring Young Adults' Contraceptive Knowledge and Attitudes: Disparities by Race/Ethnicity and Age*, 24 Women's Health Issues e281, e287 (2014).

[36] Samantha Artiga et al., *Health Coverage by Race and Ethnicity 2010-2021*, Kaiser Family Foundation (Dec. 20, 2022), https://www.kff.org/racial-equity-and-health-policy/issue-brief/health-coverage-by-race-and-ethnicity/ .

[37] Usha Ranji et al., *Beyond the Numbers: Access to Reproductive Health Care for Low-Income Women in Five Communities*, Kaiser Family Foundation (2019), https://www.kff.org/report-section/beyond-the-numbers-access-to-reproductive-health-care-for-low-income-women-in-five-communities-executive-summary/.

[38] Marcela Howell et al., *Contraceptive Equity for Black Women*, In Our Own Voice: Nat'l Black Women's Reprod. Just. Agenda 1, 2–3 (2020), http://blackrj.org/wp-content/uploads/2020/04/6217-IOOV_ContraceptiveEquity.pdf.

[39] Denise D'Angelo et al., *Rape and Sexual Coercion Related Pregnancy in the United States*, 66(3) Am. J. Prev. Med. 389-398 (2024).

[40] *See* Hall et al., *supra* note 32 (identifying 74 studies from the United States and around the world that demonstrated a correlation between IPV and abortion); *see also* Dominque Bourassa & Jocelyn Berube, *The Prevalence of Intimate Partner Violence among Women and Teenagers Seeking Abortion Compared with Those Continuing Pregnancy*, 29 J. Obstetrics & Gynaecology Can. 415 (2007).

[41] Hall et al., *supra* note 32 at 6–7.

[42] Melisa M. Holmes et al., *Rape-Related Pregnancy: Estimates and Descriptive Characteristics from a National Sample of Women*, 175 Am. J. Obstetrics & Gynecology 320, 322 (1996) (50 percent of women pregnant through rape had abortions).

[43] Sarah CM Roberts et al., *Risk of Violence from the Man Involved in the Pregnancy After Receiving or Being Denied an Abortion*, 12 BMC Med. 1, 5 (2014), https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-014-0144-z.

terminate a pregnancy to avoid exposing a child to violence.[44] And many survivors have children whom they already struggle to protect from an abusive partner.[45]

Indeed, abortion care is lifesaving medical care for many survivors. Every pregnancy carries some level of risk. But unintended pregnancies have significantly greater risks of pregnancy complications and poor birth outcomes.[46] These problems are compounded for survivors of IPV. It is common for abusers to prevent survivors from making or keeping medical appointments, restricting access to transportation, or from having private conversations with health care providers.[47] Abusers also use financial exploitation to control a survivor's medical care—by refusing to make co-payments or provide insurance.[48] Even when survivors are able to travel for appointments, abusive partners can reframe the survivor's injuries when speaking to healthcare professionals.[49]

As a result, IPV survivors are less likely to receive prenatal care and more likely to miss doctors' appointments than pregnant people in non-violent relationships, all of which increases the risks of further harm to them.[50] Pregnant people experiencing IPV are also at high risk of depression and post-traumatic stress disorder and at increased risk of having babies preterm and

---

[44] Karuna S. Chibber et al., *The Role of Intimate Partners in Women's Reasons for Seeking Abortion*, 24 Women's Health Issues e131, e134 (2014).

[45] *See, e.g.*, Joan S. Meier, *Domestic Violence, Child Custody, and Child Protection: Understanding Judicial Resistance and Imagining the Solutions*, 11 Am. U. J. Gender Soc. Pol'y & L. 657 (2003) (discussing difficulties parent survivors face in protecting children from physical harm and navigating courts for custody and protective orders).

[46] Judith McFarlane, *Pregnancy Following Partner Rape: What We Know and What We Need to Know*, 8 Trauma, Violence, & Abuse 127, 130 (2007); *see also Unintended Pregnancy in United States*, America's Health Rankings: United Health Foundation, https://www.americashealthrankings.org/explore/measures/unintended_pregnancy.

[47] Nat Stern et al., *Unheard Voices of Domestic Violence Victims: A Call to Remedy Physician Neglect*, 15 Geo. J. Gender & L. 613, 633 (2014).

[48] *Id.*

[49] *Id.* at 633-634 (one survivor reporting: "my [abusive] husband, who is a doctor, would always make sure he was with me at my doctor appointments and would never leave me alone with any doctor.")

[50] Gunnar Karakurt et al., *Mining Electronic Health Records Data: Domestic Violence and Adverse Health Effects*, 3 J. of Fam. Violence 79, 79–87 (2017).

babies with low birth weight.[51] Survivors in rural areas have a particularly difficult time accessing care: Rural areas have significantly fewer primary care physicians and fewer hospitals with obstetric care.[52]

Survivors of color are further burdened by the effects of transgenerational racism and poverty on their health, making them especially vulnerable to pregnancy-related complications.[53] While the United States as a whole has a maternal mortality rate over three times that of other developed nations,[54] the rates for women of color are strikingly higher: Black women die three times as often as white women, and American Indian and Alaskan Native women die twice as often.[55] Moreover, Black, American Indian, Alaskan Native, Native Hawaiian, and Pacific Islander women are generally more likely to have preterm births and babies with low birthweights.[56] Asian American and Pacific Islander women are at greater risk of severe maternal morbidities and maternal mortality compared to white women.[57] Immigrant women are at higher risk because they tend to receive less prenatal care than non-immigrant women, in part due to exclusionary health insurance laws and policies.[58]

---

[51] Jeanne Alhusen, *Intimate Partner Violence During Pregnancy: Maternal and Neonatal Outcomes*, 24 J. Womens Health (Larchmt) 100, 100–06 (2015).

[52] Issue Brief: Improving Access to Maternal Health Care in Rural Communities, Center for Medicare & Medicaid Services 3, 8, 10 (2019), https://www.cms.gov/About-CMS/Agency-Information/OMH/equity-initiatives/rural-health/09032019-Maternal-Health-Care-in-Rural-Communities.pdf.

[53] Cynthia Prather et al., *Racism, African American Women, and Their Sexual and Reproductive Health: A Review of Historical and Contemporary Evidence and Implications for Health Equity*, 2 Health Equity 249, 253 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6167003/pdf/heq.2017.0045.pdf.

[54] Munira Z. Gunja et al., *The U.S. Maternal Mortality Crisis Continues to Worsen: An International Comparison*, The Commonwealth Fund (Dec. 1, 2022), https://www.commonwealthfund.org/blog/2022/us-maternal-mortality-crisis-continues-worsen-international-comparison.

[55] Latoya Hill et al., *Racial Disparities in Maternal and Infant Health: Current Status and Efforts to Address Them*, Kaiser Family Foundation (2022), https://www.kff.org/racial-equity-and-health-policy/issue-brief/racial-disparities-in-maternal-and-infant-health-current-status-and-efforts-to-address-them/.

[56] *Id.*

[57] Maryam Siddiqui et al., *Increased Perinatal Morbidity and Mortality Among Asian American and Pacific Islander Women in the United States*, 124 Anesth Analg. 879 (2017).

[58] Sheela Maru et al., *Utilization of Maternal Health Care Among Immigrant Mothers in New York City, 2016–2018*, 98 J. Urban Health 711, 711–26 (2021).

Not only do pregnant people in abusive relationships face increased health risks associated with pregnancy; they are likely to suffer more, and more intense, violence during pregnancy.[59] IPV is common in pregnancy: Intimate partner violence affects as many as 324,000 pregnant women each year.[60] And IPV can and does escalate to homicide.[61] Homicide is one of the  leading causes of maternal death all across the United States[62], and the second-leading cause of pregnancy-associated death in Louisiana.[63]Most cases of pregnancy-associated homicide involve domestic violence.[64] Homicide is highest among Black women and women under 25 years of age.[65] Access to abortion is a matter of life or death for some survivors: Researchers have found an association between increased state-based limits on abortion access and increased rates of IPV-related homicide.[66]

Meaningful access to abortion care is critical to IPV survivors' ability to escape abusive relationships. Having a child, or another child, with an abusive partner can exacerbate challenges survivors face in finding housing upon leaving the abuser, increasing the risk of homelessness.[67]

---

[59] Beth A. Bailey, *Partner Violence During Pregnancy: Prevalence, Effects, Screening, and Management*, 2 Int'l J. Women's Health 183 (2010); *see also* Julie A. Gazmararian et al., *Prevalence of Violence Against Pregnant Women*, 275 JAMA 1915, 1918 (1996).

[60] *Intimate Partner Violence Screening Fact Sheet and Resources*, National Center for Excellence in Primary Care Research, Agency for Healthcare Research and Quality, https://archive.ahrq.gov/ncepcr/tools/healthier-pregnancy/fact-sheets/intimate-partner-violence-provider-fact-sheet.pdf.

[61] Alexia Cooper & Erica L. Smith, *Homicide Trends in the United States, 1980–2008, Annual Rates for 2009 and 2010* at 10 (2011), U.S. Dep't Just., Bureau of Just. Stats., http://bjs.gov/content/pub/pdf/htus8008.pdf (between 1980 and 2008 40% of homicides of women were committed by intimate partners).

[62] Maeve Wallace, *Trends in Pregnancy Associated Homicide, United States 2020*, 112 Am J Public Health 1333-36 (2022) .

[63] Louisiana Dept. of Health, *Louisiana Pregnancy-Associated Mortality Review: Maternal Morality in Louisiana 2020 Report* 13-14 (2020) https://ldh.la.gov/assets/oph/Center-PHCH/FamilyHealth/2020_PAMR_Report_April2024.pdf (also reporting that homicide was a top cause of pregnancy-associated deaths for Black women).

[64] *See* Wallace, *supra* note 62.

[65] *Id.* at 1334; Emiko Petrosky et al., *Racial and Ethnic Differences in Homicides of Adult Women and the Role of Intimate Partner Violence — United States, 2003–2014*, 66 Morbidity and Mortality Weekly Rep. 741 (July 21, 2017).

[66] Maeve Wallace et al., *States' Abortion Laws Associated With Intimate Partner Violence-Related Homicide Of Women And Girls In The US, 2014-20*, 43(5) Health Aff (Millwood) 682 (2024).

[67] *See* Carmela DeCandia et al., *Closing the Gap: Integrating Services for Survivors of Domestic Violence Experiencing Homelessness*, The National Center on Family Homelessness 4 (2013),

If a survivor who is coerced into pregnancy goes on to have a child with the abuser, it becomes even more difficult for the survivor to sever that abusive relationship.[68] The survivor must navigate the legal system to obtain custody and ensure protective parenting arrangements, commonly without legal advice or representation.[69] Violent partners have learned to use this system to their advantage to continue the abuse.[70] Nationwide, abusive fathers are more likely to seek child custody than non-abusive fathers, and they succeed more than 70 percent of the time.[71] When the legal system forces an ongoing relationship with an abuser, IPV survivors have less trust in systems and may become more isolated from support.[72]

Notably, pregnancy termination can improve survivors' circumstances. Research shows that "having a baby from an unwanted pregnancy appears to result in sustained physical violence over time."[73] In contrast, "having an abortion was associated in a reduction over time in physical violence" from the abuser.[74]

## II.    Reducing Access to Mifepristone Will Have Grave Consequences for the Lives and Health of Intimate Partner Violence Survivors.

Preliminary relief should preserve the status quo and prevent irreparable harm. *See City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). Granting the nationwide

---

https://www.air.org/sites/default/files/2021-06/Closing%20the%20Gap_Homelessness%20and%20Domestic%20Violence%20toolkit.pdf.

[68] *See, e.g.*, Naomi R. Cahn, *Civil Images of Battered Women: The Impact of Domestic Violence on Child Custody Decisions*, 44 Vand. L. Rev. 1041, 1051 (1991).

[69] *See, e.g.*, 2015 Washington State Civil Legal Needs Study Update, Civil Legal Needs Study Update Committee, Washington State Supreme Court 15 (Oct. 2015), https://www.courts.wa.gov/disability-justice-task-force/public/OCLA-2015-Civil-Legal-Needs-Study-Update.pdf; Carmody and Assocs., *The Justice Gap in Montana: As Vast as Big Sky Country* 24 (2014), https://courts.mt.gov/External/supreme/boards/a2j/docs/justicegap-mt.pdf.

[70] Ellen Gutowski & Lisa Goodman, *Coercive Control in the Courtroom: the Legal Abuse Scale (LAS)*, 28 J. of Family Violence 527 (2023).

[71] Am. Bar Ass'n Comm'n on Domestic Violence, *10 Custody Myths and How to Counter Them*, 4 ABA Comm'n on Domestic Violence Quarterly E-Newsletter 3 (July 2006), https://xyonline.net/sites/xyonline.net/files/ABACustodymyths.pdf.

[72] Mary Prezkop, *One More Battleground: Domestic Violence, Child Custody, and the Batterers' Relentless Pursuit of their Victims Through the Courts*, 9 Seattle J. Soc. Just. 1053 (2011).

[73] Roberts et al., *supra* note 43 at 5.

[74] *Id.*

restrictions Plaintiffs seek in this case would do the opposite, taking away pregnant IPV survivors' ability to make choices about their own bodies and protect their own health and safety. As explained *supra*, being forced to carry a pregnancy to term exposes survivors of IPV to a higher likelihood of further violence, including homicide, and poses significant health risks. Indeed, it could cost some pregnant people their lives.

Reinstating the In-Person Dispensing Requirement would increase barriers to medication abortion for survivors of IPV across the United States, with grave consequences for their health and well-being.

Reducing abortion access harms survivors. Research has shown a significant increase in IPV rates in areas with limited access to abortion, including Louisiana.[75] Removing telemedicine options is especially harmful to survivors. The availability of telehealth, the ability to fill prescriptions at local pharmacies, and the ability to receive medication by mail are essential to survivors of IPV because these options reduce both the cost of abortion care and the barriers of having to pay for and arrange transportation, childcare, and time off work outside the surveillance of an abuser. See *supra* I.B. Indeed, in-home medication abortion is often a survivor's only option for abortion care because the survivor must obtain care without the abuser finding out.[76] Having a variety of options for accessing that care—in one's home via telehealth or from a local provider—helps survivors maintain safety and privacy.

The need for telehealth-based abortion care is especially acute for survivors who live in rural areas. Survivors in rural America need access to abortion: They are more likely to face

---

[75] Dhaval Dave et al., *Abortion restrictions and intimate partner violence in the Dobbs Era*, 104 J. Health Econ. 103074 (2025).
[76] Yvonne Lindgren, *The Doctor Requirement: Griswold, Privacy, and at-Home Reproductive Care*, 32 Const. Comment. 341, 373 (2017).

chronic and severe IPV and have worse psychosocial and physical health outcomes.[77] If rural survivors of IPV cannot access mifepristone by mail, many will have to travel long distances to get an abortion, increasing the risk that their abuser will find out—with potentially deadly consequences. Indeed, reinstating the In-Person Dispensing Requirement would jeopardize not only their ability to end pregnancy but also their lives.

Requiring in-person dispensing of mifepristone by providers—which means that clinicians who wish to prescribe this medication to their patients can do so only if they also have the ability to stock and dispense it onsite—will also reduce the number of providers that IPV survivors can turn to for medication abortion.[78] Family physicians who might otherwise provide mifepristone-based abortions as one of their services have described the in-person dispensing requirement as a barrier to providing medication abortion because it necessitated that the provider stock, dispense, and bill for the medication onsite at their facility, requiring extra administrative steps and involvement of clinic administration.[79] When there are fewer providers available and telehealth is not an option, people who want a medication abortion will be forced to travel long distances and wait longer for appointments to get the care they need.

Survivors who must travel longer distances for abortion care will face greater difficulty hiding their abortion from an abusive partner. Compared to people in non-violent relationships, IPV survivors are three times as likely to conceal their abortion from their partner.[80] For the many

---

[77] Katie Edwards et al., *Intimate Partner Violence and the Rural-Urban-Suburban Divide: Myth or Reality? A Critical Review of the Literature*, 16 Trauma, Violence, & Abuse 359 (2015).
[78] U.S. Food and Drug Administration, Medical Review of Mifepristone (Application No. NDA  020687), Center for Drug Evaluation and Research, Dkt. 1, Exh. 51 (Oct. 6, 2025) (finding a "potential for doubling of the number of prescribers of mifepristone if the in-person dispensing requirement in ETASU C is removed from the Mifepristone REMS Program.")
[79] Na'amah Razon et al., *Exploring the Impact of Mifepristone's Risk Evaluation and Mitigation Strategy (REMS) on the Integration of Medication Abortion into US Family Medicine Primary Care Clinics*, 109 Contraception 19, 20–21 (2022).
[80] Hall et al., *supra* note 32, at 25.

survivors who are subject to reproductive coercion by their partners, traveling to a clinic or hospital may not be an option. Travel is costly, both financially—such as hotel costs, gas, or flights—and in time spent away from work and care-giving responsibilities.[81] Many IPV survivors have children and need to arrange childcare to go to medical appointments. Childcare options are limited for people who lack funds, want to keep their need for an abortion private, and/or are isolated from friends and family. These costs will be prohibitive for many survivors of IPV, who disproportionately face economic hardship and financial control by their partners.[82]

For survivors of color and immigrant survivors, discrimination and structural oppression exacerbate the barriers to abortion when telemedicine is unavailable. Transportation is a major barrier.[83] Missing work and traveling are costly, and Black and Latinx women tend to have significantly lower wages than white women and men.[84] Lack of health insurance can also limit access to abortion care. American Indian, Alaskan Native, and Latinx people are the most likely to be uninsured, followed by Black, Native Hawaiian, and Pacific Islander people.[85] Reinstating the In-Person Dispensing Requirement for mifepristone would compound the many barriers to care that survivors of IPV already face. As a result, some simply will not be able to access abortion care at all.

### III.   Undoing the 2023 REMS Will Not Prevent Reproductive Coercion and Will Instead Give More Power to Abusers By Limiting Survivors' Health Options.

As described *supra*, reproductive coercion takes many forms. Preventing reproductive

---

[81] Alexandra Thompson et al., *The Disproportionate Burdens of the Mifepristone REMS*, 104 Contraception 16, 17 (2021).
[82] Sussman et al., *supra* note 14, at 1, 4.
[83] *Car Access: Everyone Needs Reliable Transportation Access and In Most American Communities that Means a Car*, National Equity Atlas, https://nationalequityatlas.org/indicators/Car_access (last visited Apr. 28, 2023).
[84] *Fact Sheet: Gender and Racial Wage Gaps Persist as the Economy Recovers*, Institute for Women's Policy Research 2 (Sept. 2022), https://iwpr.org/wp-content/uploads/2022/10/Annual-Gender-Wage-Gap-by-Race-and-Ethnicity-2022.pdf.
[85] Artiga et al., *supra* note 36.

coercion requires a wide range of interventions to reduce IPV and give survivors the tools, resources, and support that they need to escape abuse. Interventions that have been effective at reducing IPV include individual support, counseling, economic empowerment, community mobilization, and IPV screening and referrals.[86] Response systems must also be ready to provide immediate assistance to survivors who are in or are leaving dangerous situations. This includes investment in survivor-centered services, safe housing programs, civil legal protections, and responsive healthcare.[87] Effective support must ensure that survivors can safely discern and access their reproductive choices without fear of harm.

No one should ever be forced to have, continue, or end a pregnancy against their will. Just as stories of pregnant people having their birth control sabotaged, being raped, or being blocked from accessing health care are horrific, so too are stories of pregnant people being forced or tricked into taking mifepristone. We must take these incidents seriously *and* recognize that broadly ending patients' ability to obtain mifepristone through telemedicine is neither a proportionate nor effective response to intimate partner violence. An abusive partner in Louisiana can already be prosecuted for offenses such as domestic or dating partner battery, aggravated assault of a partner, and drug-facilitated harm.[88] Abusers who are willing to deceive medical providers to get mifepristone and then drug their partners in violation of criminal and civil laws will find other ways to interfere with

---

[86] Ema Alsina et al., *Interventions to Prevent Intimate Partner Violence: A Systematic Review and Meta-Analysis*, 30(3-4) Violence Against Women 953-980 (2024).

[87] Phyllis Holditch Niolonet al., *Preventing Intimate Partner Violence Across the Lifespan: A Technical Package of Programs, Policies, and Practices*, Nat'l Center for Injury Prevention & Control, Division of Violence Prevention (2017), https://stacks.cdc.gov/view/cdc/45820.

[88] LA Rev. Stat. § 14:38.1 (mingling harmful substances); LA Rev. Stat. § 40:969D (unlawful administration or dispensing of controlled dangerous substances); LA Rev. Stat. § 14:35.3 (domestic abuse); LA Rev. Stat. § 14:34.9 (battery of a dating partner); LA Rev. Stat. § 14.37.7 (domestic abuse aggravated assault). Louisiana has also adopted coercive control principles in its response to domestic violence, calling the harm "power-based violence." LA Rev. Stat. § 17:3399.13 (2025) (mandatory reporting of power-based violence in the education system); Univ. of Louisiana Monroe Police Dept. Power-Based Violence Crime Statistics Report (2024), https://www.ulm.edu/police/power-based_violence_crime_report_october_1_2024.pdf (defining domestic violence, dating violence, aggravated assault, and family violence as power-based crimes).

their partners' pregnancies if telemedicine is no longer available.[89] Making health care harder to access in the name of protecting survivors is misguided and counterproductive: The restrictions Louisiana demands will harm survivors who need abortion care for their health and safety.

## CONCLUSION

This Court should recognize that for many survivors of IPV, accessing abortion care is critical to their health and safety because being forced to carry an unintended pregnancy to term increases survivors' risks of suffering further violence, including homicide, and poses significant health risks.

There is no evidence-based reason for reinstating the In-Person Dispensing Requirement. Plaintiffs' requested relief would have sweeping effects all across the nation, upending how abortion and miscarriage care is delivered and causing serious harm to the public—especially survivors of violence and abuse. *Amici* respectfully urge the Court to deny Plaintiffs' motion.

Dated: February 20, 2026.

Respectfully submitted,

*/s/ Rebekka C. Veith*
Rebekka Veith, La. Bar No. 36062
MILLER THIBODEAUX DYSART
VEITH & PASCHAL, LLC
643 Magazine Street, Ste. 405
New Orleans, LA 70130
(504) 977-9140 (Telephone)
(504) 977-9151 (Facsimile)
rveith@mtdvp.com

*/s/ Robin M. Turner*
Robin M. Turner, *pro hac vice*
Legal Voice
P.O. Box 582
Missoula, MT  59806
(206) 682-9552 x 110
rturner@legalvoice.org

---

[89] National Domestic Violence Hotline *supra* note 26, at 13 (9% of survey respondents reported current or former partner threatened violence if termination of pregnancy was under consideration).